## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

JOSEPH FERRARI, as Administrator of the Estate of CHRISTINE FERRARI; LEOVA JENKINS, as Administrator of the Estate of ELOISE BROOKS; IRASEMA RIVERA, as Administrator of the Estate of PAUL RIVERA; JOSE MONGE, as Administrator of the Estate of BLANCA NIEVES, STACIE DRUCKMAN, as Administrator of the Estate of ARTHUR DRUCKMAN; DELORIS PEOPLES, as Proposed Administrator of the Estate of ALEX PEOPLES; SANDRA THOMAS-WATSON, as Administrator of the Estate of BELINDA THOMAS; and PATRICIA BIONDI, as Executor of the Estate of MICHAEL BIONDI,  for themselves and on behalf of all others similarly situated,

**CLASS ACTION COMPLAINT AND JURY TRIAL DEMAND**

**Civil Action No:**

*Plaintiff(s),*

*-against-*

ANDREW M. CUOMO, HOWARD A. ZUCKER, MELISSA DEROSA, SALLY DRESLIN, JOHN DOES and JANE DOES 1-30,

*Defendant(s).*

Plaintiffs, individually and on behalf of others similarly situated, by their attorneys, Napoli & Shkolnik PLLC, and by way of Class Action Complaint against Defendants, very respectfully state, allege, and pray as follows:

### NATURE OF THE CASE

1.      This is a class action suit for damages brought by Joseph Ferrari as Administrator of the Estate of Christine Ferrari, Leova Jenkins as Administrator of the Estate of Eloise Brooks, Irasema Rivera as Administrator of the Estate of Paul Rivera, Jose Monge as Administrator of the Estate of Blanca Nieves, Stacie Druckman as Administrator of the Estate of Arthur Druckman,

1

Deloris Peoples as Administrator of the Estate of Alex Peoples, Sandra Thomas-Watson as Administrator of the Estate of Belinda Thomas, and Patricia Biondi as Executor of the Estate of Michael Biondi, on behalf of themselves and on behalf of all other similarly situated individuals ("collectively, Plaintiffs"), complaining against Andrew M. Cuomo, Howard A. Zucker, Sally Dreslin, Melissa DeRosa, and other currently unknown public officials of the State of New York, in their individual capacities ("collectively Defendants"), who acting under color of state law, (1) issued a lethal policy on March 25, 2020 ("the March 25th Directive"), that effectively ordered nursing homes to take back residents who had been discharged from hospitals after being treated for COVID-19 infection, regardless of their positive status, and (2) willfully misled and disinformed the nursing home residents of the State of New York and their next of kin, including Plaintiffs, by distorting and withholding public health information which was critical to the understanding of the real toll the infectious disease was having on this most vulnerable population, so that effective strategies could be devised to affront the crisis grounded on reliable data and information. The Defendants' shocking, wanton, conspiratorial, and disturbing actions had the targeted effect of specifically and foreseeably condemning elderly, mentally, and physically disabled nursing home residents to their deaths, depriving them of their constitutional and federal statutory rights.

- "*It wasn't just an executive order – it was a **declaration of eldercide** in the State of New York*" (*emphasis added*) – Assemblyman Ron Kim (D-Queens)[1].

- "*This approach will introduce the highly contagious virus into more nursing homes. There will be **more hospitalizations** for nursing home residents who need ventilator care and ultimately, a **higher number of deaths**. Issuing such an order is a mistake...*"*(emphasis added)* Mark Parkinson, President & CEO of the American Health Care Association.[2]

---

[1] https://nypost.com/2022/03/23/ny-pols-mark-2-year-anniversary-of-cuomo-nursing-home-order/
[2] https://www.ahcancal.org/News-and-Communications/Press-Releases/Pages/Long-Term-Care-Leaders-Address-State-Orders-on-Hospital-Admissions-to-Nursing-Homes.aspx

- *"I think it was an **utter lack of regard** for nursing home residents." (emphasis added)* Richard Mallot, executive Director of the New York-based Long Term Care Community Coalition.[3]

- "*The public was **misled** by those at the highest level of state government through **distortion and suppression of the facts** when New Yorkers deserved the truth*". Thomas DiNapoli, Comptroller of the State of New York.[4]

## JURISDICTION AND VENUE

2.      This Court has original subject matter jurisdiction pursuant to 28 U.S.C. §1331, 28 U.S.C. §1343(a)(3), 28 U.S.C. §1343(a)(4), 42 U.S.C. §1983, and 42 U.S.C. §1988.

3.      This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. §1367.

4.      Venue is proper in the U.S. District Court for the Southern District of New York pursuant to 28 U.S.C. §1391(b)(1) and 28 U.S.C. §1391(b)(2).

## THE PARTIES

### I.    Named Plaintiffs

### The Estate of Christine Ferrari by her Administrator, Joseph Ferrari

5.      Plaintiff, Joseph Ferrari, is the Administrator of the Estate of his deceased spouse, Christine Ferrari, and a resident of the State of New York, County of Westchester.

6.      Christine Ferrari was a resident at Yonkers Center for Nursing and Rehabilitation, located at 115 South Broadway, Yonkers, NY 10701, from on around January 2020, until on or around April 23, 2020.  She was admitted for short-term rehabilitation services.

7.      From March 25, 2020, through May 8, 2020, per preliminary data released by the Department of Health in response to a New York Freedom of Information Law request made by

---

[3]          https://www.statnews.com/2021/02/26/cuomos-nursing-home-fiasco-ethical-perils-pandemic-policymaking/

[4]     https://www.osc.state.ny.us/press/releases/2022/03/dinapoli-states-pandemic-response-nursing-homes-hindered-ill-prepared-state-agency

USA Today Network, Yonkers Center for Nursing and Rehabilitation reportedly had at least 30 COVID-19 positive admissions and/or readmissions they were forced to take in from hospitals. The data was produced while Defendants were the public officials in charge of disclosing the information, so they are of questionable integrity and the numbers could be higher.

8.      After the issuance of the March 25th Directive, Christine Ferrari became unnecessarily exposed to, and infected with, COVID-19 at Yonkers Center for Nursing and Rehabilitation. The March 25th Directive contributed to the nursing home experiencing an increase in positive COVID cases during that time.

9.      On or around April 23, 2020, she was transferred to St. John's Riverside Hospital with difficulty breathing.  There, she tested positive for COVID-19 and was put on a ventilator.

10.      Christine Ferrari died on April 27, 2020, due to septic shock caused by COVID-19 infection.

11.      Audrey Campbell, a certified nursing assistant in Yonkers Center for Nursing and Rehabilitation reported that resident deaths began when the nursing home started bringing in COVID-19 patients from nearby hospitals, because of the March 25th Directive.  "We had no idea what was going on, in the beginning," she said. "We didn't even know what was happening until people started getting sick."[5]

12.      At the time of her infection and death from COVID-19, Defendants were actively, willfully, and intentionally conspiring to undercount and underreport nursing home deaths to hide the truth about the devastating effects of the virus in nursing homes.

---

[5] https://www.thecut.com/2021/04/new-yorks-nursing-homes-covid-cuomo.html

**The Estate of Eloise Brooks by her Administrator, Leova Jenkins**

13.    Plaintiff, Leova Jenkins, is the Administrator of the Estate of her mother, Eloise Brooks, and a resident of the State of New York, County of New York.

14.    Eloise Brooks was a resident at Upper East Side Rehabilitation and Nursing Center, located at 211 East 78th Street, New York, NY 10021, from around November 2019, until on or around April 9, 2020.  She had been admitted for rehabilitation services following right hip surgery.

15.    From March 25, 2020, through May 8, 2020, per preliminary data released by the Department of Health because of a New York Freedom of Information Law request, Upper East Side Rehabilitation and Nursing Center reportedly had at least 110 COVID-19 positive admissions and 44 readmissions they were forced to take in from hospitals.  This data was produced while Defendants were the public officials disclosing the information, so it is of questionable integrity and the numbers could be higher.

16.    After the issuance of the March 25th Directive, Eloise Brooks became unnecessarily exposed to, and infected with, COVID-19 at Upper East Side Rehabilitation and Nursing Center. The March 25th Directive contributed to the nursing home experiencing an increase in positive COVID cases during that time.

17.    On April 9, 2020, she was sent from Upper East Side Rehabilitation and Nursing Center to Lenox Hill Hospital with difficulty breathing, shortness of breath, and hypoxia.  At the hospital, she tested positive for COVID-19.  She died five days later, on April 14, 2020.

18.    By the end of May 2020, upon belief and information, Upper East Side Rehabilitation and Nursing Center had reported over 200 positive COVID-19 cases in their facility among staff and residents, and at least 89 of its residents had died from COVID-19.

**The Estate of Paul Rivera by her Administrator, Irasema Rivera**

19.     Plaintiff, Irasema Rivera, is the Administrator of the Estate of her father, Paul Rivera, and a resident of Charlotte, North Carolina.

