# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOSEPH FERRARI, as Administrator of the Estate of CHRISTINE FERRARI; LEOVA JENKINS, as Administrator of the Estate of ELOISE BROOKS; IRASEMA RIVERA, as Administrator of the Estate of PAUL RIVERA; JOSE MONGE, as Administrator of the Estate of BLANCA NIEVES, STACIE DRUCKMAN, as Administrator of the Estate of ARTHUR DRUCKMAN; DELORIS PEOPLES, as Proposed Administrator of the Estate of ALEX PEOPLES; SANDRA THOMAS-WATSON, as Administrator of the Estate of BELINDA THOMAS; and PATRICIA BIONDI, as Executor of the Estate of MICHAEL BIONDI,  for themselves and on behalf of all others similarly situated, | **AMENDED COMPLAINT AND JURY TRIAL DEMAND**<br><br>**Case No: 1:23-cv-07715-KPF** |
| *Plaintiff(s),* | |
| -*against*- | |
| ANDREW M. CUOMO, HOWARD A. ZUCKER, M.D., MELISSA DEROSA, JOHN DOES and JANE DOES 1-30, | |
| *Defendant(s).* | |

Plaintiffs, individually and on behalf of others similarly situated, by their attorneys,  Napoli & Shkolnik PLLC, and by way of this Class Action Complaint against the Defendants,  very respectfully state, allege, and pray as follows:

## NATURE OF THE CASE

1.      This is a class action suit for damages brought by plaintiffs, Joseph Ferrari as Administrator of the Estate of Christine Ferrari, Leova Jenkins as Administrator of the Estate of Eloise Brooks,  Irasema Rivera as Administrator of the Estate of Paul Rivera, Jose Monge as Administrator of the Estate of Blanca Nieves, Stacie Druckman as Administrator of the Estate of

Arthur Druckman, Deloris Peoples as Administrator of the Estate of Alex Peoples, Sandra Thomas-Watson as Administrator of the Estate of Belinda Thomas, and Patricia Biondi as Executor of the Estate of Michael Biondi, on behalf of themselves and on behalf of all other similarly situated individuals ("collectively, Plaintiffs"), complaining against Andrew M. Cuomo, Howard A. Zucker, M.D.,  Melissa DeRosa, and other currently unknown public officials of the State of New York, in their individual capacities ("collectively Defendants"), who acting under color of state law, (1) issued a foreseeably lethal mandate on March 25, 2020 ("the March 25th Directive"), that ordered nursing homes to admit and/or readmit residents who had been discharged from hospitals after being treated for COVID-19 infection, regardless of their positive or negative status, and with direct orders not to even ascertain their infection status, (2) continued enforcing their foreseeably lethal policy even on the face of disbelief and warnings from health and geriatric-centered advocacy groups and experts, and (3) willfully conspired to mislead and disinform the people of the State of New York, including nursing home residents and their families, including the Plaintiffs herein, by distorting and withholding vital public health information which was critical to the understanding of the real toll the pandemic infectious disease was having on this vulnerable population so that effective and well-informed strategies grounded on reliable data and information, could be devised to affront the crisis. The March 25th Directive caused that  the nursing homes experience  a foreseeable  increase in positive COVID cases among staff and residents, which coupled with some nursing homes' known historic lack of staffing resources, training, and proper equipment, led to the expected and unnecessary deaths of thousands of nursing home residents. The Defendants' shocking, wanton, conspiratorial, willful, intentional, actions, still fully unexplained to the public, targeted known elderly, mentally, frail, and physically disabled

nursing home residents and their already fragile environment, and foreseeably condemned them to their premature deaths, thereby depriving them of their constitutional and federal statutory rights.

- "*It wasn't just an executive order – it was a **declaration of eldercide** in the State of New York*" (*emphasis added*) – Assemblyman Ron Kim (D-Queens)[1].

- "*This approach will introduce the highly contagious virus into more nursing homes. There will be **more hospitalizations** for nursing home residents who need ventilator care and ultimately, a **higher number of deaths**. Issuing such an order is a mistake...*"(*emphasis added*) Mark Parkinson, President & CEO of the American Health Care Association.[2]

- "*I think it was an **utter lack of regard** for nursing home residents.*" (*emphasis added*) Richard Mallot, executive Director of the New York-based Long Term Care Community Coalition.[3]

- "*The public was **misled** by those at the highest level of state government through **distortion and suppression of the facts** when New Yorkers deserved the truth*". Thomas DiNapoli, Comptroller of the State of New York.[4]

## JURISDICTION AND VENUE

2.     This Court has original subject matter jurisdiction pursuant to 28 U.S.C. §1331, 28 U.S.C. §1343(a)(3), 28 U.S.C. §1343(a)(4), 42 U.S.C. §1983, and 42 U.S.C. §1988.

3.     This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. §1367.

4.     Venue is proper in the U.S. District Court for the Southern District of New York pursuant to 28 U.S.C. §1391(b)(1) and 28 U.S.C. §1391(b)(2).

## THE PARTIES

**I.     Named Plaintiffs**

---

[1] https://nypost.com/2022/03/23/ny-pols-mark-2-year-anniversary-of-cuomo-nursing-home-order/
[2]     https://www.ahcancal.org/News-and-Communications/Press-Releases/Pages/Long-Term-Care-Leaders-Address-State-Orders-on-Hospital-Admissions-to-Nursing-Homes.aspx
[3] https://www.statnews.com/2021/02/26/cuomos-nursing-home-fiasco-ethical-perils-pandemic-policymaking/
[4] https://www.osc.state.ny.us/press/releases/2022/03/dinapoli-states-pandemic-response-nursing-homes-hindered-ill-prepared-state-agency

**The Estate of Christine Ferrari by her Administrator, Joseph Ferrari**

5.      Plaintiff, Joseph Ferrari, is the Administrator of the Estate of his deceased spouse, Christine Ferrari, and a resident of the State of New York, County of Westchester.

6.      Christine Ferrari was a resident at Yonkers Center for Nursing and Rehabilitation ("Yonkers Center"), located at 115 South Broadway, Yonkers, NY 10701, from on around January 2020, until on or around April 23, 2020.  She was admitted for short-term rehabilitation services.

7.      From March 25, 2020, through May 8, 2020, per preliminary data released by the Department of Health in response to a New York Freedom of Information Law request made by USA Today Network, Yonkers Center reportedly had at least 30 COVID-19 positive admissions and/or readmissions they were forced to take in from hospitals.[5] .

8.      After the issuance of the March 25th Directive, Christine Ferrari became unnecessarily exposed to, and infected with, COVID-19 at her nursing home.  The March 25th Directive ordered nursing homes like Yonkers Center to take into the nursing home residents discharged from hospitals regardless of their COVID infection status, and without knowledge of each nursing home's capabilities to affront such a deadly task. .

9.       On or around April 23, 2020, Ms. Ferrari was transferred to St. John's Riverside Hospital with difficulty breathing.   There, she tested positive for COVID-19 and was put on a ventilator.

10.     Christine Ferrari died on April 27, 2020, due to septic shock caused by COVID-19 infection.

11.     Audrey Campbell, a certified nursing assistant in Yonkers Center for Nursing and Rehabilitation, reported that resident deaths began when the nursing home started bringing in

---

[5] The data was produced while Defendants were the public officials in charge of disclosing the information, so they are of questionable integrity and the totals may be higher.

COVID-19 patients from nearby hospitals, because of the March 25th Directive.  "We had no idea what was going on, in the beginning," she said. "We didn't even know what was happening until people started getting sick."  "Several staff members quit coming into work out of fear, leaving the remaining aides scrambling. In the beginning, they didn't have adequate PPE. Sometimes on weekends, Campbell and one other colleague were left to take care of around 30 elderly residents, many of whom became violently ill. "People were twisting and turning and moaning," Campbell remembers. She says some were throwing up and spitting blood. "We watched people die." [6]

12.     Prior to and following Ms. Ferrari's infection and death from COVID-19, the Defendants actively, willfully, and intentionally conspired among themselves and/ or with others to undercount and underreport nursing home deaths and hide the truth about the devastating effects the infectious toxin had in nursing homes, in utter disregard of the civil rights of all nursing home residents,  their health care proxies, and their next of kin. .

**The Estate of Eloise Brooks by her Administrator, Leova Jenkins**

13.     Plaintiff, Leova Jenkins, is the Administrator of the Estate of her mother, Eloise Brooks, and a resident of the State of New York, County of New York.

14.     Eloise Brooks was a resident at Upper East Side Rehabilitation and Nursing Center ("Upper East"), located at 211 East 78th Street, New York, NY 10021, from around November 2019, until on or around April 9, 2020.  She had been admitted for rehabilitation services following right hip surgery.

15.     From March 25, 2020, through May 8, 2020, per preliminary data released by the Department of Health because of a New York Freedom of Information Law request, the Upper

---

[6] https://www.thecut.com/2021/04/new-yorks-nursing-homes-covid-cuomo.html

East rehab center reportedly had at least 110 COVID-19 positive admissions and 44 readmissions they were forced to take in from hospitals.  .

16.     After the issuance of the March 25th Directive there was an increase in positive COVID-19 cases at Upper East, and as a result,, Eloise Brooks became unnecessarily exposed to, and infected with, COVID-19 at her nursing home.  .  Upper East was not equipped to handle the influx of residents, much less infected residents, within their facilities.

17.     The March 25th Directive ordered nursing homes like Upper East to admit any resident discharged from hospitals regardless of their COVID infection status.  This lethal policy was issued without knowledge of each nursing home's capabilities, including Upper East, to affront such a deadly task and against the warnings of experts and advocacy groups, and continued in force even with the knowledge of how COVID-19, even in its early stages, had ravaged through many nursing homes across the country. . .

18.     On April 9, 2020, Ms. Brooks was sent from Upper East to Lenox Hill Hospital with difficulty breathing, shortness of breath, and hypoxia.  At the hospital, she tested positive for COVID-19.  She died five days later, on April 14, 2020.

19.     By the end of May 2020, upon belief and information, Upper East Side Rehabilitation and Nursing Center had reported over 200 positive COVID-19 cases in their facility among staff and residents, and at least 89 of its residents had already died from COVID-19.