20.     Paul Rivera was a resident at Workmen's Circle MultiCare Center, located at 3155 Grace Avenue, Bronx, NY 10469, from on or round 2012, until on or around May 4, 2020. He was admitted for long-term care.

21.     From March 25, 2020, through May 8, 2020, Workmen's Circle MultiCare Center had reported at least 108 COVID-19 positive admissions and 61 readmissions they were forced to take in from hospitals.[6]  The data was produced while Defendants were the public officials disclosing the information, so it is of questionable integrity and the numbers could be higher.

22.     After the issuance of the March 25th Directive, Paul Rivera became unnecessarily exposed to, and infected with, COVID-19 at Workmen's Circle MultiCare Center.  The March 25th Directive contributed to the nursing home experiencing an increase in positive COVID cases during that time.

23.     On or around May 4, 2020, Paul Rivera was moved to the Albert Einstein Hospital due to seizures and having contracted COVID-19.  He passed away on May 12, 2020.

24.     By the end of May 2020, upon belief and information, Workmen's Circle MultiCare Center had reported over 300 positive COVID-19 cases in their facility among staff and residents, and at least 66 of its residents had died from COVID-19.

25.     At the time of her infection and death from COVID-19, Defendants were actively, willfully, and intentionally conspiring to undercount and underreport nursing home deaths to hide the truth about the devastating effects of the virus in nursing homes.

---

[6] Per preliminary data released by the Department of Health because of a New York Freedom of Information Law request made by USA TODAY Network.

**The Estate of Blanca Nieves by her Administrator, Jose Monge**

26.     Plaintiff, Jose Monge, is the Administrator of the Estate of his mother, Blanca Nieves, and a resident of the State of New York, Bronx County.

27.     Blanca Nieves was a resident at Bronx Center for Nursing and Rehabilitation, located at 101 Underhill Avenue, Bronx, NY 10472, from on or around 2016 until on or around April 18, 2020.  She was admitted for long-term care due to dementia. There were no other known pre-existing health conditions.

28.     From March 25, 2020, through May 8, 2020, Bronx Center for Nursing and Rehabilitation had reported at least 65 COVID-19 positive admissions and/or readmissions they were forced to take in from hospitals.[7]  The data was produced while Defendants were the public officials disclosing the information, so it is of questionable integrity and the numbers could be higher.

29.     After the issuance of the March 25th Directive, Blanca Nieves became unnecessarily exposed to, and infected with, COVID-19 at Bronx Center for Nursing and Rehabilitation. The March 25th Directive contributed to the nursing home experiencing an increase in positive COVID cases during that time.

30.     Blanca Nieves was transported to the hospital due to difficulty breathing. She ended up staying for a couple of weeks.  At this point, the family was told there is nothing else to be done so they transferred to hospice where she died on May 13, 2020.

31.     At the time of her infection and death from COVID-19, Defendants were actively, willfully, and intentionally conspiring to undercount and underreport nursing home deaths to hide the truth about the devastating effects of the virus in nursing homes.

---

[7] Per preliminary data released by the Department of Health because of a New York Freedom of Information Law request.

**The Estate of Arthur Druckman by his Administrator, Stacie Druckman**

32.     Plaintiff, Stacie Druckman, is the Administrator of the Estate of her father, Arthur Druckman, and a resident of the State of New York, Bronx County.

33.     Arthur Druckman was a resident at Morningside Nursing and Rehabilitation Center, located at 1000 Pelham Parkway South, Bronx, NY 10461, from on or around 2017 until on or around April 5, 2020.

34.     From March 25, 2020, through May 8, 2020, Morningside Nursing and Rehabilitation Center had reported at least 55 COVID-19 positive admissions and/or readmissions they were forced to take in from hospitals.[8]  The data was produced while Defendants were the public officials disclosing the information, so it is of questionable integrity and the numbers could be higher.

35.     After the issuance of the March 25th Directive, Arthur Druckman became unnecessarily exposed to, and infected with, COVID-19 at Morningside Nursing and Rehabilitation Center.   The March 25th Directive contributed to the nursing home experiencing an increase in positive COVID cases during that time.

36.     Arthur Druckman was transported to Jacobi Medical Center due to difficulty breathing.  He passed away from complications due to COVID-19 on April 17, 2020.

37.     At the time of her infection and death from COVID-19, Defendants were actively, willfully, and intentionally conspiring to undercount and underreport nursing home deaths to hide the truth about the devastating effects of the virus in nursing homes.

---

[8] Per preliminary data released by the Department of Health because of a New York Freedom of Information Law request.

**The Estate of Alex Peoples, by his Proposed Administrator, Deloris Peoples**

38.     Plaintiff, Deloris Peoples, is the Proposed Administrator of the Estate of her brother, Alex Peoples, and a resident of the State of New York, Westchester County.

39.     Alex Peoples was a resident at Triboro Center for Rehabilitation and Nursing, located at 1160 Teller Avenue, Bronx, NY 10461, from on or around January 2017, until on or around April 10, 2020.

40.     From March 25, 2020, through May 8, 2020, Triboro Center for Rehabilitation and Nursing had reported at least 60 COVID-19 positive admissions and/or readmissions they were forced to take in from hospitals.[9]   The data was produced while Defendants were the public officials disclosing the information, so it is of questionable integrity and the numbers could be higher.

41.     After the issuance of the March 25th Directive, Alex Peoples became unnecessarily exposed to, and infected with, COVID-19 at Triboro Center for Rehabilitation and Nursing. The March 25th Directive contributed to the nursing home experiencing an increase in positive COVID cases during that time.

42.     Alex Peoples was transported to Bronx Lebanon Medical Center due to difficulty breathing.   He passed away from complications due to COVID-19 on April 13, 2020.

43.     At the time of his infection and death from COVID-19, Defendants were actively conspiring to undercount and underreport nursing home deaths to hide the truth about the devastating effects of the virus in nursing homes, willfully and intentionally.

---

[9] Per preliminary data released by the Department of Health because of a New York Freedom of Information Law request.

**The Estate of Belinda Thomas, by her Administrator, Sandra Thomas-Watson**

44.     Plaintiff, Sandra Thomas-Watson, is the Administrator of the Estate of her mother, Belinda Thomas, and a resident of the State of New York, Richmond County.

45.     Belinda Thomas was a resident at Clove Lakes Health Care and Rehabilitation Center Inc., located at 25 Fanning Street, Staten Island, NY 10314, from on or around 2018 until on or around April 21, 2020.  She was admitted for rehabilitation services following a stroke.

46.     From March 25, 2020, through May 8, 2020, Clove Lakes Health Care and Rehabilitation Center Inc. had reported at least 55 COVID-19 positive admissions and/or readmissions they were forced to take in from hospitals.[10]  The data was produced while Defendants were the public officials disclosing the information, so it is of questionable integrity and the numbers could be higher.

47.     After the issuance of the March 25th Directive, Belinda Thomas became unnecessarily exposed to, and infected with, COVID-19 at Clove Lakes Health Care and Rehabilitation Center Inc.  The March 25th Directive contributed to the nursing home experiencing an increase in positive COVID cases during that time.

48.     Belinda Thomas was transported to Richmond University Medical Center due to difficulty breathing.  She ended up staying for a couple of weeks.  At the hospital it was confirmed that Belinda Thomas had COVID-19. She was put on a ventilator, passing away on May 1, 2020.

49.     At the time of her infection and death from COVID-19, Defendants were actively conspiring to undercount and underreport nursing home deaths to hide the truth about the devastating effects of the virus in nursing homes, willfully and intentionally.

---

[10] Per preliminary data released by the Department of Health because of a New York Freedom of Information Law request.

**The Estate of Michael Bondi, by his Executor, Patricia Biondi**

50.    Plaintiff, Patricia Biondi, is the Executor of the Estate of her deceased spouse, Michael Bondi, and a resident of the State of New York, Dutchess County.

51.    Michael Bondi was a resident at North Westchester Restorative Therapy and Nursing Center, located at 3550 Lexington Avenue, Mohegan Lake, NY 10547, from October 16, 2020, until on or around November 19, 2020.  He was admitted for subacute rehabilitation services after suffering a fall.  After his rehabilitation, the plan was to be discharged to his home.

52.    Michael Bondi became exposed to and infected with COVID-19 at North Westchester Restorative Therapy and Nursing Center.  Michael Biondi was admitted to Hudson Valley Hospital in November 2020 because he was COVID-19 positive and had low oxygen saturation and difficult breathing.  He passed away on November 24, 2020. From complications due to COVID-19 infection.

53.    At the time of his admission to North Westchester Restorative Therapy and Nursing Center and subsequent infection and death from COVID-19, Defendants were actively conspiring to undercount and underreport nursing home deaths to hide the truth about the devastating effects of the virus in nursing homes, willfully and intentionally.