20.     Prior to and following Ms. Brooks' infection and death from COVID-19, the Defendants actively, willfully, and intentionally conspired among themselves and/ or with others to undercount and underreport nursing home deaths and hide the truth about the devastating effects the infectious toxin had in nursing homes, in utter disregard of the civil rights of all nursing home residents,  their health care proxies, and their next of kin.

**The Estate of Paul Rivera by her Administrator, Irasema Rivera**

21.    Plaintiff, Irasema Rivera, is the Administrator of the Estate of her father, Paul Rivera, and a resident of Charlotte, North Carolina.

22.    Paul Rivera was a resident at Workmen's Circle MultiCare Center ("Workmen's MultiCare"), located at 3155 Grace Avenue, Bronx, NY 10469, from on or round 2012, until on or around May 4, 2020. He was admitted for long-term care.

23.    From March 25, 2020, through May 8, 2020, Workmen's MultiCare had reported at least 108 COVID-19 positive admissions and 61 readmissions they were forced to take in from hospitals.[7]

24.    After the issuance of the March 25th Directive there was an increase in positive COVID-19 cases at Workmen's MultiCare, and as a result, Paul Rivera became unnecessarily exposed to, and infected with, COVID-19 at his nursing home. The Defendants' lethal policy put him knowingly in harm's away.

25.    The March 25th Directive ordered nursing homes like Workmen's MultiCare to admit any resident discharged from hospitals regardless of their COVID infection status.  This lethal policy was issued without knowledge of each nursing home's capabilities, including Workmen's MultiCare, to affront such a deadly task and against the warnings of experts and advocacy groups, and continued in force even with the knowledge of how COVID-19, even in its early stages, had ravaged through many nursing homes across the country.

26.    On or around May 4, 2020, Paul Rivera was moved to the Albert Einstein Hospital due to seizures and having contracted COVID-19.  He passed away on May 12, 2020.

---

[7] Per preliminary data released by the Department of Health because of a New York Freedom of Information Law request made by USA TODAY Network.

27.    By the end of May 2020, upon belief and information, Workmen's MultiCare had reported over 300 positive COVID-19 cases in their facility among staff and residents, and at least 66 of its residents had died from COVID-19.

28.    Prior to and following Mr. Rivera's infection and death from COVID-19, the Defendants actively, willfully, and intentionally conspired among themselves and/ or with others to undercount and underreport nursing home deaths and hide the truth about the devastating effects the infectious toxin had in nursing homes, in utter disregard of the civil rights of all nursing home residents,  their health care proxies, and their next of kin.

**The Estate of Blanca Nieves by her Administrator, Jose Monge**

29.    Plaintiff, Jose Monge, is the Administrator of the Estate of his mother, Blanca Nieves, and a resident of the State of New York, Bronx County.

30.    Blanca Nieves was a resident at Bronx Center for Nursing and Rehabilitation ("Bronx Center"), located at 101 Underhill Avenue, Bronx, NY 10472, from on or around 2016 until on or around April 18, 2020.  She was admitted for long-term care due to dementia.  There were no other known pre-existing health conditions.

31.    From March 25, 2020, through May 8, 2020, Bronx Center had reported at least 65 COVID-19 positive admissions and/or readmissions they were forced to take in from hospitals.[8] After the issuance of the March 25th Directive there was an increase in positive COVID-19 cases at Bronx Center, and as a result,  Blanca Nieves's exposition to COVID-19 grew exponentially. She became unnecessarily exposed to, and infected with, COVID-19 at her nursing home following the implementation of the lethal policy.   Blanca Nieves was transported to the hospital due to difficulty breathing. She ended up staying for a couple of weeks.  At this point, the family

---

[8] Per preliminary data released by the Department of Health because of a New York Freedom of Information Law request.

was told there is nothing else to be done so they transferred to hospice where she died on May 13, 2020.

32.    Prior to and following Ms. Nieves' infection and death from COVID-19, the Defendants actively, willfully, and intentionally conspired among themselves and/ or with others to undercount and underreport nursing home deaths and hide the truth about the devastating effects the infectious toxin had in nursing homes, in utter disregard of the civil rights of all nursing home residents,  their health care proxies, and their next of kin.  .

**The Estate of Arthur Druckman by his Administrator, Stacie Druckman**

33.    Plaintiff, Stacie Druckman, is the Administrator of the Estate of her father, Arthur Druckman, and a resident of the State of New York, Bronx County.

34.    Arthur Druckman was a resident at Morningside Nursing and Rehabilitation Center ("Morningside"), located at 1000 Pelham Parkway South, Bronx, NY 10461, from on or around 2017 until on or around April 5, 2020.

35.    From March 25, 2020, through May 8, 2020, Morningside had reported at least 55 COVID-19 positive admissions and/or readmissions they were forced to take in from hospitals.[9] After the issuance of the March 25th Directive there was an increase in positive COVID-19 cases at Morningside, and as a result, Arthur Druckman's exposition to COVID-19 grew exponentially. He  became unnecessarily exposed to, and infected with, COVID-19 at his nursing home.  Arthur Druckman was transported to Jacobi Medical Center due to difficulty breathing.  He passed away from complications due to COVID-19 on April 17, 2020.

36.    The March 25th Directive ordered nursing homes like Morningside to admit any resident discharged from hospitals regardless of their COVID infection status.  This lethal policy

[9] Per preliminary data released by the Department of Health because of a New York Freedom of Information Law request.

was issued without knowledge of each nursing home's capabilities, including Morningside, to affront such a deadly task and against the warnings of experts and advocacy groups, and continued in force even with the knowledge of how COVID-19, even in its early stages, had ravaged through many nursing homes across the country.  .

37.    Prior to and following Mr. Druckman's infection and death from COVID-19, the Defendants actively, willfully, and intentionally conspired among themselves and/ or with others to undercount and underreport nursing home deaths and hide the truth about the devastating effects the infectious toxin had in nursing homes, in utter disregard of the civil rights of all nursing home residents,  their health care proxies, and their next of kin. .

**The Estate of Alex Peoples, by his Proposed Administrator, Deloris Peoples**

38.    Plaintiff, Deloris Peoples, is the Proposed Administrator of the Estate of her brother, Alex Peoples, and a resident of the State of New York, Westchester County.

39.    Alex Peoples was a resident at Triboro Center for Rehabilitation and Nursing ("Triboro Center"), located at 1160 Teller Avenue, Bronx, NY 10461, from on or around January 2017, until on or around April 10, 2020.

40.    From March 25, 2020, through May 8, 2020, Triboro Center had reported at least 60 COVID-19 positive admissions and/or readmissions they were forced to take in from hospitals.[10]   After the issuance of the March 25th Directive there was an increase in positive COVID-19 cases at Triboro Center, and as a result, Alex People's exposition to COVID-19 grew exponentially.  He  became unnecessarily exposed to, and infected with, COVID-19 at his nursing home.

---

[10] Per preliminary data released by the Department of Health because of a New York Freedom of Information Law request.

41.    The March 25th Directive ordered nursing homes like Triboro Center to admit any resident discharged from hospitals regardless of their COVID infection status.  This lethal policy was issued without knowledge of each nursing home's capabilities, including Triboro Center, to affront such a deadly task, went against the warnings of experts and nursing home advocacy groups, and continued in force even with the knowledge of how the COVID-19 virus, even in its early stages, had ravaged through many nursing homes across the country. .

42.    Alex Peoples was transported to Bronx Lebanon Medical Center due to difficulty breathing.   He passed away from complications due to COVID-19 on April 13, 2020.

43.    Prior to and following Mr. People's infection and death from COVID-19, the Defendants actively, willfully, and intentionally conspired among themselves and/ or with others to undercount and underreport nursing home deaths and hide the truth about the devastating effects the infectious toxin had in nursing homes, in utter disregard of the civil rights of all nursing home residents,  their health care proxies, and their next of kin..

**The Estate of Belinda Thomas, by her Administrator, Sandra Thomas-Watson**

44.    Plaintiff, Sandra Thomas-Watson, is the Administrator of the Estate of her mother, Belinda Thomas, and a resident of the State of New York, Richmond County.

45.    Belinda Thomas was a resident at Clove Lakes Health Care and Rehabilitation Center Inc. ("Clove Lakes"), located at 25 Fanning Street, Staten Island, NY 10314, from on or around 2018 until on or around April 21, 2020.  She was admitted for rehabilitation services following a stroke.

46.    From March 25, 2020, through May 8, 2020, Clove Lakes had reported at least 55 COVID-19 positive admissions and/or readmissions they were forced to take in from hospitals.[11]

---

[11] Per preliminary data released by the Department of Health because of a New York Freedom of Information Law request.

47.    After the issuance of the March 25th Directive there was an increase in positive COVID-19 cases at Clove Lakes, and as a result, Belinda Thomas' exposition to COVID-19 grew exponentially.  She  became unnecessarily exposed to, and infected with, COVID-19 at his nursing home.  Belinda Thomas was transported to Richmond University Medical Center due to difficulty breathing.  She ended up staying for a couple of weeks.  At the hospital it was confirmed that Belinda Thomas had COVID-19. She was put on a ventilator, passing away on May 1, 2020.

48.    The March 25th Directive ordered nursing homes like Clove Lakes to admit any resident discharged from hospitals regardless of their COVID infection status.  This lethal policy was issued without knowledge of each nursing home's capabilities, including Clove Lakes, to affront such a deadly task, went against the warnings of experts and nursing home advocacy groups, and continued in force even with the knowledge of how the COVID-19 virus, even in its early stages, had ravaged through many nursing homes across the country.

49.    Prior to and following Ms. Thomas' infection and death from COVID-19, the Defendants actively, willfully, and intentionally conspired among themselves and/ or with others to undercount and underreport nursing home deaths and hide the truth about the devastating effects the infectious toxin had in nursing homes, in utter disregard of the civil rights of all nursing home residents,  their health care proxies, and their next of kin. .

**The Estate of Michael Bondi, by his Executor, Patricia Biondi**

50.    Plaintiff, Patricia Biondi, is the Executor of the Estate of her deceased spouse, Michael Bondi, and a resident of the State of New York, Dutchess County.