54.    A January 28, 2021, report issued by the Office of the Attorney General entitled *Nursing Home Response to the COVID-19*, they estimated that the full death toll was 50% higher than what had been officially reported.

55.    For more than 11 months, Defendants conspired to suppress, distort, manipulate and flat-out lie to the citizens of the State of New York, and specifically nursing home residents and their next of kin like herein Plaintiffs.

56.     These willful and grossly reckless actions contributed to a false sense of security and hindered the implementation and execution of better strategies devised to protect the life of our beloved elders, which led to the deaths of thousands of nursing home residents, including one Michael Bondi and other similarly situated individuals.

## II.     The Proposed Classes

57.     The above-named Plaintiffs, pursuant to Rule 23 of the Federal Rules of Civil Procedure, seek to certify two classes of similarly situated individuals representing the estates of elderly, mentally, and physically disabled nursing home residents across the State of New York, as defined below (the "Proposed Classes").

**<u>Class 1</u>**

(1) Comprised of individuals who were nursing home residents, contracted COVID-19 and died after the March 25th Directive came into effect compelling nursing homes to admit and readmit patients discharged from hospitals even if they were positive for COVID-19 ("Class 1"). We estimate Class 1 is potentially comprised of more than 7,000.

**<u>Class 2</u>**

(2) Comprised of individuals who were nursing home residents, contracted COVID-19 and died during the period Defendants were actively conspiring to suppress, distort, manipulate public health information about the reality of the infection in nursing home settings ("Class 2"). We estimate Class 2 is potentially comprised of more than 8,000.

56.     Certification of the Proposed Classes would be appropriate because:

    a.    *The Proposed Classes are so numerous that joinder of all members is impracticable*. We estimate that between them, Class 1 and Class 2 are comprised by more than 15,000 individuals, which potentially includes all nursing home residents that passed away after between March 25, 2020 and March 2021.

    b.    *There are questions of law and fact which are common to members of the Proposed Classes, and which predominate over questions affecting any individual class member.*  Some common questions of law and fact include, *inter alia*, the following:

i. Whether the defendants acted or failed to act in a manner that deprived nursing home residents of their civil rights, including their rights to safety, freedom from harm, and the full enjoyment of their lives;

ii. Whether the intentional actions and inactions of Defendants, which precipitated and/or caused unnecessary and avoidable COVID-19 deaths in nursing homes across the State of New York, were abnormally dangerous and/or in wanton, willful, and/or reckless disregard of the safety and interests of the members of the Proposed Classes;

iii. Whether members of the Proposed Class 1 were New York nursing home residents at facilities that admitted COVID-19 positive patients from hospitals following the March 25th Directive;

iv. Whether members of the Proposed Class 1 were New York nursing home residents that got infected with COVID-19 after their nursing home facilities admitted COVID-19 positive patients from hospitals following the March 25th Directive;

v. Whether members of the Proposed Class 2 were New York nursing home residents that got infected with COVID-19 during the period Defendants were actively conspiring to suppress, distort, manipulate public health information about the reality of the infection in nursing home settings;

vi. Whether Defendants conduct and behavior shocked the conscience, as part of the inquiry necessary to state a §1983 claim;

vii. Whether Defendants' actions and omissions were done under color of state law;

viii. Whether the damages sustained by members of the Proposed Classes were foreseeable by the Defendants, given the widespread news of injury and death in the wake of the COVID-19 outbreak and pandemic in the United States and beyond.

ix. Whether Defendants had ample notice of harm, and whether their conduct was willful, reckless and/or grossly negligent;

x. Whether Defendants conspired to deprive the civil rights of elderly and disabled nursing home residents, and whether such conduct had a discriminatory animus;

xi. Whether the Defendants are liable to the Proposed Classes for actual, compensatory, punitive, and any other damages.

    c.  *The claims of the representative parties are typical of the claims of the Proposed Classes*.  The named Plaintiffs assert claims typical of those of the individual members of the Proposed Classes, based on Defendants' violations of their federally protected civil rights.  Plaintiffs' interests are not antagonistic to, or in conflict with, the Proposed Classes as a whole.  Moreover, Plaintiffs and the members of the Proposed Classes suffered damages in the same or similar ways because of the Defendants' actions and/or inactions.  In addition, Plaintiffs and the members of the Proposed Classes are relying on the same legal theories and causes of action.

    d.  *The named Plaintiffs will fairly and adequately protect and represent the interests of each member of the Proposed Classes*. Among other things, Plaintiffs have suffered the same or similar harm as the other members of the Proposed Classes and will zealously pursue their claims against the Defendants. In addition, counsel for Plaintiffs, Napoli Shkolnik, PLLC and Joseph L. Ciaccio is amply qualified to represent the interests of the Class. Counsel is a respected member of their legal community, who has engaged in complex civil litigation in the States New York, in Federal Court, and across the Country for many years, including medical malpractice, nursing home, mass tort, pharmaceutical and class action case(s).  Furthermore, there is conflict of interest between the Classes Proposed.

    e.  *A class action is the superior method for adjudicating the controversy*. First, the thousands of dollars that would be required to litigate each of their cases on an individual basis make it unlikely that members of the Classes will seek redress for the wrongful conduct alleged.  Moreover, it is desirable to concentrate the litigation in a single forum since the disposition of Class members' claims in a class action will provide substantial benefits to both the parties and the Court, and denial of class certification may result in a multitude of individual suits, with the potential for incongruity of adjudication and results.

    f.  *Finally, no unusual difficulties are likely to be encountered in the management of their class action, as it is straight forward.* The proceedings can be structured to simplify the initial trial on common issues. In addition, the Court has flexibility to manage special claims through the creation of a subclass or subclasses and through deferral of individual claims to subsequent claims proceedings.

57.    Defendants' actions and omissions, as described throughout this complaint, are generally applicable to the Proposed Classes and impacted them directly.  Accordingly, final

compensatory relief regarding these Proposed Class Members is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

58.    Plaintiffs reserve the right to modify the definition of the Proposed Classes, or propose the creation of subclasses, before the Court decides whether certification is appropriate.

**III.    Defendants**

59.    Defendant **Andrew M. Cuomo** ("Defendant Cuomo") served as Governor of New York from 2011 until 2021.  Upon information and belief, at all times relevant to this Complaint, his address was at the New York State Capitol Building, Albany, NY 12224.  His current address is unknown.

60.    Defendant **Howard A. Zucker** ("Defendant Zucker") served as Commissioner of the New York Department of Health from on or around May 2015, until on or around November 2021.  Upon information and belief, at all times relevant to this Complaint, his address was at Corning Tower, Empire State Plaza, Albany, NY 12237.   His current address is unknown.

61.    Defendant **Melissa DeRosa** ("Defendant DeRosa"), served as the Secretary of Staff for Governor of New York from 2017 to 2021.  Upon information and belief, at all times relevant to this Complaint, her address was at the New York State Capitol Building, Albany, NY 12224.  Her current address is unknown.

62.    Defendant **Sally Dreslin ("Defendant Dreslin")**, served as Executive Deputy Commissioner of the New York State Department of Health since 2015 until 2020.  She was replaced on July 6, 2020, after being on leave since April 23, 2020.  Upon information and belief, at all times relevant to this Complaint, her address was at Corning Tower, Empire State Plaza, Albany, NY 12237.  Her current address is unknown

63.    Defendants Cuomo, Zucker, DeRosa, and Dreslin were at the top of the deadly March 25th Directive that instructed nursing home operators they must accept residents discharged from hospitals, even if they were still positive for COVID-19.

64.    John and Jane Does 1-30 are individuals whose identities and involvement can only be ascertained through the discovery process, but that upon information and belief, acted under color of state law to deprive plaintiffs-decedents of their federally protected constitutional and statutory rights.

65.    During this complaint, the term "Defendants" will refer to the above-referenced defendants collectively.

## STATEMENT OF FACTS

**I.    Facts Common to All Causes of Action**

    A.    COVID-19 Timeline of Events - State and Federal Guidance Related to Nursing Home Facilities and Residents

66.    On December 31, 2019, the World Health Organization (herein after referred to as "WHO") China Country Office was informed of dozens of cases of pneumonia of unknown etiology detected in Wuhan City, Hubei Province of China.

67.    In or around January 2020, Defendants were made aware of severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2) spreading world-wide and nationally, known colloquially as the coronavirus, that caused severe medical distress and death in individuals who caught the disease, especially, the elderly.

68.    On January 7, 2020, the viral outbreak in Wuhan, China was identified as a new type/strain of coronavirus, 2019-nCoV (hereinafter referred to as "novel coronavirus").

69.    SARS-CoV-2 is known and documented to cause a debilitating and deadly disease, the Coronavirus disease 2019 (also referred to herein as, "COVID-19").

70.     On January 11, 2020, Chinese state media reported its first known death from the novel coronavirus.

71.     On January 12, 2020, China shared the genetic sequence of the novel coronavirus for countries to use in developing specific diagnostic kits.