51.    Michael Bondi was a resident at North Westchester Restorative Therapy and Nursing Center, located at 3550 Lexington Avenue, Mohegan Lake, NY 10547, from October 16,

2020, until on or around November 19, 2020.  He was admitted  tosubacute rehabilitation services after suffering a fall.  After his rehabilitation, the plan was to be discharged to his home.

52.     Michael Bondi became exposed to and infected with COVID-19 at North Westchester Restorative Therapy and Nursing Center.  Michael Biondi was admitted to Hudson Valley Hospital in November 2020 because he was COVID-19 positive and had low oxygen saturation and difficult breathing.  He passed away on November 24, 2020, from complications due to COVID-19 infection.

53.     Prior to and following Mr. Biondi's infection and death from COVID-19, the Defendants actively, willfully, and intentionally conspired among themselves and/ or with others to undercount and underreport nursing home deaths and hide the truth about the devastating effects the infectious toxin had in nursing homes, in utter disregard of the civil rights of all nursing home residents,  their health care proxies, and their next of kin. .

54.     A January 28, 2021, in a report issued by the Office of the Attorney General of the State of New York, entitled *Nursing Home Response to the COVID-19*, it was  estimated that the full death toll was 50% higher than what had been officially reported by state officials, including the Defendants.

55.     For more than 11 months, the Defendants conspired to suppress, distort, manipulate, and flat-out lie to the citizens of the State of New York, and relevant to the present claims, to nursing home residents, their health care proxies, and their next of kin, like herein Plaintiffs.

56.     These reckless, willful, conspiratorial, intentional, and/or  grossly reckless actions created a false sense of security and hindered the implementation and execution of better strategies designed to protect the life of our beloved elders.  Their inexplicable actions led to the deaths of

thousands of nursing home residents, including one Michael Bondi and other similarly situated individuals.

## II.    The Proposed Classes

57.    The above-named Plaintiffs, pursuant to Rule 23 of the Federal Rules of Civil Procedure, seek to certify two classes of similarly situated individuals representing the estates of elderly, mentally, and/or physically disabled nursing home residents across the State of New York, who were under lockdown and confined to their nursing homes during the COVID-19 pandemic, as defined below (the "Proposed Classes").

### Class 1

(1) Comprised of individuals who were nursing home residents who were under lockdown orders at any time during the effectiveness of the March 25th Directive, and were exposed to, contracted the COVID-19 viral infection, and died after the March 25th Directive came into effect compelling nursing homes to admit and readmit patients discharged from hospitals even if they were positive for COVID-19 ("Class 1"). We estimate Class 1 is potentially comprised of more than 7,000.

### Class 2

(2) Comprised of individuals who were nursing home residents at any time during the period the Defendants were actively conspiring, suppressing, distorting, and manipulating public health information about death count of the COVID-19 infection in nursing home settings ("Class 2"). We estimate Class 2 is potentially comprised of more than 8,000.

58.    Certification of the Proposed Classes would be appropriate because:

   a.    *The Proposed Classes are so numerous that joinder of all members is impracticable.* We estimate that between them, Class 1 and Class 2 are comprised by more than 15,000 individuals, which potentially includes all nursing home residents that passed away between March 25, 2020, and March 2021 approximately,.

   b.    *There are questions of law and fact which are common to members of the Proposed Classes, and which predominate over questions affecting any individual class member.* Some common questions of law and fact include, *inter alia*, the following:

i.   Whether the defendants acted or failed to act in a manner that deprived nursing home residents of their civil rights, including their rights to life, safe environment, freedom from harm, and the full enjoyment of their lives;

ii.  Whether the actions and omissions of Defendants, which precipitated and/or caused unnecessary and avoidable COVID-19 deaths in nursing homes across the State of New York, were abnormally dangerous and/or in wanton, willful, and/or reckless disregard of the rights, safety, and interests of the members of the Proposed Classes;

iii. Whether members of the Proposed Class 1 were New York nursing home residents at facilities that admitted COVID-19 positive patients from hospitals following the March 25th Directive;

iv.  Whether members of the Proposed Class 1 were New York nursing home residents infected with COVID-19 after their nursing home facilities admitted COVID-19 positive patients from hospitals following the March 25th Directive;

v.   Whether members of the Proposed Class 2 were New York nursing home residents infected with COVID-19 during the period Defendants were actively conspiring, suppressing, distorting, and manipulating public health information about the real death toll  of COVID-19 infection in nursing home settings;

vi.  Whether Defendants conduct and behavior shocks the conscience, as part of the inquiry necessary to state a §1983 claim;

vii. Whether Defendants' actions and omissions were done under color of state law;

viii. Whether the damages sustained by members of the Proposed Classes were foreseeable events that should have been known to  the Defendants, given the widespread news of injury and death within nursing home settings in the wake of the COVID-19 outbreak and pandemic in the United States and beyond.

ix.  Whether Defendants had ample notice of harm, and whether their conduct was willful, reckless,and/or grossly negligent;

x.   Whether Defendants conspired to deprive the civil rights of elderly and disabled nursing home residents who were locked down and confined to their nursing homes, and whether such conduct had a discriminatory

animus;

xi.   Whether Defendants' actions and omissions deprived the civil rights of elderly and disabled nursing home residents who were locked down and confined to their nursing homes;

xii.  Whether the Defendants are liable to the Proposed Classes for actual, compensatory, punitive, and any other damages.

c.   *The claims of the representative parties are typical of the claims of the Proposed Classes.* The named Plaintiffs assert claims typical of those of the individual members of the Proposed Classes based on Defendants' violations of their federally protected civil and constitutional rights. Plaintiffs' interests are not antagonistic to, or in conflict with, the Proposed Classes as a whole. Moreover, Plaintiffs and the members of the Proposed Classes suffered damages in the same or similar ways because of the Defendants' actions and/or inactions. In addition, Plaintiffs and the members of the Proposed Classes are relying on the same legal theories and causes of action.

d.   *The named Plaintiffs will fairly and adequately protect and represent the interests of each member of the Proposed Classes.* Among other things, Plaintiffs have suffered the same or similar harm as the other members of the Proposed Classes and will zealously pursue their claims against the Defendants. In addition, counsel for Plaintiffs, Napoli Shkolnik, PLLC and Joseph L. Ciaccio is amply qualified to represent the interests of the Class. Counsel is a respected member of their legal community, who has engaged in complex civil litigation in the States New York, in Federal Court, and across the Country for many years, including medical malpractice, nursing home, mass tort, pharmaceutical, and other class action case(s). Furthermore, there is no conflict of interest between the Proposed Classes.

e.   *A class action is the superior method for adjudicating the controversy.* First, the financial capital required to litigate each of their cases on an individual basis makes it unlikely that members of the Classes will seek redress for the wrongful conduct alleged. Moreover, it is desirable to concentrate the litigation in a single forum since the disposition of Class members' claims in a class action will provide substantial benefits to both the parties and the Court, and denial of class certification may result in a multitude of individual suits, with the potential for incongruity of adjudication and results.

f.   *Finally, no unusual difficulties are likely to be encountered in the management of their class action, as it is straightforward.* The proceedings can be structured to simplify the initial trial on common issues. In addition, the Court has flexibility to manage special claims through the creation of a subclass or subclasses, and through deferral of individual claims to subsequent claims

proceedings.

59.     Defendants' actions and omissions, as described throughout this complaint, are generally applicable to both Proposed Classes and impacted them directly.  Accordingly, final compensatory relief regarding these Proposed Class Members is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

60.     Plaintiffs reserve the right to modify the definition of the Proposed Classes or propose the creation of subclasses before the Court decides whether certification is appropriate.

**III.     Defendants**

61.      Defendant **Andrew M. Cuomo** ("Defendant Cuomo") served as Governor of New York from 2011 until 2021.  At all times relevant to this Complaint, upon information and belief, his address was at the New York State Capitol Building, Albany, NY 12224.   His current address is unknown.

62.     Defendant **Howard A. Zucker, M.D.,** ("Defendant Zucker") served as Commissioner of the New York Department of Health from on or around May 2015, until on or around November 2021.  At all times relevant to this Complaint, upon information and belief, his address was at Corning Tower, Empire State Plaza, Albany, NY 12237.   His current address is unknown.

63.     Defendant **Melissa DeRosa** ("Defendant DeRosa"), served as the Secretary of Staff for Governor of New York from 2017 to 2021.  At all times relevant to this Complaint, upon information and belief, her address was at the New York State Capitol Building, Albany, NY 12224.  Her current address is unknown.  Secretary DeRosa, in her book she described herself as "the most senior member of New York Governor Andrew Cuomo's team leading the nation

through a once-in-a-century pandemic, making life-or-death decisions, projecting our administration's competence to an admiring world."

64.    Defendants Cuomo, Zucker, and DeRosa were at the top of the deadly March 25th Directive that ordered nursing home operators to admit residents discharged from hospitals, even if they were still suspected or confirmed positive for COVID-19, and prohibited them from requiring a hospitalized resident to be tested for COVID-19 prior to admission or readmission. This lethal policy was issued with full knowledge of its foreseeable disastrous effects on the elderly and disabled nursing home population.

65.    In her book/memoir, published in October 2023[12], Defendant DeRosa boasted about her participation in the implementation and execution of public policy during the COVID-19 pandemic, alongside Defendants Cuomo and Zucker. She described herself as "the most senior member of New York Governor Andrew Cuomo's team leading the nation through a once-in-a-century pandemic, making life-or-death decisions, projecting our administration's competence to an admiring world." She also admitted the Defendants' prior knowledge of the dangers faced by the nursing home population by stating:

> "While we understood very little about the virus, the medical community was certain it was especially dangerous for the immunocompromised and the elderly, a situation we saw playing out in Seattle, Washington, where nursing homes were being enveloped by COVID spread."

66.    John and Jane Does 1-30 are individuals whose identities and involvement can only be ascertained through the discovery process, but that upon information and belief, acted under

---

[12] The book is titled What's Left Unsaid: My Life at the Center of Power, Politics, and Crisis.

color of state law to deprive plaintiffs-decedents of their federally protected constitutional and statutory rights.