72.     On January 20, 2020, Japan, South Korea and Thailand reported their first confirmed cases of the novel coronavirus. On that same day, the head of a Chinese government coronavirus team confirmed that the novel coronavirus outbreak was transmitted by human-to-human contact, which was a development that put medical facilities, institutions, and long-term skilled nursing facilities on notice of the possibility that the novel corona virus could spread quickly and widely.

73.     On January 23, 2020, the United States and WHO confirmed its first case of the novel coronavirus in the State of Washington.

74.     On February 11, 2020, the WHO announced "COVID-19" as the shortened name of the novel "coronavirus disease 2019".

75.     On February 13, 2020, the U.S. Director of The Centers for Disease Control and Prevention (hereinafter referred to as "CDC") announced that COVID-19 will likely become a community virus and remain beyond this current season.

76.     On February 25, 2020, the CDC issued a warning that spread of the virus to the United States is likely and that people should prepare; and U.S. senators receive a classified briefing on the Trump administration's coronavirus response.

77.     The first case of COVID-19 in the United States was confirmed on January 21, 2020, in Washington State.

78.     On February 28, 2020, a case of the novel coronavirus disease was identified and confirmed in a woman resident of a long-term care skilled nursing facility in King County, Washington. A subsequent epidemiologic investigation identified 129 cases of COVID-19, including 81 residents (of approx. 130 - over 62% of the resident population), 34 staff members, and 14 visitors. This was presumably the first recorded cases of the deadly virus at a nursing home facility. The infected resident died three days later, on March 2, 2020. Overall, 111 (86%) cases occurred among nursing home residents of King County, Washington State (81 facility A residents, 17 staff members, and 13 visitors) and 18 (14%) among nursing home residents of Snohomish County (directly north of King County) (17 staff members and one visitor). As of March 9, 2020, at least eight other King County skilled nursing and assisted living facilities had reported one or more confirmed COVID-19 cases.

79.     These residents and/or patients there were the first in the nation to suffer from and die as a result of the COVID-19 virus, and news of the dire situation and the first deaths in the United States at the Life Care Center in Kirkland, Washington was widespread all throughout the United States and was known to Defendants.

80.     On February 29, 2020, the United States instituted "do not travel warnings" for affected areas including Italy and South Korea.

81.     On February 29, 2020, the CDC posted "Healthcare Facilities: Preparing for Community Transmission" with the following specific instructions to nursing homes:

    a. Limit visitors to the facility.
    b. Post visual alerts (signs, posters) at entrances and in strategic places providing instruction on hand hygiene, respiratory hygiene, and cough etiquette.
    c. Ensure supplies are available (tissues, waste receptacles, alcohol-based hand sanitizer).
    d. Take steps to prevent known or suspected COVID-19 patients from exposing other patients.
    e. Limit the movement of COVID-19 patients (e.g. keep them in their rooms)

      f.   Identify dedicated staff to care for COVID-19 patients.

      g.  Observe newly arriving patients/residents for development of respiratory symptoms.

82.    On March 1, 2020, the first confirmed COVID-19 case in the State of New York was reported.

83.    On March 3, 2020, the first presumed COVID-19-related death occurred at a nursing home in the State of New York.

84.    On March 3, 2020, the WHO reported more than 90,000 infections of COVID-19 globally and about 3,000 deaths.

85.    On March 4, 2020, the Centers for Medicare and Medicaid Services ("CMS") issued its *Guidance for Infection Control and Prevention of Coronavirus Disease 2019 (COVID-19) in Nursing Homes*, recommending suspension and limitation of standard nursing home activities, and the screening of visitors and staff at nursing homes for signs and symptoms of a respiratory infection, such as fever, cough, and sore throat.

86.    Other CMS recommendations included: increasing the availability and accessibility of alcohol-based hand sanitizers, tissues, no touch receptacles for disposal, and facemasks at the facility's entrances, waiting rooms, patient check-ins, etc.; increasing signage for vigilant infection prevention, such as hand hygiene and cough etiquette; properly cleaning, disinfecting, and limiting sharing of medical equipment between residents and areas of the facility; and providing additional work supplies to avoid sharing among staff and residents (i.e., pens, pads), and properly disinfecting workplace areas (such as nurses' stations, phones, internal radios, etc.).

87.    On March 6, 2020, the NYSDOH issued guidance DAL NH-20-04, addressed to nursing homes, regarding the precautions and procedures these facilities should take to protect and maintain the health and safety of their residents and staff during the COVID-19 pandemic

outbreak, and recognizing the "potential for more serious illness among older adults" and the "risk of outbreak" in these facilities  This NYSDOH guidance  recommended screening visitors, nursing home staff, and employees for symptoms of illness upon arriving at work, such as fever, lower respiratory infection, shortness of breath, cough, nasal congestion, runny nose, sore throat, nausea, vomiting, and/or diarrhea, adding that "nursing homes strictly enforce their illness and sick leave policies".

88.     The next day, on March 7, 2020, Defendant Andrew M. Cuomo, then Governor of New York, declared a state of emergency over the COVID-19 outbreak as cases in the state continued to rise.

89.     On March 9, 2020, CMS issued a *Revised Guidance for Infection Control and Prevention of Coronavirus Disease 2019 (COVID-19) in Nursing Homes*.  In a press release announcing the Revised Guidance, CMS stated that "according to the latest data from the Centers for Disease Control and Prevention (CDC), seniors are at the greatest risk of serious illness due to COVID-19, which is why CMS is providing valuable information to providers who interact with patients in the hospice setting. To protect these vulnerable patients, CMS is amplifying its current health and safety requirements by delivering detailed guidance on the screening, treatment and transfer procedures healthcare workers must follow when interacting with patients to prevent the spread of COVID-19. CMS is also issuing additional guidance specific to nursing homes to help control and prevent the spread of the virus".

90.     CMS stressed that these "[nursing home] facilities should continue to be vigilant in identifying any possible infected individuals" and that they "should consider frequent monitoring for potential symptoms of respiratory infection as needed throughout the day".  Per the revised CMS Guidance, "[a] nursing home can accept a resident diagnosed with COVID-19 and still under

Transmission Based Precautions for COVID-19 as long as the facility can follow CDC guidance for Transmission-Based Precautions.  If a nursing home cannot, it must wait until these precautions are discontinued."

91.    On March 11, 2020, President Donald J. Trump suspended travel from Europe, with the exception of the United Kingdom, and the WHO deemed COVID-19 a global "pandemic."

92.    On March 11, 2020, the NYDOH issued Guidance #20-10, which recognized that "older individuals, particularly those with other underlying health conditions, have shown greater susceptibility to the virus and often experience much more serious illness and outcomes" adding that "the potential for more serious illness among older adults, coupled with the communal nature of adult care residential services, represents a risk of outbreak and a substantial challenge" for these types of adult care facilities.

93.    On March 13, 2020, seven days after recommending screening visitors, nursing home staff, and employees for symptoms of illness upon arriving at work, the NYDOH issued another Health Advisory addressed to nursing homes and adult care facilities, requiring, *inter alia*, (i) the suspension of "all visitation expect when medically necessary", that "duration and number of visits should be minimized", that [v]isitors should wear a facemask while in the facility and should be allowed only in the resident's room"; (ii) the immediate implementation of "health checks for all [health care personnel] and other facility staff at the beginning of each shift…regardless of whether they are providing direct patient care";  (iii) that "all [health care personnel] and other facility staff shall wear a facemask while within 6 feet of residents"; (iv) that nursing homes "[n]otify the local health department and NYSDOH" of confirmed COVID-19 cases at their facilities; (v) that nursing homes "actively monitor all residents on affected units once per shift", including "a symptom check, vitals, lung auscultation, and pulse oximetry"; (vi)

That they "assure that all residents in affected units remain in their rooms" and to "cancel group activities and communal dining"; (vii) that "residents must wear facemasks when [health care providers] or other direct care providers enter their rooms"; (viii) that staff not be floated between units; (ix) to "cohort residents with COVID-19 with dedicated [health care personnel] and other direct care providers";  (x) to "minimize the number of [health care personnel] and other direct care providers entering rooms"; and (xi) to place all residents on affected units "on droplet and contact precautions, regardless of the presence of symptoms and regardless of COVID-19 status", among other guidance.

94.    On March 13, 2020, President Donald J. Trump declared a "national emergency".

95.    On March 13, 2020, the Center for Medicare & Medicaid Services ("CMS") issued "Guidance for Infection Control and Prevention Concerning Coronavirus Disease 2019 (COVID-19) in Nursing Homes (Revised)" that contained a specific section for limiting transmission of COVID in nursing homes with additional guidance including canceling community dining and group activities and reminding residents to practice social distancing.