67.    All throughout this complaint, the term "Defendants" will refer to the above-referenced defendants collectively.

## **STATEMENT OF FACTS**

### I.    **Facts Common to All Causes of Action**

A.    COVID-19 Timeline of Events - State and Federal Guidance Related to Nursing Home Facilities and Residents

68.    On December 31, 2019, the World Health Organization (herein after referred to as "WHO") China Country Office was informed of dozens of cases of pneumonia of unknown etiology detected in Wuhan City, Hubei Province of China.

69.    In or around January 2020, Defendants were made aware of severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2) spreading world-wide and nationally, known colloquially as the coronavirus, that caused severe medical distress and death in individuals who caught the disease, especially, the elderly.

70.    On January 7, 2020, the viral outbreak in Wuhan, China was identified as a new type/strain of coronavirus, 2019-nCoV (hereinafter referred to as "novel coronavirus").

71.    SARS-CoV-2 is known and documented to cause a debilitating and deadly disease, the Coronavirus disease 2019 (also referred to herein as, "COVID-19").

72.    On January 11, 2020, Chinese state media reported its first known death from the novel coronavirus.

73.    On January 12, 2020, China shared the genetic sequence of the novel coronavirus for countries to use in developing specific diagnostic kits.

74.     On January 20, 2020, Japan, South Korea and Thailand reported their first confirmed cases of the novel coronavirus. On that same day, the head of a Chinese government coronavirus team confirmed that the novel coronavirus outbreak was transmitted by human-to-human contact, which was a development that put medical facilities, institutions, and long-term skilled nursing facilities on notice of the possibility that the novel corona virus could spread quickly and widely.

75.     On January 23, 2020, the United States and WHO confirmed its first case of the novel coronavirus in the State of Washington.

76.     On February 6, 2020, CMS urged healthcare facilities to prepare for the emerging COVID threat: "[b]ecause coronavirus infections can rapidly appear and spread, facilities must take steps to prepare, including reviewing their infection control policies and practices to prevent the spread of infection." The guidance emphasized the need for staff to "comply with basic infection control practices," including hand hygiene."

77.     On February 11, 2020, the WHO announced "COVID-19" as the shortened name of the novel "coronavirus disease 2019".

78.     On February 13, 2020, the U.S. Director of The Centers for Disease Control and Prevention (hereinafter referred to as "CDC") announced that COVID-19 will likely become a community virus and remain beyond this current season.

79.     On February 25, 2020, the CDC issued a warning that spread of the virus to the United States is likely and that people should prepare; and U.S. senators receive a classified briefing on the Trump administration's coronavirus response.

80.     The first case of COVID-19 in the United States was confirmed on January 21, 2020, in Washington State.

81.     On February 28, 2020, a case of the novel coronavirus disease was identified and confirmed in a woman resident of a long-term care skilled nursing facility in King County, Washington. A subsequent epidemiologic investigation identified 129 cases of COVID-19, including 81 residents (of approx. 130 - over 62% of the resident population), 34 staff members, and 14 visitors. This was presumably the first recorded cases of the deadly virus at a nursing home facility. The infected resident died three days later, on March 2, 2020. Overall, 111 (86%) cases occurred among nursing home residents of King County, Washington State (81 facility A residents, 17 staff members, and 13 visitors) and 18 (14%) among nursing home residents of Snohomish County (directly north of King County) (17 staff members and one visitor). As of March 9, 2020, at least eight other King County skilled nursing and assisted living facilities had reported one or more confirmed COVID-19 cases.

82.     These residents and/or patients there were the first in the nation to suffer from and die as a result of the COVID-19 virus, and news of the dire situation and the first deaths in the United States at the Life Care Center in Kirkland, Washington was widespread all throughout the United States and was known to Defendants.

83.     On February 29, 2020, the United States instituted "do not travel warnings" for affected areas including Italy and South Korea.

84.     On February 29, 2020, the CDC posted "Healthcare Facilities: Preparing for Community Transmission" with the following specific instructions to nursing homes:

   a. Limit visitors to the facility.
   b. Post visual alerts (signs, posters) at entrances and in strategic places providing instruction on hand hygiene, respiratory hygiene, and cough etiquette.
   c. Ensure supplies are available (tissues, waste receptacles, alcohol-based hand sanitizer).
   d. Take steps to prevent known or suspected COVID-19 patients from exposing other patients.
   e. Limit the movement of COVID-19 patients (e.g. keep them in their rooms)

      f.   Identify dedicated staff to care for COVID-19 patients.

      g.  Observe newly arriving patients/residents for development of respiratory symptoms.

85.    On March 1, 2020, the first confirmed COVID-19 case in the State of New York was reported.

86.    On March 3, 2020, the first presumed COVID-19-related death occurred at a nursing home in the State of New York.

87.    On March 3, 2020, the WHO reported more than 90,000 infections of COVID-19 globally and about 3,000 deaths.

88.    On March 4, 2020, the Centers for Medicare and Medicaid Services ("CMS") issued its *Guidance for Infection Control and Prevention of Coronavirus Disease 2019 (COVID-19) in Nursing Homes*, recommending suspension and limitation of standard nursing home activities, and the screening of visitors and staff at nursing homes for signs and symptoms of a respiratory infection, such as fever, cough, and sore throat.

89.    Other CMS recommendations included: increasing the availability and accessibility of alcohol-based hand sanitizers, tissues, no touch receptacles for disposal, and facemasks at the facility's entrances, waiting rooms, patient check-ins, etc.; increasing signage for vigilant infection prevention, such as hand hygiene and cough etiquette; properly cleaning, disinfecting, and limiting sharing of medical equipment between residents and areas of the facility; and providing additional work supplies to avoid sharing among staff and residents (i.e., pens, pads), and properly disinfecting workplace areas (such as nurses' stations, phones, internal radios, etc.).

90.    On March 6, 2020, the NYSDOH issued guidance DAL NH-20-04, addressed to nursing homes, regarding the precautions and procedures these facilities should take to protect and maintain the health and safety of their residents and staff during the COVID-19 pandemic

outbreak, and recognizing the "potential for more serious illness among older adults" and the "risk of outbreak" in these facilities  This NYSDOH guidance  recommended screening visitors, nursing home staff, and employees for symptoms of illness upon arriving at work, such as fever, lower respiratory infection, shortness of breath, cough, nasal congestion, runny nose, sore throat, nausea, vomiting, and/or diarrhea, adding that "nursing homes strictly enforce their illness and sick leave policies".

91.    The next day, on March 7, 2020, Defendant Andrew M. Cuomo, then Governor of New York, declared a state of emergency over the COVID-19 outbreak as cases in the state continued to rise.

92.    On March 9, 2020, CMS issued a *Revised Guidance for Infection Control and Prevention of Coronavirus Disease 2019 (COVID-19) in Nursing Homes*.  In a press release announcing the Revised Guidance, CMS stated that "according to the latest data from the Centers for Disease Control and Prevention (CDC), seniors are at the greatest risk of serious illness due to COVID-19, which is why CMS is providing valuable information to providers who interact with patients in the hospice setting. To protect these vulnerable patients, CMS is amplifying its current health and safety requirements by delivering detailed guidance on the screening, treatment and transfer procedures healthcare workers must follow when interacting with patients to prevent the spread of COVID-19. CMS is also issuing additional guidance specific to nursing homes to help control and prevent the spread of the virus".

93.    CMS stressed that these "[nursing home] facilities should continue to be vigilant in identifying any possible infected individuals" and that they "should consider frequent monitoring for potential symptoms of respiratory infection as needed throughout the day".  Per the revised CMS Guidance, "[a] nursing home can accept a resident diagnosed with COVID-19 and still under

Transmission Based Precautions for COVID-19 as long as the facility can follow CDC guidance for Transmission-Based Precautions.  If a nursing home cannot, it must wait until these precautions are discontinued."

94.    On March 11, 2020, President Donald J. Trump suspended travel from Europe, with the exception of the United Kingdom, and the WHO deemed COVID-19 a global "pandemic."

95.    On March 11, 2020, the NYDOH issued Guidance #20-10, which recognized that "older individuals, particularly those with other underlying health conditions, have shown greater susceptibility to the virus and often experience much more serious illness and outcomes" adding that "the potential for more serious illness among older adults, coupled with the communal nature of adult care residential services, represents a risk of outbreak and a substantial challenge" for these types of adult care facilities.

96.    On March 13, 2020, seven days after recommending screening visitors, nursing home staff, and employees for symptoms of illness upon arriving at work, the NYDOH issued another Health Advisory addressed to nursing homes and adult care facilities, requiring, *inter alia*, (i) the suspension of "all visitation expect when medically necessary", that "duration and number of visits should be minimized", that [v]isitors should wear a facemask while in the facility and should be allowed only in the resident's room"; (ii) the immediate implementation of "health checks for all [health care personnel] and other facility staff at the beginning of each shift…regardless of whether they are providing direct patient care";  (iii) that "all [health care personnel] and other facility staff shall wear a facemask while within 6 feet of residents"; (iv) that nursing homes "[n]otify the local health department and NYSDOH" of confirmed COVID-19 cases at their facilities; (v) that nursing homes "actively monitor all residents on affected units once per shift", including "a symptom check, vitals, lung auscultation, and pulse oximetry"; (vi)

That they "assure that all residents in affected units remain in their rooms" and to "cancel group activities and communal dining"; (vii) that "residents must wear facemasks when [health care providers] or other direct care providers enter their rooms"; (viii) that staff not be floated between units; (ix) to "cohort residents with COVID-19 with dedicated [health care personnel] and other direct care providers"; (x) to "minimize the number of [health care personnel] and other direct care providers entering rooms"; and (xi) to place all residents on affected units "on droplet and contact precautions, regardless of the presence of symptoms and regardless of COVID-19 status", among other guidance.

97.    On March 13, 2020, President Donald J. Trump declared a "national emergency".

98.    On March 13, 2020, the Center for Medicare & Medicaid Services ("CMS") issued "Guidance for Infection Control and Prevention Concerning Coronavirus Disease 2019 (COVID-19) in Nursing Homes (Revised)" that contained a specific section for limiting transmission of COVID in nursing homes with additional guidance including canceling community dining and group activities and reminding residents to practice social distancing.