96.    On March 13, 2020, CMS a issued a memorandum entitled: Guidance for Infection Control and Prevention of Coronavirus Disease 2019 (COVID-19) in Nursing Homes, which stated, in part:

> h.  Prompt detection, triage and isolation of potentially infectious residents are essential to prevent unnecessary exposures among residents, healthcare personnel, and visitors at the facility;
> i.  Facilities without an airborne infection isolation room (AIIR) are not required to transfer the resident assuming:
>> a)    1) the resident does not require a higher level of care; and
>> b)    2) the facility can adhere to the rest of the infection prevention and control practices recommended for caring for a resident with COVID-19;
> j.  Facilities should restrict visitation of all visitors and non-essential health care personnel, except for certain compassionate care situations, such as an end-of-life situation.  In those cases, visitors will be limited to a specific room only;

22

k.  Facilities are expected to notify potential visitors to defer visitation until further notice (through signage, calls, letters, etc.);

l.  Those with symptoms of a respiratory infection (fever, cough, shortness of breath, or sore throat) should not be permitted to enter the facility at any time (even in end-of-life situations);

m.  Cancel communal dining and all group activities, such as internal and external group activities;

n.  Remind residents to practice social distancing and perform frequent hand hygiene;

o.  Screen all staff at the beginning of their shift for fever and respiratory symptoms. Actively take their temperature and document absence of shortness of breath, new or change in cough, and sore throat. If they are ill, have them put on a facemask and self-isolate at home;

p.  Facilities should identify staff that work at multiple facilities (*e.g.*, agency staff, regional or corporate staff, etc.) and actively screen and restrict them appropriately to ensure they do not place individuals in the facility at risk for COVID-19;

q.  Facilities should review and revise how they interact with vendors and receiving supplies, agency staff, EMS personnel and equipment, transportation providers (*e.g.*, when taking residents to offsite appointments, etc.), and other non-health care providers (*e.g.*, food delivery, etc.), and take necessary actions to prevent any potential transmission; and

r.  Take actions to mitigate any resource shortages and show they are taking all appropriate steps to obtain the necessary supplies as soon as possible.

97.    On March 15, 2020 the CDC issued guidance and advised that no gatherings of 50 or more people take place until further notice.

98.    On March 16, 2020, President Trump advised citizens to avoid groups of more than 10 individuals.

99.    On March 18, 2020, the CDC published a report titled *COVID-19 in a Long-Term Facility – King County, Washinton, February 27-March 9, 2020*, where it highlighted that COVID-19 "can cause severe illness and death, particularly among older adults with chronic health conditions", that "COVID-19 can spread rapidly in long-term residential care facilities, and persons with chronic underlying medical conditions are at greater risk for COVID-19–associated severe disease and death", and that "long-term care facilities should take proactive steps to protect the health of residents and preserve the health care workforce by identifying and excluding

potentially infected staff members and visitors, ensuring early recognition of potentially infected patients, and implementing appropriate infection control measures".  Per the CDC report, one of the factors that likely contributed to the vulnerability of these facilities was the "delayed recognition of cases because of low index of suspicion" and the "difficulty identifying persons with COVID-19 based on signs and symptoms alone".

100.   The CDC concluded that the "findings demonstrate that outbreaks of COVID-19 in long-term care facilities can have a critical impact on vulnerable older adults", and that "once COVID-19 has been introduced into a long-term care facility, it has the potential to result in high attack rates among residents, staff members, and visitors".  Per the CDC, "the underlying health conditions and advanced age of many long-term care facility residents and the shared location of patients in one facility places these persons at risk for severe morbidity and death".  For these reasons, "[a]s this pandemic expands, continued implementation of public health measures targeting vulnerable populations such as residents of long-term care facilities…will be critical."

101.   All of the above-mentioned events highlighted the seriousness of the pandemic event and its potential deadly consequences in nursing home settings, where most of the residents are mentally and physically disabled.

B.    The March 25th Directive to Nursing Homes and its Foreseeably Disastrous Consequences

102.   On March 23, 2020, Defendants issued a mandate addressed to hospitals, ambulatory surgery centers, office-based surgery practices, and diagnostic and treatment centers, requiring an increase in the availability of beds by a minimum of 50%.  The mandate required that "the CEO of every licensed hospital in New York State…legally certify and submit a COVID-19 plan detailing a plan to potentially increase bed capacity by 100%…and a definite plan to increase bed

capacity a minimum of 50%", by March 24, 2020.[11]

103.   Twenty-four hours later, on March 25, 2020, Defendants announced a compulsory order (the March 25th Directive) addressed to nursing homes mandating that "<u>no resident shall be denied re-admission or admission to the [nursing home] solely based on a confirmed or suspected diagnosis of COVID-19</u>" (emphasis in original), and adding that nursing homes were "<u>prohibited</u> from requiring a hospitalized resident who is determined medically stable to be tested for COVID-19 prior to admission or re-admission". (Emphasis supplied)

104.   The March 25th Directive was criticized by many patient care support groups and healthcare organizations, including AMDA - The Society for Post-Acute and Long-Term Care Medicine ("AMDA"), who the very next day, on March 26, 2020, issued a statement denouncing the directive as "over-reaching, not consistent with science, unenforceable, and beyond all, not in the least consistent with patient safety principles".   AMDA made clear it "cannot endorse or abide by this policy directive", because "[d]ecisions on transfer are not at the sole directive of the hospitals or hospital physicians", but instead, "joint responsibilities since the impact may likely have dire, indeed fatal, consequences", ominously adding that "[u]nsafe transfers will increase the risk of transmission in post-acute and long-term care facilities".

105.   Per AMDA, the March 25th Directive had the effect of overriding "Federal directives set forth by the Centers for Medicare and Medicaid Services which stipulate that such decisions to accept a patient be made with the understanding that the facility can safely care for such patients."

106.   On March 29, 2020, AMDA, the American Health Care Association ("AHCA"), and the National Center for Assisted Living ("NCAL") issued a joint statement expressing they were "deeply concerned with the recent New York State March 25th order, calling the "blanket

---

[11] https://dmna.ny.gov/covid19/docs/all/DOH_COVID19_FacilityDirective_032320.pdf

order" a "short-term and short-sighted solution that will only add to the surge in COVID-19 patients that require hospital care".

107.   Per these organizations, "[b]ased on what we currently know about how this virus can spread in institutional settings, the hospitalizations and case fatality rate, this action by a state will put the many frail and older adults who reside in nursing homes at risk", adding that "[a]lternative settings for patients recovering from COVID-19 must be considered and implemented now, including large field hospitals, dormitories, hotels, and shuttered nursing homes or hospitals".

108.   In their joint statement, AMDA, the AHCA, and the NCAL warned that:

> In New York, requiring all New York nursing homes state-wide to accept all patients regardless of their COVID-19 status, even from hospitals that are not at capacity, will likely cause many more hospitalizations, since elderly people over the age of 80 with chronic diseases are most at risk of hospitalizations – and they constitute the majority of nursing home residents today.[12]

109.   They also added that "[i]n assisted living residences and continuing care retirement communities, these factors and the challenges in managing COVID-19 (+) or COVID-19 exposed residents are even more significant".

110.   As per AHCA President and CEO, Mark Parkinson, "This approach will introduce the highly contagious virus into more nursing homes.  There will be more hospitalizations for nursing home residents who need ventilator care and ultimately, a higher number of deaths. Issuing such an order is a mistake and there is a better solution".  Per Mr. Parkinson, "The bottom line is that nursing homes are not a priority in the public health system and this policy reflects that."

111.   In another statement, the AHCA also stressed that "[s]ending hospitalized patients

---

[12] Id.

who are likely harboring the virus to nursing homes that do not have the appropriate units, equipment and staff to accept COVID-19 patients is a recipe for disaster", adding that "Governors and public health officials should be working with nursing homes to create as many segregated units as possible right now."

112.  Stephen Hanse, President and CEO of the New York State Health Facilities Association, a group that represents the nursing home industry, described the policy as unprecedented and stated it "raised significant concerns for nursing homes that don't have coronavirus-positive residents or are at capacity". Hanse also echoed some of Cuomo's now infamous words by saying, "This treacherous virus spreads through nursing homes like fire through dry grass and the state's March 25 policy served to unnecessarily fan the flames of this fire."  "The governor stated that nursing homes are the state's No. 1 concern," he added.

113.  Similarly, It was reported that the President and CEO[13] of LeadingAge New York, an organization that represents nonprofit nursing homes in New York, said he didn't hear about the policy until after it was released. This national lobby representing a large group of nursing homes called the policy a "mistake" that could cause more hospitalizations.

114.  By March 29, 2020, the United States already accounted for the highest number of infections in the world, recording more than 140,000 cases and 2,000 deaths.  On that same day, President Donald J. Trump announced an extension of "social distancing" guidelines.