99.    On March 13, 2020, CMS a issued a memorandum entitled: Guidance for Infection Control and Prevention of Coronavirus Disease 2019 (COVID-19) in Nursing Homes, which stated, in part:

> h.  Prompt detection, triage and isolation of potentially infectious residents are essential to prevent unnecessary exposures among residents, healthcare personnel, and visitors at the facility;
> i.  Facilities without an airborne infection isolation room (AIIR) are not required to transfer the resident assuming:
>> a)    1) the resident does not require a higher level of care; and
>> b)    2) the facility can adhere to the rest of the infection prevention and control practices recommended for caring for a resident with COVID-19;
> j.  Facilities should restrict visitation of all visitors and non-essential health care personnel, except for certain compassionate care situations, such as an end-of-life situation.  In those cases, visitors will be limited to a specific room only;

k.   Facilities are expected to notify potential visitors to defer visitation until further notice (through signage, calls, letters, etc.);

l.   Those with symptoms of a respiratory infection (fever, cough, shortness of breath, or sore throat) should not be permitted to enter the facility at any time (even in end-of-life situations);

m.   Cancel communal dining and all group activities, such as internal and external group activities;

n.   Remind residents to practice social distancing and perform frequent hand hygiene;

o.   Screen all staff at the beginning of their shift for fever and respiratory symptoms. Actively take their temperature and document absence of shortness of breath, new or change in cough, and sore throat. If they are ill, have them put on a facemask and self-isolate at home;

p.   Facilities should identify staff that work at multiple facilities (*e.g.*, agency staff, regional or corporate staff, etc.) and actively screen and restrict them appropriately to ensure they do not place individuals in the facility at risk for COVID-19;

q.   Facilities should review and revise how they interact with vendors and receiving supplies, agency staff, EMS personnel and equipment, transportation providers (*e.g.*, when taking residents to offsite appointments, etc.), and other non-health care providers (*e.g.*, food delivery, etc.), and take necessary actions to prevent any potential transmission; and

r.   Take actions to mitigate any resource shortages and show they are taking all appropriate steps to obtain the necessary supplies as soon as possible.

100.   On March 15, 2020 the CDC issued guidance and advised that no gatherings of 50 or more people take place until further notice.

101.   On March 16, 2020, President Trump advised citizens to avoid groups of more than 10 individuals.

102.   On March 18, 2020, the CDC published a report titled *COVID-19 in a Long-Term Facility – King County, Washinton, February 27-March 9, 2020*,  where it highlighted that COVID-19 "can cause severe illness and death, particularly among older adults with chronic health conditions", that "COVID-19 can spread rapidly in long-term residential care facilities, and persons with chronic underlying medical conditions are at greater risk for COVID-19–associated severe disease and death", and that "long-term care facilities should take proactive steps to protect the health of residents and preserve the health care workforce by identifying and excluding

potentially infected staff members and visitors, ensuring early recognition of potentially infected patients, and implementing appropriate infection control measures". Per the CDC report, one of the factors that likely contributed to the vulnerability of these facilities was the "delayed recognition of cases because of low index of suspicion" and the "difficulty identifying persons with COVID-19 based on signs and symptoms alone".

103.  The CDC concluded that the "findings demonstrate that outbreaks of COVID-19 in long-term care facilities can have a critical impact on vulnerable older adults", and that "once COVID-19 has been introduced into a long-term care facility, it has the potential to result in high attack rates among residents, staff members, and visitors". Per the CDC, "the underlying health conditions and advanced age of many long-term care facility residents and the shared location of patients in one facility places these persons at risk for severe morbidity and death". For these reasons, "[a]s this pandemic expands, continued implementation of public health measures targeting vulnerable populations such as residents of long-term care facilities…will be critical."

104.  The above-mentioned events highlighted the seriousness of the pandemic event, the COVID-19 toxin, and its potential catastrophic consequences in nursing home settings, where most of the residents are elderly, frail, mentally, and physically disabled.

B.  <u>The March 25th Lethal Mandate Addressed to Nursing Homes and its Foreseeably Disastrous Consequences</u>

105.  On March 23, 2020, Defendants issued a mandate addressed to hospitals, ambulatory surgery centers, office-based surgery practices, and diagnostic and treatment centers, requiring an increase in the availability of beds by a minimum of 50%. The mandate required that "the CEO of every licensed hospital in New York State…legally certify and submit a COVID-19 plan detailing a plan to potentially increase bed capacity by 100%…and a definite plan to increase bed

capacity a minimum of 50%", by March 24, 2020.[13]

106.   Twenty-four hours later, on March 25, 2020, the Defendants issued and announced a compulsory order (the March 25th Directive) directed to nursing homes and mandating that "no resident shall be denied re-admission or admission to the [nursing home] solely based on a confirmed or suspected diagnosis of COVID-19" (emphasis in original), and adding that nursing homes were "prohibited from requiring a hospitalized resident who is determined medically stable to be tested for COVID-19 prior to admission or re-admission". (Emphasis supplied)

107.   The March 25th Directive was criticized by many patient care support groups and healthcare organizations, including AMDA - The Society for Post-Acute and Long-Term Care Medicine ("AMDA"), who the very next day, on March 26, 2020, issued a statement denouncing the directive as "over-reaching, not consistent with science, unenforceable, and beyond all, not in the least consistent with patient safety principles".   AMDA made clear it "cannot endorse or abide by this policy directive", because "[d]ecisions on transfer are not at the sole directive of the hospitals or hospital physicians", but instead, "joint responsibilities since the impact may likely have dire, indeed fatal, consequences", ominously adding that "[u]nsafe transfers will increase the risk of transmission in post-acute and long-term care facilities".

108.   Per AMDA, the March 25th lethal mandate had the effect of overriding "[f]ederal directives set forth by the Centers for Medicare and Medicaid Services which stipulate that such decisions to accept a patient be made with the understanding that the facility can safely care for such patients."

109.   On March 29, 2020, AMDA, the American Health Care Association ("AHCA"), and the National Center for Assisted Living ("NCAL") issued a joint statement expressing they

---

[13] https://dmna.ny.gov/covid19/docs/all/DOH_COVID19_FacilityDirective_032320.pdf

were "deeply concerned with the recent New York State March 25th order, calling the "blanket order" a "short-term and short-sighted solution that will only add to the surge in COVID-19 patients that require hospital care".

110.  Per these organizations, "[b]ased on what we currently know about how this virus can spread in institutional settings, the hospitalizations and case fatality rate, this action by a state will put the many frail and older adults who reside in nursing homes at risk", adding that "[a]lternative settings for patients recovering from COVID-19 must be considered and implemented now, including large field hospitals, dormitories, hotels, and shuttered nursing homes or hospitals".

111.  In their joint statement, AMDA, the AHCA, and the NCAL warned that:

> In New York, requiring all New York nursing homes state-wide to accept all patients regardless of their COVID-19 status, even from hospitals that are not at capacity, will likely cause many more hospitalizations, since elderly people over the age of 80 with chronic diseases are most at risk of hospitalizations – and they constitute the majority of nursing home residents today.[14]

112.  They added that "[i]n assisted living residences and continuing care retirement communities, these factors and the challenges in managing COVID-19 (+) or COVID-19 exposed residents are even more significant".

113.  As per AHCA President and CEO, Mark Parkinson, "This approach will introduce the highly contagious virus into more nursing homes.  There will be more hospitalizations for nursing home residents who need ventilator care and ultimately, a higher number of deaths. Issuing such an order is a mistake and there is a better solution".  Per Mr. Parkinson, "The bottom line is that nursing homes are not a priority in the public health system and this policy reflects that."

---

[14] Id.

114.   In another statement, the AHCA also stressed that "[s]ending hospitalized patients who are likely harboring the virus to nursing homes that do not have the appropriate units, equipment and staff to accept COVID-19 patients is a recipe for disaster", adding that "Governors and public health officials should be working with nursing homes to create as many segregated units as possible right now."

115.   Stephen Hanse, President and CEO of the New York State Health Facilities Association, a group that represents the nursing home industry, described the policy as unprecedented and stated it "raised significant concerns for nursing homes that don't have coronavirus-positive residents or are at capacity". Hanse also echoed some of Defendant Cuomo's now infamous words by saying, "This treacherous virus spreads through nursing homes like fire through dry grass and the state's March 25 policy served to unnecessarily fan the flames of this fire."  "The governor stated that nursing homes are the state's No. 1 concern," he added.

116.   Similarly, it was reported that the President and CEO[15] of LeadingAge New York, an organization that represents nonprofit nursing homes in New York, said he didn't hear about the policy until after it was released. This national lobby representing a large group of nursing homes called the policy a "mistake" that could cause more hospitalizations.  Clearly, nursing home advocates and experts did not have the Defendants' ear.

117.   By March 29, 2020, the United States already accounted for the highest number of infections in the world, recording more than 140,000 cases and 2,000 deaths.  On that same day, President Donald J. Trump announced an extension of "social distancing" guidelines.

118.   On March 31, 2020, the CDC issued another report titled *Preliminary Estimates of the Prevalence of Selected Underlying Health Conditions Among Patients with Coronavirus*

---

[15] Jim Clyne.   See,   https://www.statnews.com/2021/02/26/cuomos-nursing-home-fiasco-ethical-perils-pandemic-policymaking/

*Disease 2019 — United States, February 12–March 28, 2020*, advising that "[r]eports from China and Italy suggest that risk factors for severe disease include older age and the presence of at least one of several underlying health conditions. U.S. older adults, including those aged ≥65 years and particularly those aged ≥85 years, also appear to be at higher risk for severe COVID-19–associated outcomes".    Per national averages, that would mean more than 60% of the nursing home population.

119.    On April 2, 2020, CMS issued a *COVID-19 Long-Term Care Facility Guidance* where it again recognized the "ease of spread in long-term care facilities and the severity of illness that occurs in residents with COVID-19".[16]

120.    Although the states of California and New Jersey had instituted similar policies at some point, New York became the first state to issue a blanket order prohibiting nursing homes from denying admission or readmission to residents who are infected with COVID-19, and banning them from testing patients for the disease before they are admitted or readmitted.