115.  On March 31, 2020, the CDC issued another report titled *Preliminary Estimates of the Prevalence of Selected Underlying Health Conditions Among Patients with Coronavirus Disease 2019 — United States, February 12–March 28, 2020*, advising that "[r]eports from China and Italy suggest that risk factors for severe disease include older age and the presence of at least

---

[13] Jim Clyne.  See,  https://www.statnews.com/2021/02/26/cuomos-nursing-home-fiasco-ethical-perils-pandemic-policymaking/

one of several underlying health conditions. U.S. older adults, including those aged ≥65 years and particularly those aged ≥85 years, also appear to be at higher risk for severe COVID-19–associated outcomes".   Per national averages, that would mean more than 60% of the nursing home population.

116.   On April 2, 2020, CMS issued a *COVID-19 Long-Term Care Facility Guidance* where it again recognized the "ease of spread in long-term care facilities and the severity of illness that occurs in residents with COVID-19".[14]

117.   Although California and New Jersey had instituted similar policies, New York became the first state to issue a blanket order prohibiting nursing homes from denying admission or readmission to residents who are infected with COVID-19 and banning them from testing patients for the disease before they are admitted or readmitted.

118.   The blowback to these policies prompted California to soften its mandate on April 1, saying facilities "can be expected" to receive COVID patients only if they have adequate protective gear and can follow the federal government's infection control recommendations.

119.   In New Jersey, the state health department clarified in a statement that only facilities "that have the ability to separate patients" into three groups — those who have been infected, those who have been exposed and those who have not been exposed — could accept discharged hospital patients or returning residents who've been infected, adding that 130 long-term care facilities were not accepting admissions.

120.   Even with all the public concern from experts surrounding Defendants' shocking and egregious March 25th Directive, a similar mandate was issued on April 7, 2020, addressed to Adult Care Facilities (ACF), ordering that **"[n]o resident shall be denied re-admission or admission**

---

[14] https://www.cms.gov/files/document/4220-covid-19-long-term-care-facility-guidance.pdf

**to the ACF solely based on a confirmed or suspected diagnosis of COVID-19**" (emphasis in original), and prohibiting them "from requiring a hospitalized resident….to be tested for COVID-19 prior to admission or readmission".

121.   On April 17, 2020, the New York Times reported that approximately one fifth (or 20%) of all COVID-19 deaths were related to nursing homes[15].

122.   Astonishingly, on April 20, 2020, when asked about the state's policy on admitting and readmitting persons to nursing homes regardless of their COVID-19 status, Defendant Cuomo answered "That's a good question, I don't know", deflecting the question to Defendant Zucker. When asked the same question, Defendant Zucker confirmed that under the policy, "If you are positive, you should be admitted back to a nursing home", adding that the "necessary precautions wil be taken to protect the other residents there".

123.   When asked about Defendant Zucker's statement, Assemblyman Ronald T. Kim (D-Queens) stated "It's either he's lying or they have absolutely no idea what's going on the ground". Later on, we all found out that Defendant Zucker, along with the other Co-Defendants, were indeed lying, with objectively disasttrous consequences.

124.   On April 25, 2020, Defendant Cuomo continued to double down on their misguided and insensible March 25th Directive by stating that "They [nursing homes] don't have a right to object.  That is the rule and that is the regulation, and they have to comply with that", and adding that "If they can't do it, we'll put them in a facility that can do it".

125.   By this time, Defendants already knew of widespread reports that the coronavirus had killed nearly 11,000 people in nursing homes in 36 states, with more than one third of them occurring in New York, and for all intents and purposes, were already conspiring to mislead the

---

[15] https://www.nytimes.com/2020/04/17/us/coronavirus-nursing-homes.html

public with distorted facts and suppressed data.

126.    While Defendants were satisfied with putting New York nursing home residents out to slaughter, other jurisdictions tried a different approach.  In Boston, for example, state and local officials partnered up with health care providers to create a temporary 1,000-bed facility in a convention center for recovering patients who did not need hospital-level care. In Minnesota, providers created a 50-bed facility for recovering coronavirus patients who might otherwise be sent to nursing homes.  It was also reported that Connecticut and Massachusetts were both reopening previously shuttered nursing homes to create facilities dedicated to COVID residents.

127.    In New York, however, while Defendant Cuomo was saying, "This virus uses nursing homes", "They [nursing homes] are ground zero", and "It's a congregation of vulnerable people", there were no plans to create COVID-only nursing homes or rehabilitation facilities, nor to relocate nursing home residents to safer available locations.

128.    Based on data collected from long-term care facilities across the country, as of May 22, 2020, 43% of all COVID-19 deaths in the United States were residents of long-term care facilities, despite only comprising 0.62% of the nation's population.

129.    The March 25th Directive was partially rescinded on May 10, 2020, via Executive Order No. 202.30, to now require that a "hospital shall not discharge a patient to a nursing home, unless the nursing home operator or administrator has first certified that it is able to properly care for such patient" and that a "hospital shall not discharge a patient to a nursing home, without first performing a diagnostic test for COVID-19 and obtaining a negative result".

130.    Referring to the March 25th Directive, Assemblyman Ron Kim described it as "the deadliest decision ever made in New York State history".

131.   In a self-serving report released on July 6, 2020, the NYDOH, headed by Defendant Zucker, conveniently concluded that the March 25th Directive was not responsible for spreading infection and death among the vulnerable and frail nursing home population.  Rather, the report tried to place blame on staffers and visitors, signaling them as the ultimate culprits responsible for the spread of COVID-19 within New York's nursing homes.  Defendant Zucker stated "Admission policies were not a significant factor in nursing home fatalities" and that the "March 25 guidance was not the driving force in nursing home deaths".

132.   The so-called report, revised in February 2021, wanted to convey that "New York State followed the federal government's Centers for Medicare & Medicaid Services guidance which stated that nursing homes should accept residents with COVID-19 as long as they can use transmission-based precautions".  However, CMS did not command nursing homes to accept COVID-19 positive patients nor did CMS prohibit nursing homes from requiring a hospitalized resident cleared for discharge to a nursing home to be tested for COVID-19 prior to admission or readmission and integration to the senior community environment.  In fact, the CDC guidance emphasized that a nursing home should admit residents with COVID-19 only if able to follow CDC guidance for transmission-based precautions.  Moreover, unlike Defendants, CMS did not actively and knowingly conspired to hide and distort public health information regarding nursing home COVID-19 total death count.

133.   On January 28, 2021, a report issued by the New York State Office of the Attorney General ("OAG") concluded that  "over 4,000 nursing home deaths occurred after the issuance of the March 25 guidance", adding that "these admissions may have contributed to increased risk of nursing home resident infection, and subsequent fatalities".  The AG report also found that the Government of the State of New York and its State Department of Health, headed by these

Defendants, had undercounted COVID-19-related deaths of nursing home residents by as much as 50 percent, or close to 4,000 underreported deaths.

134.  In response to the OAG report's findings that he downplayed the total number of nursing home residents killed by COVID-19, Defendant Cuomo stated defiantly "Who cares [if they] died in the hospital, died in a nursing home?  They died".  He also stubbornly dismissed all criticism of his March 25th Directive by stating they were "political attacks" and continued to insist he was following "federal guidance".

135.  In February 2021, after the OAG report, Defendants finally provided and disclosed real-time information regarding nursing home residents' deaths.  At that time, Defendant Zucker stated that "When I saw the attorney general's report, I decided to finish that up and get it out in real-time".

136.  Per the "new" data provided, as of January 19, 2021, the total reported nursing home death total stood at 12,743.  A day earlier, the official tally pushed by Defendants in a concerted manner, so color of state law, had been 8,711.

137.  The previously undisclosed and willfully suppressed data showed that the admission of COVID-positive patients into New York nursing homes during the time the March 25th Directive was in effect, "was associated with a statistically significant increase in resident deaths".

138.  On February 10, 2021, Defendant Zucker sent a letter to lawmakers stating that the total number of nursing home residents killed by COVID-19 had increased to 13,297.  This number did not include deaths at assisted living facilities/adult care facilities, which raised the total death count to over 15,000 deaths of mostly vulnerable elderly and/or disabled individuals.

139.  On February 11, 2021, Defendant DeRosa shockingly and brazenly admitted on a call with state legislative members that the underreporting and withholding of nursing home

COVID-19 death totals was intentional and with the purpose of misleading the public and federal authorities.

140.   Assemblyman Ron Kim, who took part in the call, stated that Defendant DeRosa's remarks sounded "like they admitted that they were trying to dodge having any incriminating evidence that might put the administration or the [Health Department] in further trouble with the Department of Justice."[16]

141.   On March 15, 2022, the Office of the New York State Comptroller ("State Comptroller") released the findings of an audit to determine whether the NYDOH, headed by Defendant Zucker, was collecting "necessary data to make informed decisions and promote strong infection prevention and control policies, and whether the data collected by the Department, including data reported to the public, is accurate and reliable". The State Comptroller's audit covered from January 2017 through November 2021.