12.    The blowback to these policies prompted California to soften its mandate on April 1, saying facilities "can be expected" to receive COVID patients only if they have adequate protective gear and can follow the federal government's infection control recommendations.

122.    In New Jersey, the state health department clarified in a statement that only facilities "that have the ability to separate patients" into three groups — those who have been infected, those who have been exposed and those who have not been exposed — could accept discharged hospital patients or returning residents who've been infected, adding that 130 long-term care facilities were not accepting admissions.

123.    Even with all the public concern from nursing home experts and advocates, as well

---

[16] https://www.cms.gov/files/document/4220-covid-19-long-term-care-facility-guidance.pdf

as medical experts and organizations, due to Defendants' shocking and egregious March 25th lethal policy, a similar mandate was issued on April 7, 2020, this time addressed to Adult Care Facilities (ACF), ordering that **"[n]o resident shall be denied re-admission or admission to the ACF solely based on a confirmed or suspected diagnosis of COVID-19**" (emphasis in original), and prohibiting them "from requiring a hospitalized resident….to be tested for COVID-19 prior to admission or readmission".

124.  On April 17, 2020, the New York Times reported that approximately one fifth (or 20%) of all COVID-19 deaths were related to nursing homes[17].

125.  Astonishingly, on April 20, 2020, when asked about the state's policy on admitting and readmitting persons to nursing homes regardless of their COVID-19 status, Defendant Cuomo answered "That's a good question, I don't know", deflecting the question to Defendant Zucker. When asked the same question, Defendant Zucker confirmed that under the policy, "If you are positive, you should be admitted back to a nursing home", adding that the "necessary precautions wil be taken to protect the other residents there".

126.  When asked about Defendant Zucker's statement, Assemblyman Ronald T. Kim (D-Queens) stated "It's either he's lying or they have absolutely no idea what's going on the ground". Much too late, we all found out that Defendant Zucker, along with the other Co-Defendants, were indeed lying, with objectively disastrous consequences.

127.  On April 25, 2020, Defendant Cuomo continued to double down on his misguided and insensible March 25th lethal mandate by stating that "[t]hey [meaning nursing homes] don't have a right to object.  That is the rule and that is the regulation, and they have to comply with that", and adding that "If they can't do it, we'll put them in a facility that can do it".  Meanwhile,

---

[17] https://www.nytimes.com/2020/04/17/us/coronavirus-nursing-homes.html

the lethal policy was kept in place.  By this time, Defendants already knew of widespread reports that the coronavirus had killed nearly 11,000 people in nursing homes in 36 states, with more than one third of them occurring in New York, and for all intents and purposes, were already conspiring to mislead the public with distorted facts and suppressed data.

128.    While Defendants were satisfied with putting New York nursing home residents out to slaughter, other jurisdictions tried a different approach.  In Boston, for example, state and local officials partnered up with health care providers to create a temporary 1,000-bed facility in a convention center for recovering patients who did not need hospital-level care. In Minnesota, providers created a 50-bed facility for recovering coronavirus patients who might otherwise be sent to nursing homes.  It was also reported that Connecticut and Massachusetts were both reopening previously shuttered nursing homes to create facilities dedicated exclusively to COVID residents.

129.    In New York, however, while Defendant Cuomo was saying that "[t]his virus uses nursing homes", "[t]hey [nursing homes] are ground zero", and "[i]t's a congregation of vulnerable people", there were no plans to create COVID-only nursing homes or rehabilitation facilities, nor to relocate nursing home residents to safer available locations, either state or federal.

130.  The March 25th lethal mandate was partially rescinded on May 10, 2020, via Executive Order No. 202.30, to now require that a "hospital shall not discharge a patient to a nursing home, unless the nursing home operator or administrator has first certified that it is able to properly care for such patient" and that a "hospital shall not discharge a patient to a nursing home, without first performing a diagnostic test for COVID-19 and obtaining a negative result".

131.  Based on data collected from long-term care facilities across the country, as of May 22, 2020, 43% of all COVID-19 deaths in the United States were residents of long-term care

facilities, despite only comprising 0.62% of the nation's population.

132.   Referring to the March 25th Directive, Assemblyman Ron Kim described it as "the deadliest decision ever made in New York State history".

133.   In a self-serving report released on July 6, 2020, the NYDOH, headed by Defendant Zucker, conveniently concluded that the March 25th lethal mandate was not responsible for further spreading infection and death among the vulnerable and frail nursing home population.  Rather, the report tried to place blame on staffers and visitors, signaling them as the ultimate culprits responsible for the spread of COVID-19 within New York's nursing homes.  Defendant Zucker conveniently concluded that "[a]admission policies were not a significant factor in nursing home fatalities" and that the "March 25 guidance was not the driving force in nursing home deaths".

134.   Denis Nash, an epidemiologist and executive director of the CUNY Institute for Implementation Science in Population Health, stated "I don't think this report convincingly demonstrates that the policy was not another important driver of deaths".  "The key consideration here is a question of 'what if.' What if there had been no such policy. … Would there have been fewer deaths? How many fewer? ... They didn't fully leverage epidemiological methods to rigorously address that question, in my view."

135.   As reported by Pro Publica, "The health department's report was done with the aid of the consulting company McKinsey & Co. The report says it drew on data collected from nursing homes through surveys. It does not list a single author by name, in or out of the health department. McKinsey itself is only listed in a footnote. The health department's website lists four independent reviewers, none of whom are epidemiologists. Two are hospital executives: Michael Dowling, the Northwell hospital chain CEO, and Dr. David L. Reich, president and chief operating officer of Mount Sinai Hospital. Neither answered emailed questions for this story. The health department

34

would not say who, exactly, authored the report, or how much it paid McKinsey for its involvement. McKinsey declined to comment for this story, but did not cite a reason." [18]

136.   The so-called report, revised in February 2021, wanted to convey that "New York State followed the federal government's Centers for Medicare & Medicaid Services guidance which stated that nursing homes should accept residents with COVID-19 as long as they can use transmission-based precautions".  However, CMS did not command nor order nursing homes to accept COVID-19 positive residents nor did CMS prohibit nursing homes from requiring a hospitalized resident cleared for discharge to a nursing home to be tested for COVID-19 prior to admission or readmission and their integration to the senior community environment.  In fact, the CDC guidance emphasized that a nursing home should admit residents with COVID-19 only if able to follow CDC guidance for transmission-based precautions.  Moreover, unlike the Defendants, CMS did not actively and knowingly conspire to hide and distort public health information regarding the nursing home COVID-19 total death count.

137.   On January 28, 2021, a report issued by the New York State Office of the Attorney General ("OAG") concluded that  "over 4,000 nursing home deaths occurred after the issuance of the March 25 guidance", adding that "these admissions may have contributed to increased risk of nursing home resident infection, and subsequent fatalities".  The AG report also found that the Government of the State of New York and its State Department of Health, headed by these Defendants, had undercounted COVID-19-related nursing home resident deaths by as much as 50 percent, or close to 4,000 underreported deaths.

138.   In response to the OAG report's findings, which suggest that he downplayed the total number of nursing home residents killed by COVID-19, Defendant Cuomo stated defiantly "Who

---

[18] https://www.propublica.org/article/andrew-cuomos-report-on-controversial-nursing-home-policy-for-covid-patients-prompts-more-controversy.

cares [if they] died in the hospital, died in a nursing home?  They died".   He also stubbornly dismissed all criticism of his March 25th lethal mandate by stating they were "political attacks" and continued to insist he was following "federal guidance".

139.   In February 2021, after the OAG report, the Defendants finally disclosed real-time information regarding nursing home residents' deaths.  At that time, Defendant Zucker stated that "[w]hen I saw the attorney general's report, I decided to finish that up and get it out in real-time".  Per the "new" data provided, as of January 19, 2021, the total reported nursing home death total stood at 12,743.  A day earlier, the official tally pushed by the Defendants, in a concerted manner, so color of state law, had been 8,711.

140.   The previously undisclosed and willfully suppressed data showed that the admission of COVID-positive patients into New York nursing homes during the time the March 25th Directive was in effect, "was associated with a statistically significant increase in resident deaths".

141.   On February 10, 2021, Defendant Zucker sent a letter to lawmakers stating that the total number of nursing home residents killed by COVID-19 had now increased to 13,297.  This number did not include deaths at assisted living facilities/adult care facilities, which raised the total death count to over 15,000 deaths of mostly vulnerable elderly and/or disabled individuals.

142.   On February 11, 2021, Defendant DeRosa shockingly and brazenly admitted on a call with state legislative members that the underreporting and withholding of nursing home COVID-19 death totals was intentional and with the purpose of misleading the public and federal authorities.  Assemblyman Ron Kim, who took part in the call, stated that Defendant DeRosa's remarks sounded "like they admitted that they were trying to dodge having any incriminating evidence that might put the administration or the [Health Department] in further trouble with the

Department of Justice."[19]

143.  On March 15, 2022, the Office of the New York State Comptroller ("State Comptroller") released the findings of an audit to determine whether the NYDOH, headed by Defendant Zucker, was collecting "necessary data to make informed decisions and promote strong infection prevention and control policies, and whether the data collected by the Department, including data reported to the public, is accurate and reliable". The State Comptroller's audit covered the period from January 2017 through November 2021.

144.  Per the State Comptroller's report, entitled *Department of Health: Use, Collection, and Reporting of Infection Control Data*[20]:

> State auditors also found that DOH did not provide the public with accurate COVID-19 death counts and became entangled in the undercounting of those deaths as the Executive took control of information provided to the public. DOH would not provide auditors with a breakdown by name of the nursing home residents who died from COVID-19, and the actual number of nursing home residents who died is still uncertain. The audit revealed that, on many key indicators, New York significantly trailed other states in surveying nursing homes and developing strategies to stop infections from spreading in facilities.