142.   Per the State Comptroller's report, entitled *Department of Health: Use, Collection, and Reporting of Infection Control Data*[17]:

> State auditors also found that DOH did not provide the public with accurate COVID-19 death counts and became entangled in the undercounting of those deaths as the Executive took control of information provided to the public. DOH would not provide auditors with a breakdown by name of the nursing home residents who died from COVID-19, and the actual number of nursing home residents who died is still uncertain. The audit revealed that, on many key indicators, New York significantly trailed other states in surveying nursing homes and developing strategies to stop infections from spreading in facilities.

143.   The State Comptroller, Thomas DiNapoli, added, "Our audit findings are extremely troubling. The public was misled by those at the highest level of state government through

---

[16] *Cuomo aide Melissa DeRosa admits they hid nursing home data so feds wouldn't find out*, February 11, 2021, The New York Post.
[17] Report 2020-S-55.

distortion and suppression of the facts when New Yorkers deserved the truth. The pandemic is not over, and I am hopeful the current administration will make changes to improve accountability and protect lives. An important step would be for DOH to provide the families who lost loved ones with answers as to the actual number of nursing homes residents who died. These families are still grieving, and they deserve no less."

144.    Some of the State Comptroller's key audit findings about the NYDOH included:

a)  NYDOH understated the number of nursing home deaths due to COVID-19 by at least 4,100, and at times during the pandemic by more than 50%;

b)  Auditors found the Executive routinely reported incorrect data, inflating the perception of New York's performance against other states.

c)  NYDOH was slow to respond to a federal directive to conduct surveys of nursing homes for infection control problems, surveying just 20% of facilities between March 23 and May 30, 2020, compared with over 90% for some other states.

d)  Auditors found that data from one of NYDOH's key informational systems was not complete nor reliable, and found that NYDOH was aware of this problem long before the pandemic and had committed to resolve it. However, DOH never followed through on the corrective actions, which may have limited its ability to respond to the COVID-19 nursing home crisis.

e)  NYDOH imposed impediments on the audit, including delaying requested data, limiting auditors' contact with program staff, not addressing auditors' questions during meetings, and not providing supporting documentation. These are not routine actions by state agencies undergoing an Office of the State Comptroller audit and raise serious concerns about the control environment at DOH.

145.    Furthermore, the State Comptroller's audit found the NYDOH - through Defendants' shocking and intentional actions and omissions -  failed to meet its "ethical" and "moral" imperatives to act transparently in counting deaths between April 2020 and February 2021. "Rather than providing accurate and reliable information during a public health emergency, the department instead conformed to the executive's narrative, often presenting data in a manner that misled the public," stated the report.

146.    These egregious failures are the result of Defendants' deliberate, concerted, willful, purposeful, wanton, grossly negligent, discriminatory, and reckless conduct, actions, and omissions, undertaken under color of state law.

147.    In April 2020, emails disclosed to the public revealed that the head of a Brooklyn nursing home, Cobble Hill Health Center, pleaded in vain with state health officials to send residents suspected of having COVID-19 to the under-utilized Javits Convention Center or U.S. Naval hospital ship Comfort, weeks before 55 residents died of the virus, making it the hardest-hit at the time, per various reports.

148.    At the time this plea was made, it was reported that only 134 of the 1,000 beds at the Javits Center were full, and the Comfort, which had just been reconfigured to treat up to 500 COVID-19 patients, had a mere 62 on board.

149.    To make matters worse, the Navy hospital ship wound up treating just 179 patients before Defendant Cuomo decided it was no longer needed.    Instead, Defendants pressed on with their shocking and nonsensical approach, willfully, wantonly, recklessly, and in complete disregard of the rights of nursing home residents across the State of New York, arguably the most vulnerable population comprised of elderly and frail individuals, many of whom suffered from physical and cognitive disabilities.

150.  Per New York Department of Health data, 17,400 (25%) of the 70,000+ reported COVID-19 deaths in New York State occurred in long-term care facilities.

151.    Per the State Comptroller's report, between March 4, 2020, and May 23, 2021, the estimated number of New York nursing home resident that died due to COVID-19 infection was 13,919, with 9,650 deaths occurring between March 4, 2020, and July 15, 2020, and 4,136 deaths occurring between July 16, 2020, and March 16, 2021.

152.    In October 2020, Defendant Cuomo published *American Crisis*, a biographical book of the "leadership lessons" he learned through early months of the pandemic, which suggests the possibility of a financial incentive behind his willful decision to distort, suppress facts, and misinform the public.  Not only were the policies he put in place especially egregious, but he also intentionally obscured public health data for political gain, at the peril of the whole nursing home population, including disabled and elderly individuals.

153.    The Empire Center for Public Policy — which sued Cuomo to obtain nursing home death data and succeeded — did an analysis of the available data and acknowledged the March 25th Directive made a "bad situation worse" and there was a statistically significant increase in resident deaths in nursing homes that accepted hospital transfers.  Per their analysis, while the March 25th Directive was in force, more than 9,000 COVID-19 patients – who had recovered from acute symptoms but were known or assumed to still be carrying the virus – were moved into nursing homes, most of them as new arrivals.

154.    In a report issued by the Foundation for Research on Equal Opportunity, a non-profit and non-partisan think tank, using data from the Centers for Medicare and Medicaid Services, as well as New York state data released by court order in fulfillment of numerous Freedom of Information Law (FOIL) requests, they estimated that 1,242 long-term care residents per 10,000 had died of coronavirus in New York as of Jan. 31, 2021, compared to 740 per 10,000 if the data excluded residents who died in hospitals, as Defendants did.[18]

155.    As stated in their report and echoed by Plaintiffs herein: "New York officials missed a crucial opportunity to provide better data that could have saved lives. Accurate data on the toll of COVID in New York nursing homes and other LTC facilities would have enabled policymakers to

---

[18] https://freopp.org/the-true-covid-death-toll-in-new-york-state-long-term-care-facilities-bb425848d561

target resources to facilities struggling to contain infections. In addition, family caregivers needed accurate information to know where to place their loved ones who are in need of nursing home care."

## COUNT I
## AGAINST ALL DEFENDANTS
## 42 U.S.C. §1983
## (Deprivation of Civil Rights)

156.   Plaintiffs hereby incorporate by reference each of the preceding allegations as though set forth herein.

157.   Section 1 of the Fourteenth Amendment to the U.S. Constitution, commonly known as the Due Process Clause, states:

> "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

158.   For its part, 42 U.S.C §1983 states in pertinent part:

> "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable."

159.   At all times relevant to this complaint, Defendants' actions and omissions were under the color of state law.

160.    Defendants purposely, willfully, and wantonly decided not to heed the warnings from experts in the long-term care industry, and instead carried on with their reckless March 25th Directive and in fact doubled down, with Defendant Cuomo saying "They [nursing homes} don't have a right to object.  That is the rule and that is the regulation, and they must comply with that".

161.  It's been publicly reported that Defendants didn't talk to relevant nursing home stakeholders, patient support groups, nor with elderly or disabled persons advocates before they designed and implemented the policy, and were perhaps too reliant on the financially and politically powerful hospital industry lobby.

162.    Defendants proceeded with their March 25th Directive and subsequent cover-up, despite early compelling evidence that nursing home residents were especially vulnerable to COVID-19.  As mentioned earlier, the first known cluster of COVID-19 cases in the United States happened in a State of Washington nursing home, and  multiple public health experts warned of this population's vulnerability since early March, well before Defendants' March 25th Directive.

163.    Defendants purposely, willfully, and wantonly suppressed, distorted, manipulated, and withheld relevant public health information, with the intent of covering up the disastrous effects of their March 25th Directive.

164.    Defendants purposely, willfully, and wantonly conspired to obscure public health information from the public and federal authorities which informed how their order worsened the death toll at nursing homes across the State of New York.

165.    Defendants, through their individual actions and acting under color of state law, conspired to publicly misstate how their policy worked, conspired to withhold public data, conspired to publish falsified research under the NYSDOH's name, and conspired to stonewall inquiries from the New York State Legislature.

166.    Defendants intentionally created the false impression that New York was one of the best performing states in the country on nursing home COVID-19 deaths, when in reality it was one of the worst.

167.    Although Defendant DeRosa claimed that they delayed release of complete data on COVID-19 deaths in nursing homes out of fear of an investigation from the U.S. Department of Justice, a New York Times investigation discovered that in June 2020, months before any mention of a potential federal investigation, senior Cuomo administration officials, including all Defendants, had rewritten a NYDOH report with the intent of excluding long-term care residents who died in hospitals, months before federal officials requested the state's data.

168.    Defendants' concerted acts of deliberate and reckless indifference, wanton and willful misconduct, and malicious intent, contributed to thousands of elderly, mentally, and physically disabled nursing home residents, including Plaintiffs-decedents, being unnecessarily and mortally infected with COVID-19.