145.  The State Comptroller, Thomas DiNapoli, added, "Our audit findings are extremely troubling. The public was misled by those at the highest level of state government through distortion and suppression of the facts when New Yorkers deserved the truth. The pandemic is not over, and I am hopeful the current administration will make changes to improve accountability and protect lives. An important step would be for DOH to provide the families who lost loved ones with answers as to the actual number of nursing homes residents who died. These families are still grieving, and they deserve no less."

---

[19] *Cuomo aide Melissa DeRosa admits they hid nursing home data so feds wouldn't find out*, February 11, 2021, The New York Post.
[20] Report 2020-S-55.

146.    Some of the State Comptroller's key audit findings about the NYDOH included:

a)    NYDOH understated the number of nursing home deaths due to COVID-19 by at least 4,100, and at times during the pandemic **by more than 50%**;

b)    Auditors found the Executive **routinely** reported incorrect data, inflating the perception of New York's performance against other states.

c)    NYDOH was **slow to respond** to a federal directive to conduct surveys of nursing homes for infection control problems, surveying just 20% of facilities between March 23 and May 30, 2020, compared with over 90% for some other states.

d)    Auditors found that data from one of NYDOH's key informational systems was **incomplete and unreliable**, , and found that NYDOH was aware of this problem long before the pandemic and had committed to resolve it. However, DOH never followed through on the corrective actions, which may have limited its ability to respond to the COVID-19 nursing home crisis.

e)    NYDOH **imposed impediments** on the audit, including delaying requested data, limiting auditors' contact with program staff, not addressing auditors' questions during meetings, and not providing supporting documentation. These are not routine actions by state agencies undergoing an Office of the State Comptroller audit and raise serious concerns about the control environment at DOH.

147.    Furthermore, the State Comptroller's audit found the NYDOH failed to meet its "ethical" and "moral" imperatives to act transparently in counting nursing home deaths between April 2020 and February 2021.   "Rather than providing accurate and reliable information during a public health emergency,  the department instead conformed to the executive's narrative, often presenting data in a manner that misled the public," stated the report. These egregious failures are the result of Defendants' deliberate, concerted, willful, purposeful, wanton, grossly negligent, discriminatory, and reckless conduct, actions, and omissions, undertaken under color of state law.

148.    In April 2020, emails disclosed to the public revealed that the head of a Brooklyn nursing home, Cobble Hill Health Center, pleaded in vain with state health officials to send residents suspected of having COVID-19 to the under-utilized Javits Convention Center or to the U.S. Naval hospital ship Comfort, weeks before 55 of their residents died of the virus, making it

one of the hardest-hit nursing homes at the time. Per various reports, at the time this plea was made, only 134 of the 1,000 beds at the Javits Center were full, and the Comfort naval ship, which had just been reconfigured to treat up to 500 COVID-19 patients, had a mere 62 patients on board.

149.    To make matters worse, the Navy hospital ship ended up treating only 179 patients before Defendant Cuomo decided it was no longer needed. The Army Corps temporary hospital at Stony Brook was also underutilized. Instead, Defendants pressed on with their shocking and nonsensical approach, willfully, wantonly, recklessly, and in complete disregard of the rights of nursing home residents across the State of New York, arguably the most vulnerable population within the state, comprised of elderly and frail individuals, many of whom suffered from physical and cognitive disabilities, that were confined to their nursing homes.

150.   Per New York Department of Health data, 25% of reported COVID-19 deaths in New York State occurred in long-term care facilities.

151.    Per the State Comptroller's report, between March 4, 2020, and May 23, 2021, the estimated number of New York nursing home residents that died due to COVID-19 infection was 13,919, with 9,650 deaths occurring between March 4, 2020, and July 15, 2020, and 4,136 deaths occurring between July 16, 2020, and March 16, 2021.

152.    In October 2020, Defendant Cuomo published *American Crisis*, a biographical book of the "leadership lessons" he learned through early months of the pandemic, which suggests the possibility of a financial incentive behind his willful decision to conspire, distort, suppress facts, and misinform the public. Not only were the policies he put in place especially egregious, but he also intentionally obscured public health data for political gain, at the peril of the whole nursing home population, including disabled and elderly individuals.

153.    The Empire Center for Public Policy — which successfully sued Cuomo to obtain nursing home-related death data — analyzed the available data and acknowledged the March 25th lethal mandate made a "bad situation worse" and there was a statistically significant increase in resident deaths in nursing homes that accepted hospital transfers.  Per their analysis, while the March 25th lethal mandate was in force, more than 9,000 COVID-19 patients – who had recovered from acute symptoms but were known or assumed to still be carrying the virus – were moved into nursing homes, most of them as new arrivals.

154.    In a report issued by the Foundation for Research on Equal Opportunity, a non-profit and non-partisan think tank, using data from the Centers for Medicare and Medicaid Services as well as New York state data released by court order in fulfillment of numerous Freedom of Information Law (FOIL) requests, they estimated that 1,242 long-term care residents per 10,000 had died of coronavirus in New York as of Jan. 31, 2021, compared to 740 per 10,000 if the data excluded those residents who died after being transferred to a hospital due to health deterioration from COVID-19 infection, as Defendants chose to do.[21]

155.    As stated in their report and echoed by the herein Plaintiffs: "New York officials missed a crucial opportunity to provide better data that could have saved lives. Accurate data on the toll of COVID in New York nursing homes and other LTC facilities would have enabled policymakers to target resources to facilities struggling to contain infections. In addition, family caregivers needed accurate information to know where to place their loved ones who are in need of nursing home care."

156.    Per various reports, rather than reaching out to nursing home and geriatric advocates and experts, the Defendants worked closely and/or conspired with outside private actors

---

[21] https://freopp.org/the-true-covid-death-toll-in-new-york-state-long-term-care-facilities-bb425848d561

representing the hospital industry, like the Greater New York Hospital Association ("GNYHA"), in the design and implementation of the March 25th lethal mandate addressed to nursing homes.  Per information and belief, these private actors, including the GNYHA, have also been generous donors of Defendant Cuomo's political campaigns.

157.    As reported by the Empire Center, the "ill-conceived policy was the brainchild of the nonprofit hospital association [GNYHA], which pitched it to Gov. Andrew Cuomo's office shortly before it went into effect. In the name of easing a crisis for the association's members, the Cuomo administration contributed to a disaster for vulnerable nursing-home residents, who died by the thousands."[22]   Many nursing homes that were required to take recovering COVID-19 patients under the state policy, including the nursing homes of plaintiff's decedents, had foreseeable outbreaks of the deadly virus.[23]

158.    Defendants' lethal policy created a danger within all nursing homes, including those where plaintiff's -decedents were residents, and made the Proposed Classes even more vulnerable and susceptible to being exposed to and contract the deadly infection.

## COUNT I
## AGAINST ALL DEFENDANTS
## 42 U.S.C. §1983
## (Deprivation of Civil Rights; and Conspiracy to Deprive Civil Rights)

159.    Plaintiffs hereby incorporate by reference each of the preceding allegations as though set forth herein.

160.    Section 1 of the Fourteenth Amendment to the U.S. Constitution, commonly known as the Due Process Clause, states:

> "All persons born or naturalized in the United States, and subject to
> the jurisdiction thereof, are citizens of the United States and of the

---

[22] https://www.empirecenter.org/publications/the-hospital-lobbyists-behind-cuomos-nursing-home-scandal/.
[23] https://www.nbcnews.com/news/us-news/coronavirus-spreads-new-york-nursing-home-forced-take-recovering-patients-n1191811

State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

161.    For its part, 42 U.S.C §1983 states in pertinent part:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable."

162.    At all times relevant to this complaint, Defendants' actions and omissions were performed in their individual capacities, under the color of state law.

163.    Defendants purposely, willfully, recklessly, and wantonly ignored the warnings from experts in the long-term care industry, carried on with their reckless March 25th lethal policy even after public outcry from families, experts, and advocacy groups, and in fact doubled down, with Defendant Cuomo saying "[t]hey [nursing homes} don't have a right to object.  That is the rule and that is the regulation, and they must comply with that".

164.    It's been publicly reported and well-documented that Defendants didn't consult with relevant nursing home stakeholders, patient support groups, nursing home resident advocacy groups, nor with elderly or disabled individuals public interest organizations, before designing and implementing the lethal policy, and  instead chose to be completely  reliant on the financially and politically powerful hospital industry lobby.

165.    Defendants proceeded with their March 25th lethal mandate and subsequent cover-up, despite early compelling evidence, known to them at the time, that nursing home residents were especially vulnerable to COVID-19.    As mentioned earlier, the first known cluster of COVID-19 cases in the United States happened in a State of Washington nursing home, and understandably, multiple public health experts had been warning of this population's vulnerability since early February, well before Defendants' March 25th lethal mandate.

166.    Defendants purposely, willfully, recklessly, intentionally, and wantonly conspired to suppress, distort, manipulate, and withhold relevant public health information, with the intent of covering up the disastrous effects of their March 25th lethal policy.

167.    Defendants purposely, willfully, recklessly, intentionally, and wantonly conspired to hide public health information from the public and federal authorities which provided evidence of how their lethal mandate worsened the state of affairs and COVID-19 exposure and death toll at nursing homes across the State of New York.

168.    Defendants, in their individual capacities and acting under color of state law, conspired to publicly misstate how their lethal policy worked, conspired to withhold public data, conspired to publish falsified research and reports,  and conspired to stonewall inquiries from the New York State Legislature and investigative journalists.

169.    Defendants intentionally tried to create the false impression that New York was one of the best performing states in the country on nursing home COVID-19 deaths, when in reality it was one of the worst.

170.    Although Defendant DeRosa has been reported as claiming  they delayed release of complete data on COVID-19 deaths in nursing homes out of fear of an investigation from the U.S. Department of Justice, a New York Times investigation discovered that, in June 2020, months

before any mention of any potential federal investigation and months before federal officials requested the state's data, senior Cuomo administration officials, including all of the Defendants, had rewritten a NYDOH report with the intent of excluding long-term care residents who died in hospitals..

171.   Defendants' concerted acts of deliberate and reckless indifference, wanton and willful misconduct, and malicious and tortious intent, contributed to the premature deaths of thousands of elderly, mentally, and physically disabled nursing home residents, including Plaintiffs-decedents, who were unnecessarily and mortally infected with COVID-19 while they were confined, under lockdown, at their nursing homes.