169.    The deprivation of Plaintiffs-decedents federally protected constitutional and statutory rights was a direct result of Defendants' gross and lethal misuse of power, possessed and given by virtue of state law, and made possible only because they were clothed with the authority of state law.

170.    Defendants' shocking, unsound, reckless, and willful approach caused catastrophic results for the elderly and disabled population residing at nursing homes, violated their substantive due process rights, and deprived them of their federally protected constitutional and statutory rights, including the fundamental right to life, the right to bodily integrity, and the right to a safe environment.

171.    Furthermore, Defendants interfered with the rights guaranteed by federal statues and regulations, like the Federal Nursing Home Reform Act, 42 U.S.C1396r, 42 U.S.C. 1395i-3, and 42 CFR 483.

### COUNT II
### AGAINST ALL DEFENDANTS
### (New York Civil Rights Act; Article I, N.Y. Constitution)

172.    Plaintiffs hereby incorporate by reference each of the preceding allegations as though set forth herein.

173.    By engaging in the above-mentioned course of conduct under the color of state law, Defendants caused Plaintiffs-decedents and the Proposed Classes of elderly, mentally, and physically disabled nursing home residents, to be deprived of their constitutional rights, secured and guaranteed under the Fifth and Fourteenth Amendments of the United States Constitution, and rights guaranteed by Article I of the New York State Constitution and the New York Civil Rights Act.

### COUNT III
### AGAINST ALL DEFENDANTS
### FOR CONSCIOUS PAIN AND SUFFERING

174.    Plaintiffs hereby incorporate by reference each of the preceding allegations as though set forth herein.

175.    As a result of Defendants' actions and inactions, the Plaintiffs-decedents and the members of the Proposed Classes they represent sustained severe multiple injuries in, to, and about their bodies resulting in wrongful death.

176.    As a result of Defendants' actions and inactions, the Plaintiffs-decedents and the members of the Proposed Classes they represent suffered excruciating conscious pain, agony, and suffering, including fear of imminent death.

177.    As a result of Defendants' actions and inactions, the Plaintiffs-decedents, their Estates, next of kin, and the members of the Proposed Classes they represent, sustained damages.

### COUNT IV
### AGAINST ALL DEFENDANTS
### FOR WRONGFUL DEATH

178.    Plaintiff hereby incorporates by reference each of the preceding allegations as though set forth herein.

179.    Defendants proceeded with their March 25th Directive and subsequent cover-up, despite early compelling evidence that nursing home residents were especially vulnerable to COVID-19.  As mentioned earlier, the first known cluster of COVID-19 cases in the United States happened in a State of Washington nursing home, and multiple public health experts warned of this population's vulnerability since early March, well before Defendants' March 25th Directive.

180.    As a result of Defendants' concerted acts of deliberate and reckless indifference, wanton and willful misconduct, and malicious intent, the Plaintiffs-decedents sustained severe bodily injuries resulting in wrongful and untimely deaths.

181.    Defendants had a duty to Plaintiffs and the members of the Proposed Classes to protect the public and provide reliable and relevant public health information in a timely and transparent manner.

182.    Defendants breached their duty by purposely, willfully, and wantonly conspiring to obscure public health information from the public and federal authorities.

183.    As a result of Defendants' concerted acts of deliberate and reckless indifference, wanton and willful misconduct, and malicious intent, the Plaintiffs-decedents and the members of the Proposed Classes left surviving next of kin and distributees.

184.    As a result of Defendants' concerted acts of deliberate and reckless indifference, wanton and willful misconduct, and malicious intent, the surviving next of kin and distributees of Plaintiffs-decedents and the members of the Proposed Classes became liable for, and spent money for, funeral and other expenses.

185.    As a result of Defendants' concerted acts of deliberate and reckless indifference, wanton and willful misconduct, and malicious intent, the surviving next of kin and distributees of Plaintiffs-decedents and the members of the Proposed Classes suffered pecuniary damages.

186.    As a result of Defendants' concerted acts of deliberate and reckless indifference, wanton and willful misconduct, and malicious intent, the surviving next of kin and distributees of Plaintiffs-decedents and the members of the Proposed Classes sustained all other damages allowed by law.

187.    As a result of Defendants' concerted acts of deliberate and reckless indifference, wanton and willful misconduct, and malicious intent,, Plaintiffs and the members of the Proposed Classes have suffered damages in an amount that exceeds any jurisdictional limits.

## COUNT IV
## AGAINST ALL DEFENDANTS
## FOR GROSS NEGLIGENCE

188.    Plaintiffs hereby incorporate by reference each of the preceding allegations as though set forth herein.

189.    Defendants had ample notice of danger and willfully failed to prevent harm from it.

190.    Defendants purposely, willfully, and wantonly suppressed, distorted, manipulated, and withheld relevant public health information, with the intent of covering up the disastrous effects of their March 25th Directive.

191.    Defendants purposely, willfully, and wantonly conspired to obscure public health information from the public and federal authorities which informed how their order worsened the death toll at nursing homes across the State of New York.

192.    Defendants, through their individual actions and acting under color of state law, conspired to publicly misstate how their policy worked, conspired to withhold public data, conspired to publish falsified research under the NYSDOH's name, and conspired to stonewall inquiries from the New York State Legislature.

193.    Defendants intentionally created the false impression that New York was one of the best performing states in the country on nursing home COVID-19 deaths, when in fact it was one of the worst.

194.    Defendants' concerted acts of deliberate and reckless indifference, wanton and willful misconduct, and malicious intent, executed with the knowledge of its potential harm to others, contributed to thousands of elderlies and/or disabled nursing home residents, including Plaintiffs-decedents, being unnecessarily and mortally infected with COVID-19.

195.    The deprivation of Plaintiffs-decedents federally protected constitutional and statutory rights was a direct result of Defendants' gross and lethal misuse of power, possessed and given by virtue of state law, and made possible only because they were clothed with the authority of state law.

196.    Defendants' shocking, unsound, reckless, and willful approach caused catastrophic results for the elderly and disabled population residing at nursing homes, violated their substantive due process rights, and deprived them of their federally protected constitutional and statutory rights, including the fundamental right to life, the right to bodily integrity, and the right to a safe environment.

## COUNT V
## AGAINST ALL DEFENDANTS
## FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

197.    Plaintiffs hereby incorporate by reference each of the preceding allegations as though set forth herein.

198.    Defendants purposely, willfully, and wantonly suppressed, distorted, manipulated, and withheld relevant public health information, with the intent of covering up the disastrous effects of their March 25th Directive.

199.    Defendants purposely, willfully, and wantonly conspired to obscure public health information from the public and federal authorities which informed how their order worsened the death toll at nursing homes across the State of New York.

200.    Defendants, through their individual actions and acting under color of state law, conspired to publicly misstate how their policy worked, conspired to withhold public data, conspired to publish falsified research under the NYSDOH's name, and conspired to stonewall inquiries from the New York State Legislature.

201.    Defendants' concerted acts of deliberate and reckless indifference, wanton and willful misconduct, and malicious intent, executed with the knowledge of its potential harm to others, contributed to thousands of elderlies and/or disabled nursing home residents, including Plaintiffs-decedents, being unnecessarily and mortally infected with COVID-19.

202.    Defendants' shocking, unsound, reckless, and willful approach caused catastrophic results for the elderly and disabled population residing at nursing homes, violated their substantive due process rights, and deprived them of their federally protected constitutional and statutory rights, including the fundamental right to life, the right to bodily integrity, and the right to a safe environment.

203.  As a result of Defendants' concerted acts of deliberate and reckless indifference, wanton and willful misconduct, and malicious intent, Plaintiffs-decedents were basically sentenced to death.

204.  As a result of Defendants' shocking and concerted acts of deliberate and reckless indifference, wanton and willful misconduct, and malicious intent, Plaintiffs suffered severe emotional distress stemming from the events surrounding their relatives' deaths.

WHEREFORE, Plaintiffs, on behalf of themselves and the Proposed Classes 1 and 2, demand judgment against the Defendants, jointly and severally:

1.  Awarding the Plaintiffs and putative class members of the Proposed Class 1 and 2 damages to the fullest extent available under the law, including actual, compensatory, punitive, and consequential damages;

2.  Awarding the Plaintiffs and putative class members of the Proposed Class 1 and 2 with attorney's fees, interests, costs, and disbursements; and,

3.  Awarding the Plaintiffs and putative class members of the Proposed Classes 1 and 2 with such other relief as this Court may deem just and proper.

Dated: Melville, New York
         August 31, 2023

Respectfully submitted,

**NAPOLI SHKOLNIK, PLLC**
*Attorneys for Plaintiff*

 */s/ Joseph L. Ciaccio*
Joseph L. Ciaccio, Esq.
Bar No. JC6856
400 Broadhollow Rd, Suite 305
Melville, New York, 11747
T: 212-397-1000