172.   The deprivation of Plaintiffs-decedents federally protected constitutional and statutory rights was a direct result of Defendants' gross and lethal misuse of power, possessed and given by virtue of state law, and made possible only because they were clothed with the authority of state law.

173.   Defendants' shocking, unsound, reckless, intentional, and willful approach caused catastrophic results for the elderly and disabled population residing and confined at nursing homes during the COVID-19 pandemic, violated their substantive due process rights, and deprived them of their federally protected constitutional and statutory rights, including the fundamental right to life, the right to bodily integrity, and the right to a safe environment, by subjecting them to the unnecessary exposure of known deadly toxins.

174.   Defendants, through their shocking actions and omissions, interfered with the rights guaranteed by federal statutes and regulations, like the Federal Nursing Home Reform Act, 42 U.S.C1396r, 42 U.S.C. 1395i-3, and 42 CFR 483.

175.    Moreover, Defendants, through their shockingly reckless actions and omissions, took part on a conspiracy that resulted in the deprivation of nursing home residents' civil rights, given there was (1) an agreement between two or more state actors, or a state actor and a private entity, (2) to act in concert to inflict known constitutional injury; and (3) an overt act done in furtherance of the goal of causing damages.

## COUNT II
## AGAINST ALL DEFENDANTS
### (New York Civil Rights Act; N.Y. State Constitution)

176.    Plaintiffs hereby incorporate by reference each of the preceding allegations as though set forth herein.

177.    By engaging in the above-mentioned course of conduct under the color of state law, Defendants caused Plaintiffs-decedents and the Proposed Classes of elderly, mentally, and physically disabled nursing home residents, who were confined and under lockdown at their nursing homes, to be deprived of their constitutional rights, secured and guaranteed under the Fifth and Fourteenth Amendments of the United States Constitution, and rights guaranteed by Article I of the New York State Constitution and the New York Civil Rights Act.

178.    Furthermore, Article I, §16 of the New York State Constitution provides in pertinent part, "The right of action, now existing to recover damages for injuries resulting in death, shall never be abrogated; and the amount recoverable shall not be subject to any statutory limitation".

## COUNT III
## AGAINST ALL DEFENDANTS
## FOR CONSCIOUS PAIN AND SUFFERING

179.    Plaintiffs hereby incorporate by reference each of the preceding allegations as though set forth herein.

180.    As a result of Defendants' actions and omissions, Plaintiffs-decedents and the members of the Proposed Classes they represent sustained severe multiple injuries in, to, and about their bodies resulting in wrongful death.

181.    As a result of Defendants' actions and omissions, Plaintiffs-decedents and the members of the Proposed Classes they represent suffered excruciating conscious pain, agony, and suffering, including fear of imminent death.

182.    As a result of Defendants' actions and omissions, Plaintiffs-decedents,          their Estates, next of kin, and the members of the Proposed Classes they represent, sustained damages.

**COUNT IV**
**AGAINST ALL DEFENDANTS**
**FOR WRONGFUL DEATH**

183.    Plaintiff hereby incorporates by reference each of the preceding allegations as though set forth herein.

184.    Defendants proceeded with their March 25th lethal policy and subsequent cover-up, despite early compelling evidence that nursing home residents were especially vulnerable to COVID-19.   As mentioned earlier, the first known cluster of COVID-19 cases in the United States happened in a State of Washington nursing home, and multiple public health experts warned of this population's vulnerability since at least early February, well before Defendants' March 25th lethal policy.

185.    As a result of Defendants' concerted acts of deliberate and reckless indifference, wanton and willful misconduct, and malicious intent, the Plaintiffs-decedents sustained severe bodily injuries resulting in wrongful and untimely deaths.

186.    Defendants had a duty to Plaintiffs and the members of the Proposed Classes to protect the public and provide reliable and relevant public health information in a timely and transparent manner.

187.    Defendants breached their duty by purposely, willfully, and wantonly conspiring to obscure, hide, and distort public health information from the public and from local and federal authorities.

188.    As a result of Defendants' concerted acts of deliberate and reckless indifference, wanton and willful misconduct, and malicious intent, the Plaintiffs-decedents and the members of the Proposed Classes suffered their untimely deaths, leaving surviving next of kin and distributees.

189.    As a result of Defendants' concerted acts of deliberate and reckless indifference, wanton and willful misconduct, and malicious intent, the surviving next of kin and distributees of Plaintiffs-decedents and the members of the Proposed Classes became liable for, and spent money for, funeral and other expenses.

190.    As a result of Defendants' concerted acts of deliberate and reckless indifference, wanton and willful misconduct, and malicious intent, the surviving next of kin and distributees of Plaintiffs-decedents and the members of the Proposed Classes suffered pecuniary damages.

191.    As a result of Defendants' concerted acts of deliberate and reckless indifference, wanton and willful misconduct, and malicious intent, the surviving next of kin and distributees of Plaintiffs-decedents and the members of the Proposed Classes sustained all other damages allowed by law.

192.    As a result of Defendants' concerted acts of deliberate and reckless indifference, wanton and willful misconduct, and malicious intent,, Plaintiffs and the members of the Proposed Classes have suffered damages in an amount that exceeds any jurisdictional limits.

## COUNT V
## AGAINST ALL DEFENDANTS
## FOR GROSS NEGLIGENCE

193.    Plaintiffs hereby incorporate by reference each of the preceding allegations as though set forth herein.

194.    Defendants had ample notice of danger, willfully failed to prevent harm from it, and instead issued a lethal policy that effectively created a dangerous situation within all the nursing homes in the State of New York and put their vulnerable residents in immediate risk of death.

195.    Defendants purposely, willfully, recklessly, deliberately, and wantonly suppressed, distorted, manipulated, and withheld relevant public health information with the intent of covering up the disastrous effects of their March 25th lethal policy.

196.    Defendants purposely, willfully, and wantonly conspired to hide and suppress public health information which evidenced how their lethal policy worsened the death toll at nursing homes across the State of New York.

197.    Defendants, acting under color of state law, conspired to publicly misstate how their policy worked, conspired to withhold public data, conspired to publish falsified research and reports under the NYSDOH's name, and conspired to stonewall inquiries from the New York State Legislature.

198.    Defendants intentionally created the false impression that New York was one of the best performing states in the country on nursing home COVID-19 deaths when in fact it was one of the worst.

199.    Defendants' concerted acts of deliberate and reckless indifference, wanton and willful misconduct, and malicious intent, executed with the knowledge of its potential harm to

48

others, contributed to thousands of elderlies and/or disabled nursing home residents, including Plaintiffs-decedents, being unnecessarily and mortally infected with COVID-19.

200.    The deprivation of Plaintiffs-decedents federally protected constitutional and statutory rights and their subsequent deaths were the  direct and proximate result of Defendants' gross and lethal misuse of power, possessed and given by virtue of state law, and made possible only because they were clothed with the authority of state law.

201.    Defendants' shocking, reckless, deliberately indifferent, and willful approach caused catastrophic results for the elderly and disabled population residing and confined at nursing homes during the COVID-19 pandemic, violated their substantive due process rights, and deprived them of their federally protected constitutional and statutory rights, including the fundamental right to life, the right to bodily integrity, and the right to a safe environment.

**COUNT VI**
**AGAINST ALL DEFENDANTS**
**FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

202.    Plaintiffs hereby incorporate by reference each of the preceding allegations as though set forth herein.

203.    Defendants purposely, willfully, recklessly, deliberately, and wantonly suppressed, distorted, manipulated, and withheld relevant public health information with the intent of covering up the disastrous effects of their March 25th  lethal policy.

204.    Defendants purposely, willfully, recklessly, deliberately, and wantonly conspired to hide, suppress, and distort public health information regarding the true death toll at nursing homes across the State of New York.

205.    Defendants, in their individual capacities and acting under color of state law, conspired to publicly misstate how their lethal mandate worked, conspired to withhold public data,

conspired to publish falsified research and reports under the NYSDOH's name, and conspired to stonewall inquiries from the New York State Legislature.

206.    Defendants' concerted acts of deliberate and reckless indifference, wanton and willful misconduct, and malicious intent, executed with the full knowledge of their potential harm to others, contributed to thousands of elderly and disabled nursing home residents being unnecessarily and mortally infected with COVID-19 while they were confined to their nursing homes.

207.    Defendants' shocking, reckless, deliberately indifferent, and willful conduct resulted in catastrophic results for the elderly and disabled population residing at nursing homes and confined to these nursing homes during the COVID-19 pandemic.  Their actions and omissions violated these nursing home residents' substantives due process rights, and deprived them of their federally protected constitutional and statutory rights, including the fundamental right to life, the right to bodily integrity, and the right to a safe environment.

208.  As a result of Defendants' concerted acts of deliberate and reckless indifference, wanton and willful misconduct, and malicious intent, Plaintiffs-decedents, and the Proposed Classes they represent, were sentenced to death.

209.  As a result of Defendants' shocking and concerted acts of deliberate and reckless indifference, wanton and willful misconduct, and malicious intent, Plaintiffs suffered severe emotional distress stemming from the events surrounding their relatives' deaths.

WHEREFORE, Plaintiffs, on behalf of themselves and the Proposed Classes 1 and 2, demand judgment against the Defendants, jointly and severally:

1. Awarding damages to the Plaintiffs and putative class members of the Proposed Classes  1 and 2,to the fullest extent available under the law, including actual, compensatory, punitive, and consequential damages;

2.   Awarding attorney's fees, interests, costs, and disbursements to the Plaintiffs and putative class members of the Proposed Classes 1 and 2; and,

3.   Awarding such other relief as this Court may deem just and proper.

Dated: Melville, New York
      February 20, 2024

                                      Respectfully submitted,

                                      **NAPOLI SHKOLNIK, PLLC**
                                      *Attorneys for Plaintiff*

                                      S/  Joseph L. Ciaccio         
                                      Joseph L. Ciaccio, Esq.
                                      Bar No. JC6856
                                      400 Broadhollow Rd, Suite 305
                                      Melville, New York, 11747
                                      T: 212-397-1000