UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

<table>
<tr><td>

JOSEPH FERRARI, as Administrator of the
Estate of CHRISTINE FERRARI; LEOVA
JENKINS, as Administrator of the Estate of
ELOISE BROOKS; IRASEMA RIVERA, as
Administrator of the Estate of PAUL RIVERA;
JOSE MONGE, as Administrator of the estate of
BLANCA NIEVES; STACIE DRUCKMAN, as
Administrator of the Estate of ARTHUR
DRUCKMAN; DELORIS PEOPLES, as Proposed
Administrator of the Estate of ALEX PEOPLES;
SANDRA THOMAS-WATSON, as Administrator of
the Estate of BELINDA THOMAS; and PATRICIA
BIONDI, as Executor of the Estate of MICHAEL
BIONDI, *on behalf of themselves and all others
similarly situated,*

Plaintiffs,

-v.-

ANDREW M. CUOMO, HOWARD A. ZUCKER,
M.D., MELISSA DEROSA, JOHN DOES and
JANE DOES 1-30,

Defendants.

</td><td>

23 Civ. 7715 (KPF)

**OPINION AND ORDER**

</td></tr>
</table>

KATHERINE POLK FAILLA, District Judge:

On March 25, 2020, in the early days of the COVID-19 pandemic, the
New York State Department of Health (the "DOH") issued an advisory that
directed nursing homes to readmit residents who had been discharged from
hospitals after being treated for COVID-19, regardless of whether those
residents continued to test positive for the virus. That advisory, and its alleged
impact on Christine Ferrari, Eloise Brooks, Paul Rivera, Blanca Nieves, Arthur
Druckman, Alex Peoples, Belinda Thomas, and Michael Biondi — all of whom

resided in nursing homes, contracted COVID-19 while in those nursing homes, and ultimately died from the virus — are at the heart of this case. These individuals are represented in this action by the administrators of their respective estates ("Plaintiffs"), who allege that Defendants Andrew M. Cuomo ("Cuomo"), Howard A. Zucker ("Zucker"), and Melissa DeRosa ("DeRosa," and collectively, "Defendants") are civilly liable for the effects of that advisory on nursing home facilities. Plaintiffs also allege that Defendants are liable for their failure to accurately report the number of nursing home deaths in New York State that resulted from the COVID-19 pandemic.

Plaintiffs have brought federal claims pursuant to 42 U.S.C. § 1983, and state-law claims for violations of the New York Civil Rights Act and the New York State Constitution, as well as for conscious pain and suffering, wrongful death, gross negligence, and intentional infliction of emotional distress. Before the Court now are Defendants' motions to dismiss the Amended Complaint in its entirety. As explained herein, and despite the Court's deepest sympathy for Plaintiffs and their families, the fact remains that their proffered claims are not legally viable. Accordingly, the Court grants Defendants' motions to dismiss; the Court dismisses the federal Section 1983 claim with prejudice, and the state-law claims without prejudice.

## BACKGROUND[1]

### A.    Factual Background

### 1.    The Parties

As mentioned, Plaintiffs in this action are the administrators of the estates of their family members, all of whom were residents of nursing homes and adult care facilities in New York State who died during the COVID-19 pandemic (collectively, "Decedents").  (AC ¶ 1).  Plaintiffs include the following:

- Joseph Ferrari is the Administrator of the Estate of his deceased spouse, Christine Ferrari.  (AC ¶ 5).  Ms. Ferrari was admitted to the Yonkers Center for Nursing and Rehabilitation in or around January 2020 for short-term rehabilitation services.  (*Id.* ¶ 6).  Ms. Ferrari died on April 27, 2020, due to "septic shock caused by COVID-19."  (*Id.* ¶ 10).

- Leova Jenkins is the Administrator of the Estate of her mother, Eloise Brooks.  (AC ¶ 13).  Ms. Brooks was admitted to the Upper East Side Rehabilitation and Nursing Center in or around November 2019, for rehabilitation services following hip surgery.  (*Id.* ¶ 14). Ms. Brooks was transferred to a hospital on April 9, 2020, after experiencing "difficulty breathing."  (*Id.*

---

[1]    This Opinion draws its facts from the Amended Complaint ("AC" (Dkt. #39)), the well-pleaded allegations of which are taken as true for purposes of this Opinion.  *See Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009).  The Court also relies, as appropriate, on certain of the exhibits attached to the Declaration of Nelson A. Boxer ("Boxer Decl., Ex. [ ]" (Dkt. #43)), the Declaration of Rita M. Glavin ("Glavin Decl., Ex. [ ]" (Dkt. #48)), and the Declaration of Joseph L. Ciaccio ("Ciaccio Decl., Ex. [ ]" (Dkt. #52)).  *See DiFolco* v. *MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (explaining that on a motion to dismiss, courts may consider documents incorporated by reference and documents integral to a complaint).

For ease of reference, the Court refers to Zucker's memorandum of law in support of his motion to dismiss as "Zucker Br." (Dkt. #44); to DeRosa's memorandum of law in support of her motion to dismiss as "DeRosa Br." (Dkt. #46); to Cuomo's memorandum of law in support of his motion to dismiss as "Cuomo Br." (Dkt. #49); to Plaintiffs' consolidated memorandum of law in opposition to Defendants' motions as "Pl. Opp." (Dkt. #53); to Zucker's reply memorandum of law as "Zucker Reply" (Dkt. #56); to DeRosa's reply memorandum of law as "DeRosa Reply" (Dkt. #55); and to Cuomo's reply memorandum of law as "Cuomo Reply" (Dkt. #54).

¶ 18).  She died five days later, on April 14, 2020, after
being diagnosed with COVID-19.  (*Id.*).

- Irasema Rivera is the Administrator of the Estate of her
  father, Paul Rivera.  (AC ¶ 21).  Mr. Rivera was a long-
  term care resident of the Workmen's Circle Multicare
  Center in the Bronx, New York, from in or around 2012,
  until on or about May 4, 2020.  (*Id.* ¶ 22).  On May 4,
  2020, Mr. Rivera was brought to the hospital because
  he was having seizures and had contracted COVID-19.
  (*Id.* ¶ 26).  He died on May 12, 2020.  (*Id.*).

- Jose Monge is the Administrator of the Estate of his
  mother, Blanca Nieves.  (AC ¶ 29).  Ms. Nieves was a
  long-term care resident at the Bronx Center for Nursing
  and Rehabilitation from in or around 2016, until on or
  about April 18, 2020.  (*Id.* ¶ 30).  Ms. Nieves, who
  suffered from dementia, died on May 13, 2020, after she
  was hospitalized and placed on hospice due to COVID-
  19-related complications.  (*Id.* ¶ 31).

- Stacie Druckman is the Administrator of the Estate of
  her father, Arthur Druckman.  (AC ¶ 33).  Mr.
  Druckman was a resident at the Morningside Nursing
  and Rehabilitation Center in the Bronx, New York, from
  in or around 2017, until on or about April 5, 2020.  (*Id.*
  ¶ 34).  Mr. Druckman died from COVID-19-related
  complications on April 17, 2020.  (*Id.* ¶ 35).

- Deloris Peoples is the Proposed Administrator of the
  Estate of her brother, Alex Peoples.  (AC ¶ 38).  Mr.
  Peoples was a resident of Triboro Center for
  Rehabilitation and Nursing in the Bronx, New York,
  from in or around January 2017, until on or about
  April 10, 2020.  (*Id.* ¶ 39).  Mr. Peoples died from
  COVID-19-related complications on April 13, 2020.  (*Id.*
  ¶ 42).

- Sandra Thomas-Watson is the Administrator of the
  Estate of her mother, Belinda Thomas.  (AC ¶ 44).  Ms.
  Thomas was a resident at the Clove Lakes Health Care
  and Rehabilitation Center Inc. in Staten Island, New
  York, where she received rehabilitation services
  following a stroke.  (*Id.* ¶ 45).  She was a resident of the
  facility from 2018 until April 21, 2020.  (*Id.*).  Ms.
  Thomas died on May 1, 2020, after being hospitalized

and put on a ventilator after contracting COVID-19. (*Id.* ¶ 47).

▪ Patricia Biondi is the Executor of the Estate of her deceased spouse, Michael Biondi. (AC ¶ 50). Mr. Biondi was a resident at the North Westchester Restorative Theory and Nursing Center in Mohegan Lake, New York, from October 16, 2020, until on or about November 19, 2020. (*Id.* ¶ 51). Mr. Biondi was admitted to a hospital in November 2020 because of COVID-19-related complications, and he died on November 24, 2020. (*Id.* ¶ 52).

Plaintiffs also seek to bring claims on behalf of two proposed classes of similarly situated individuals, which classes "represent[ ] the estates of elder, mentally, and/or physically disabled nursing home residents across the State of New York, who were under lockdown and confined to their nursing homes during the COVID-19 pandemic." (*Id.* ¶ 57).[2]

Defendants are all former New York State government officials. Andrew M. Cuomo served as Governor of New York from 2011 until 2021. (AC ¶ 61). Howard A. Zucker served as Commissioner of the DOH from approximately

---

[2]    Specifically, Plaintiffs propose the following two classes:

**Class 1:** Comprised of individuals who were nursing home residents who were under lockdown orders at any time during the effectiveness of the March 25th Directive, and were exposed to, contracted the COVID-19 viral infection, and died after the March 25th Directive came into effect compelling nursing homes to admit and readmit patients discharged from hospitals even if they were positive for COVID-19 ("Class 1"). [Plaintiffs] estimate Class 1 is potentially comprised of more than 7,000.

**Class 2:** Comprised of individuals who were nursing home residents at any time during the period the Defendants were actively conspiring, suppressing, distorting, and manipulating public health information about death count of the COVID-19 infection in nursing home settings ("Class 2"). [Plaintiffs] estimate Class 2 is potentially comprised of more than 8,000.

(AC ¶ 57).

May 2015 until November 2021. (*Id.* ¶ 62). Melissa DeRosa served as the Governor's Secretary of Staff from 2017 to 2021. (*Id.* ¶ 63). Plaintiffs also bring claims against John and Jane Does 1-30, who "are individuals whose identities and involvement can only be ascertained through the discovery process," but who, "upon information and belief, acted under color of state law to deprive plaintiffs-decedents of their federally protected constitutional and statutory rights." (*Id.* ¶ 66).

### 2. COVID-19 and Nursing Home Facilities

The COVID-19 pandemic, and the devastation it wrought, need no introduction. The Amended Complaint details the early months of the COVID-19 outbreak in the United States, as politicians, health organizations, and the public gained awareness of the growing threat the virus posed. As alleged in the Amended Complaint, Defendants were first "made aware" of COVID-19 in January 2020. (AC ¶ 69). The first case of COVID-19 in New York was reported shortly thereafter, on March 1, 2020. (*Id.* ¶ 85). On March 7, 2020, then-Governor Cuomo declared a state of emergency. (*Id.* ¶ 91). Less than a week later, the World Health Organization declared COVID-19 a global pandemic (*id.* ¶ 94), and President Donald J. Trump declared a national emergency (*id.* ¶ 97).

According to Plaintiffs, even in the early days of the pandemic, there was an awareness of the acute risk that COVID-19 posed to older adults — particularly those housed in long-term care facilities such as nursing homes. (AC ¶ 82). Reports had spread of an incident in King County, Washington,

where a resident of a nursing home died on March 2, 2020, three days after contracting COVID-19. (*Id.* ¶¶ 81-82). And as of March 9, 2020, at least eight other King County skilled nursing and assisted living facilities had reported one or more confirmed COVID-19 cases. (*Id.* ¶ 81). Recognizing the urgency of the situation, several public health organizations began issuing guidance directly targeted at adult care facilities, such as nursing homes.

For example, on February 29, 2020, the Centers for Disease Control and Prevention (the "CDC") issued a report to nursing homes, which report instructed facilities to, among other things, "[t]ake steps to prevent known or suspected COVID-19 patients from exposing other patients." (AC ¶ 84). On March 4, 2020, the Center for Medicare and Medicaid Services (the "CMS") issued its *Guidance for Infection Control and Prevention of Coronavirus Disease 2019 (COVID-19) in Nursing Homes*, which recommended the suspension of standard nursing home activities and the screening of visitors and staff for signs of infections. (*Id.* ¶ 88). The DOH followed suit, and issued guidance on March 6, 2020, detailing precautions and procedures that nursing homes should take to protect the health of their residents and staff. (*Id.* ¶ 90).

The CDC, the CMS, and the DOH continued to issue updated versions of their reports throughout March 2020, and each report provided additional guidance on how to limit the transmission of COVID-19 in nursing homes. (AC ¶¶ 92-93, 95-96, 98-100). On March 18, 2020, the CDC published a report analyzing what occurred in King County, Washington, titled *COVID-19 in a Long-Term Facility — King County, Washington, February 27-March 9, 2020.*

This CDC report highlighted that COVID-19 (i) can cause "severe illness and death, particularly among older adults with chronic health conditions," and (ii) "can spread rapidly in long-term residential care facilities." (*Id.* ¶ 102). The report also emphasized that "[a]s the pandemic expands, continued implementation of public health measures targeting vulnerable populations such as residents of a long-term care facilities … will be critical." (*Id.* ¶ 103).

Ultimately, the predictions outlined by the CDC, the CMS, and the DOH proved only too accurate. (AC ¶ 131). As of May 22, 2020, for example, 43% of all COVID-19 deaths in the United States were residents of long-term care facilities, even though that cohort comprised only 0.62% of the nation's population. (*Id.*).

### 3. The March 25th Directive

In March 2020, COVID-19 was spreading rapidly throughout New York State. In response, on March 23, 2020, Defendants issued a mandate addressed to hospitals, ambulatory surgery centers, office-based surgery practices, and diagnostic and treatment centers, requiring an increase in the availability of beds by a minimum of 50 percent. (AC ¶ 105). Two days later, on March 25, 2020, Defendants issued another advisory (the "March 25th Directive")[3] — this one directed at nursing homes — that mandated that "no resident shall be denied re-admission or admission to the [nursing home] solely

---

[3]    Plaintiffs refer to the pronouncement as the "March 25th Directive," while Defendants refer to it as the "March 25th Advisory." (*Compare* AC ¶ 1, *with* Zucker Br. 3, DeRosa Br. 2, *and* Cuomo Br. 4). Both terms appear in the text of the document. (*See* Boxer Decl., Ex. A). The Court adopts Plaintiffs' nomenclature, recognizing that this semantic difference has no impact on the Court's analysis.

based on a confirmed or suspected diagnosis of COVID-19." (*Id.* ¶ 106). The March 25th Directive also "prohibited [nursing homes] from requiring a hospitalized resident who is determined medically stable to be tested for COVID-19 prior to admission or re-admission." (*Id.*).

Immediately after its issuance, the March 25th Directive allegedly provoked the ire of patient care support groups and public health organizations, who criticized the directive as "over-reaching" and "not consistent with science." (AC ¶¶ 107-112). These organizations included the Society for Post-Acute and Long-Term Care Medicine of the American Medical Directors Association (the "AMDA"), the American Health Care Association (the "AHCA"), and the National Center for Assisted Living (the "NCAL"). (*Id.*). For example, in a joint statement, the three organizations warned that "requiring all New York nursing homes state-wide to accept all patients regardless of their COVID-19 status, even from hospitals that are not at capacity, will likely cause many more hospitalizations." (*Id.* ¶ 111). However, despite the criticism of the March 25th Directive, another directive was issued on April 7, 2020, which similarly required that "[n]o resident shall be denied re-admission or admission to [an adult care facility] solely based on a confirmed or suspected diagnosis of COVID-19." (*Id.* ¶ 123).

The March 25th Directive continued to remain in effect, even though by April 25, 2020, Defendants allegedly "knew of widespread reports that the coronavirus had killed nearly 11,000 people in nursing homes in 36 states, with more than one third of them occurring in New York." (AC ¶ 127). During

this time, individuals such as the head of a Brooklyn-based nursing home,

Cobble Hill Health Center, allegedly "pleaded" with health officials, to no avail,

to take alternate measures, such as sending residents suspected of having

COVID-19 to the Javits Convention Center or to the U.S. Navy hospital ship

USNS *Comfort*. (*Id.* ¶ 148). The Amended Complaint suggests that in creating

and maintaining the March 25th Directive, Defendants were swayed by the

influence of "outside private actors" in the hospital industry, such as the

Greater New York Hospital Association ("GNYHA"), who were allegedly

"generous donors" to Governor Cuomo's political campaigns. (*Id.* ¶ 156). These

organizations were, in turn, allegedly motivated by a desire to ease the burden

of the pandemic on their association's members. (*Id.* ¶ 157).

On May 10, 2020, the March 25th Directive was partially rescinded via

Executive Order No. 202.30. (AC ¶ 130). Under this new directive, hospitals

were not permitted to "discharge a patient to a nursing home, unless the

nursing home operator or administrator has first certified that it is able to

properly care for such patient." (*Id.*). Moreover, a hospital was not to

discharge a patient to a nursing home "without first performing a diagnostic

test for COVID-19 and obtaining a negative result." (*Id.*).

### 4.    The DOH Report

In a report released on July 6, 2020 (the "DOH Report"), the DOH

concluded that the March 25th Directive was not responsible for the further

spreading of COVID-19 among nursing home populations. (AC ¶ 133). Indeed,

the DOH Report concluded that "[a]dmission policies were not a significant

10

factor in nursing home fatalities," and that the "March 25 guidance was not the driving force in nursing home deaths." (*Id.*). The report also claimed that New York State followed the CMS's guidance when forming its nursing-home-related policies. (*Id.* ¶ 136). Plaintiffs challenge the validity of this report, and assert that the CMS had always emphasized that nursing homes should admit residents with COVID-19 *only* if able to "follow CDC guidance for transmission-based precautions." (*Id.*).

After its issuance, the DOH Report was heavily criticized by members of the public health community and the press. One article published by *ProPublica* noted that while the report was done with "the aid of the consulting company McKinsey & Co," the report failed list a "single author by name." (AC ¶ 135). And perhaps most damningly, on January 28, 2021, a different report issued by the New York State Office of the Attorney General (the "OAG") concluded that "over 4,000 nursing home deaths occurred after issuance of the March 25 guidance," and that "these admissions may have contributed to increased risk of nursing home resident infection, and subsequent fatalities." (*Id.* ¶ 137).

The OAG also found that the State of New York and the DOH had undercounted COVID-19-related nursing home resident deaths by as much as 50 percent, or close to 4,000 underreported deaths. (AC ¶ 137). While Governor Cuomo allegedly dismissed the criticisms of the DOH Report (*id.* ¶ 138), in February 2021, the DOH Report was revised (*id.* ¶ 136). The updated report provided that, as of January 19, 2021, the total reported

nursing home deaths stood at 12,743. (*Id.* ¶ 139). This was a significant uptick from one day earlier, when the total "pushed by the Defendants, in a concerted manner," had been 8,711. (*Id.*). On February 10, 2021, Zucker sent a letter to lawmakers stating that the total number of nursing home residents who had died from COVID-19 was now 13,297. (*Id.* ¶ 141).

On March 15, 2022, the Office of the New York State Comptroller (the "Comptroller") published the findings of an audit that covered the period from January 2017 through November 2021. (AC ¶ 143). This audit found that "New York significantly trailed other states in surveying nursing homes and developing strategies to stop infections from spreading in facilities." (*Id.* ¶ 144). The Comptroller opined that "[t]he public was misled by those at the highest level of state government through distortion and suppression of facts when New Yorkers deserved the truth." (*Id.* ¶ 145). Moreover, the Comptroller found that the DOH had "failed to meet its 'ethical' and 'moral' imperatives to act transparently in counting nursing home deaths between April 2020 and February 2021." (*Id.* ¶ 147). Per the Comptroller's report, an estimated 13,919 residents in New York nursing homes died from COVID-19 between March 4, 2020, and May 23, 2021. (*Id.* ¶ 151).

## B.    Procedural Background

This case was initiated on August 30, 2023, with the filing of a complaint. (Dkt. #1). Plaintiffs brought a federal claim for deprivation of civil rights under Section 1983, as well as numerous state-law claims. On November 17, 2023, the Court received pre-motion letters from Defendants

Zucker (Dkt. #18), Cuomo (Dkt. #22), and DeRosa (Dkt. #23), each requesting a pre-motion conference regarding Defendants' anticipated motions to dismiss. On November 29, 2023, the Court received an additional pre-motion letter from then-Defendant Sally Dreslin.  (Dkt. #26).  Plaintiffs opposed each of these requests.  (Dkt. #27, 30).

The Court held a pre-motion conference on January 18, 2024, during which the Court set a briefing schedule for Defendants' motions to dismiss, which schedule included a period for Plaintiffs to file an Amended Complaint. (January 18, 2024 Minute Entry).  In accordance with the Court's schedule, Plaintiffs filed the Amended Complaint, the operative pleading in this action, on February 22, 2024.  (Dkt. #39).  The Amended Complaint dismissed Plaintiffs' claims against Sally Dreslin, who was then terminated from this action.  (*Id.*). On March 29, 2024, the remaining Defendants filed their individual motions to dismiss the Amended Complaint.  (Dkt. #42, 45, 47).  Plaintiffs filed their consolidated opposition to the motions to dismiss on June 3, 2024.  (Dkt. #53). On June 28, 2024, Defendants filed their replies in further support of their motions to dismiss the Amended Complaint.  (Dkt. #54, 55, 56).

## DISCUSSION

### A.    Applicable Law

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court must "draw all reasonable inferences in [p]laintiff['s] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief."  *Faber* v. *Metro. Life*

*Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted); *see also Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." (internal quotation marks omitted)).  A plaintiff is entitled to relief if she alleges "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007); *see also In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) ("While *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to nudge [plaintiff's] claims across the line from conceivable to plausible." (internal quotations marks omitted) (citing *Twombly*, 550 U.S. at 570)).

That said, a court is "not bound to accept conclusory allegations or legal conclusions masquerading as factual conclusions."  *Rolon* v. *Henneman*, 517 F.3d 140, 149 (2d Cir. 2008) (citation and internal quotation marks omitted); *see also Harris* v. *Mills*, 572 F.3d 66, 72 (2d Cir. 2009) ("[A]lthough a court must accept as true all of the allegations contained in a complaint, that tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." (internal quotation marks omitted) (quoting *Iqbal*, 556 U.S. at 678)).  Moreover, "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

On a motion to dismiss, "the Court may consider any written instrument attached to the [c]omplaint as an exhibit, any statements or documents incorporated by reference in the [c]omplaint, documents that are 'integral' to the [c]omplaint even if they are not incorporated by reference, and matters of which judicial notice may be taken." *Donoghue* v. *Gad*, No. 21 Civ. 7182 (KPF), 2022 WL 3156181, at *2 (S.D.N.Y. Aug. 8, 2022) (citing *Chambers* v. *Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002); *Goel* v. *Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016)).

## B.    Analysis

Against the dispiriting factual backdrop outlined above, the Court considers the adequacy of Plaintiffs' pleadings.[4]  It begins with Plaintiffs' federal claim in Count I, which comprises substantive and conspiracy claims under 42 U.S.C. § 1983 predicated on violations of Decedents' rights under the U.S. Constitution and the Federal Nursing Home Reform Act of 1987 (the "FNHRA").  In their motions to dismiss, Defendants argue that Count I should be dismissed because: (i) Plaintiffs fail to allege a violation of federal rights; and (ii) even if Plaintiffs' federal rights were violated, Defendants acted in their individual capacities and are shielded by the doctrine of qualified immunity. The Court addresses each argument in turn, and ultimately agrees that Plaintiffs have failed to plead a viable Section 1983 claim.  Moreover, because

---

[4]    For clarity, the Court refers generally to "Plaintiffs'" claims, even as it is aware that the conduct underlying the claims was directed at, and the consequences felt most acutely by, Decedents.

the Court dismisses Plaintiffs' sole federal claim, it declines to exercise supplemental jurisdiction over Plaintiffs' remaining state-law claims.

### 1. Plaintiffs' Section 1983 Claim Is Dismissed for Failure to State a Claim

Section 1983 provides a cause of action against any

> person who, under color of any statute, ordinance, regulation, custom, or usage, of any State … , subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws.

42 U.S.C. § 1983. "To state a claim under [Section 1983], a plaintiff must allege both that: [i] a right secured by the Constitution or laws of the United States was violated, and [ii] the right was violated by a person acting under the color of state law." *Golian* v. *N.Y.C. Admin. for Child. Servs.*, 282 F. Supp. 3d 718, 727 (S.D.N.Y. 2017) (citing *West* v. *Atkins*, 487 U.S. 42, 48 (1988)). Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker* v. *McCollan*, 443 U.S. 137, 144 n.3 (1979); *see Thomas* v. *Roach*, 165 F.3d 137, 142 (2d Cir. 1999). Here, as previously noted, Plaintiffs assert that Defendants violated their substantive due process rights under the Fourteenth Amendment, as well as their statutory rights under the FNHRA. The Court, however, finds that Plaintiffs have failed to assert a violation under either theory.

### a.    Plaintiffs Have Failed to Allege a Constitutional Violation

The Court begins by addressing Plaintiffs' constitutional claim, whereby Plaintiffs allege that Defendants' actions deprived their loved ones of their "fundamental rights to life, bodily integrity, and the right to personal security." (Pl. Opp. 18, 22-24).  Plaintiffs' claim is based in the Due Process Clause of the Fourteenth Amendment (AC ¶ 160), which, as the Supreme Court explained in *DeShaney* v. *Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 196 (1989), "was to intended to prevent government 'from abusing [its] power, or employing it as an instrument of oppression[.]'"  As such, the Due Process Clause "protects against government action that is arbitrary, conscience-shocking, or oppressive in a constitutional sense, but not against government action that is incorrect or ill advised."  *Cunney* v. *Bd. of Trs. of Vill. of Grand View, N.Y.*, 660 F.3d 612, 626 (2d Cir. 2011) (quoting *Kaluczky* v. *City of White Plains*, 57 F.3d 202, 211 (2d Cir. 1995)); *accord Ferran* v. *Town of Nassau*, 471 F.3d 363, 369-70 (2d Cir. 2006).  Nor does the Due Process Clause "require[ ] the State to protect the life, liberty, and property of its citizens against invasion by private actors."  *DeShaney*, 489 U.S. at 195.[5]

---

[5]    *See generally Cullen* v. *Mello*, No. 23-413, 2024 WL 1904571, at *2 (2d Cir. May 1, 2024) (summary order):

>    "Substantive due process protects against government action that is arbitrary, conscience-shocking, or oppressive in a constitutional sense, but not against government action that is incorrect or ill-advised." *Kaluczky* v. *City of White Plains*, 57 F.3d 202, 211 (2d Cir. 1995) (cleaned up).  Nor does "substantive due process ... entitle federal courts to examine every alleged violation of state law, especially ones that, while perhaps vexatious, are more routine than egregious." *Kuck* v. *Danaher*, 600 F.3d 159, 167 (2d Cir. 2010).  Rather, "[s]ubstantive due process standards are violated only by conduct that is so outrageously arbitrary as to constitute a

The Second Circuit nevertheless has recognized "'two separate and distinct theories' under which a state actor's failure to protect against private violence can violate substantive due process.'" *Golian*, 282 F. Supp. 3d at 728 (quoting *Benzman* v. *Whitman*, 523 F.3d 119, 127 (2d Cir. 2008) (internal quotation marks omitted)).  These "two exceptions to th[e] general principle, rooted in the Supreme Court's analysis in *Deshaney*," are (i) the "special relationship exception" and (ii) the "state-created danger exception."  *Matican* v. *City of New York*, 524 F.3d 151, 155-57 (2d Cir. 2008).  Even if a plaintiff's claims fall within one of these two exceptions, however, a defendant's behavior only constitutes a constitutional violation if the behavior was "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience."  *Cnty. of Sacramento* v. *Lewis*, 523 U.S. 833, 848 n.8 (1998).  Here, because Plaintiffs argue that both exceptions apply, the Court considers (i) whether Defendants' substantive Section 1983 claim falls within either of the two *DeShaney* exceptions and (ii) whether Defendants' behavior can be said to shock the contemporary conscience.

### i.    The Special Relationship Exception

"The special relationship exception grows from the *DeShaney* Court's observation that 'in certain limited circumstances the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals.'"  *Matican*, 524 F.3d at 155 (quoting *DeShaney*, 489 U.S.

---

gross abuse of governmental authority." *Natale* v. *Town of Ridgefield*, 170 F.3d 258, 263 (2d Cir. 1999).

at 198).  The "linchpin of any special relationship exception" is "involuntary custody," *id.* at 156 (citing *Lombardi* v. *Whitman*, 485 F.3d 73, 79 n.3 (2d Cir. 2007)), such as when someone is incarcerated, *id.* at 155-56 (citing *DeShaney*, 489 U.S. at 199-200; *Lombardi*, 485 F.3d at 79 n.3); involuntarily committed to an institution for mental health reasons, *id.* (citing *DeShaney*, 489 U.S. at 199-200); or placed in foster care, *id.* at 156 (citing *Doe* v. *N.Y.C. Dep't of Soc. Servs.*, 649 F.2d 134, 141 (2d Cir. 1981)).  *See also Ying Jin Gan* v. *City of New York*, 996 F.2d 522, 533 (2d Cir. 1993) (collecting cases).  Although "[i]nvoluntary custody for purposes of substantive due process does not require the plaintiff to be in the physical custody of the State, … some form of functional state control over the person is required."  *Golian*, 282 F. Supp. 3d at 728.

Plaintiffs assert that a "special relationship" arose because: [i] the State ordered a "lockdown which confined these nursing home residents, many cognitively impaired and physically disabled, to their respective facilities; [ii] granted nursing homes with broad immunity from liability, via the Emergency Disaster Treatment Protection Act ('EDTPA'), PHL §§ 3080-3082, and [iii] issued a Must-Admit Order that directly impacted their quality of life." (Pl. Opp. 36).  However, Plaintiffs fail to allege how this confluence of factors equates to the narrow circumstances where this Circuit has previously found "involuntary custody" over plaintiffs.  *Matican*, 524 F.3d at 156.  Even in the limited situations where the Second Circuit has recognized that physical custody is not required to assert that a special relationship exists, it has

nonetheless required some functional state control over the person. For example, in *Jacob* v. *Ramirez*, the Court found that a parolee, though not in the state's physical custody, was "nonetheless in its legal custody" such that a special relationship existed. 400 F.3d 105, 106 (2d Cir. 2005) (*per curiam*). Critical to the *Jacob* Court's reasoning was the fact that the state "curtail[s]" a parolee's "freedom of movement" beyond that of the average citizen. *Id.*

Here, Decedents were voluntarily placed into nursing home facilities and were free at all times to seek alternative methods of treatment. *Cf. George* v. *Rockland State Psychiatric Ctr.*, No. 10 Civ. 8091 (NSR), 2014 WL 5410059, at *8 (S.D.N.Y. Oct. 23, 2014) (concluding that special relationship did not exist between parolee and state when parolee was "free to find his own medical treatment" at a specific hospital); *Bascom* v. *City of New York,* No. 23 Civ. 10898 (VEC), 2025 WL 692082, at *4 (S.D.N.Y. Mar. 4, 2025) (finding no special relationship existed between the state and children who were "voluntarily enrolled" in an after-school program). What is more, the mere fact that these nursing homes were subject to state regulations — as many institutions are — does not render all those housed within them in a "special relationship" with the state. Using similar logic, courts in this District have routinely refused to apply the special relationship exception in cases involving schools, despite the prevalence of state regulations and compulsory attendance requirements. *See, e.g.*, *H.B.* v. *Monroe Woodbury Cent. Sch. Dist.*, No. 11 Civ. 5881 (CS), 2012 WL 4477552, at *10 (S.D.N.Y. Sept. 27, 2012) ("[C]ourts in this Circuit and elsewhere have generally held that '[e]ven in light of compulsory

[education] attendance laws, no special relationship is created between students and school districts such that school districts take on any such duty to protect students from the private actions of others.'" (quoting *Santucci* v. *Newark Valley Sch. Dist.*, No. 05 Civ. 971 (TJM), 2005 WL 2739104, at *3 (N.D.N.Y. Oct. 24, 2005)); *see also F.H. by Pichardo* v. *City of Yonkers*, No. 19 Civ. 4722 (PED), 2022 WL 16722214, at *5 (S.D.N.Y. Nov. 4, 2022) ("[W]hile schools impose certain rules and restrictions on students, they do not limit an individual's freedom to act in the same manner as involuntary confinement by the state in a state prison or mental institution." (quoting *P.W.* v. *Fairport Cent. Sch. Dist.*, 927 F. Supp. 2d 76, 82 (W.D.N.Y. 2013)).  This difference in treatment makes sense, because courts are instructed to apply the special relationship exception only in "exceptional circumstances," *Ying Jang Gan*, 996 F.2d at 533, where "liability arises from the relationship between the state and a particular victim," *Pena* v. *DePrisco*, 432 F.3d 98, 109 (2d Cir. 2005). Comparable circumstances are not present here, and the Court therefore declines to expand the definition of involuntary custody beyond the limits previously recognized in this Circuit.  Accordingly, Plaintiffs cannot rely on the special relationship exception as the basis for their substantive due process claim.

### ii.     The State-Created Danger Exception

"Like the special relationship exception, the state-created danger exception arises from the Court's analysis in *DeShaney*."  *Matican*, 524 F.3d at 157.  "After explaining that no special relationship existed between the state

and petitioner, the [*DeShaney*] Court further noted that, '[w]hile the State may have been aware of the dangers that [petitioner] faced in the free world, *it played no part in their creation, nor did it do anything to render him any more vulnerable to them.*'  *Id.* (alterations in original) (emphasis added) (quoting *DeShaney*, 489 U.S. at 201).  Following this reasoning, the Second Circuit has "conclude[d] that, by negative implication, the state does infringe a victim's due process rights when its officers assist in creating or increasing the danger that the victim faced at the hands of a third party."  *Id.* (citing *Dwares* v. *City of New York*, 985 F.2d 94, 99 (2d Cir. 1993)).  In other words, "the state may be liable for failing to protect against private violence when a state actor '*affirmatively* create[s] or enhance[s] the danger of private violence.'"  *Eubanks* v. *Hansell*, No. 24-1165, 2024 WL 4662983, at *2 (2d Cir. Nov. 4, 2024) (summary order) (alterations in original) (emphasis added) (quoting *Okin* v. *Vill. of Cornwall-on-Hudson Police Dep't*, 577 F.3d 415, 428 (2d Cir. 2009)).  By contrast, the state cannot be liable where the victim of private violence alleges merely that "state functionaries … stood by and did nothing when suspicious circumstances dictated a more active role for them."  *DeShaney*, 489 U.S. at 203.  Likewise, it is insufficient to allege only "that the state agent's actions contributed to or increased the likelihood that the victim would be unsafe."  *Golian*, 282 F. Supp. 3d at 730 (citing *Hemphill* v. *Schott*, 141 F.3d 412, 418 (2d Cir. 1998); *Matican*, 524 F.3d at 158 n.7; *Okin*, 577 F.3d at 430).

Plaintiffs allege that the March 25th Directive falls within the state-created danger exception because it "undoubtedly increased the foreseeable

danger and direct harm to which nursing home residents were already exposed to and led to the deaths of many nursing home residents." (Pl. Opp. 37). They reason that not only did Defendants respond to the COVID-19 pandemic in an imprudent manner, but they in fact affirmatively created a danger by issuing the March 25th Directive. (*Id.*). As Defendants point out, however, the "Second Circuit has never found a state-created danger established in the absence of third-party, particularized violence." (Zucker Br. 19). As such, for Plaintiffs' claims to survive, they must allege facts showing that "Defendants officially sanctioned or encouraged [the] perpetrators to commit the private acts of violence." *Brown* v. *City of New York*, 786 F. App'x 289, 292 (2d Cir. 2019) (summary order) (rejecting an application of the state-created danger exception when defendants allegedly placed plaintiff in a dangerous shelter room with individuals who threatened her). But the Amended Complaint contains no allegations that the nursing homes, as the alleged perpetrators of "private violence," committed a state-sanctioned violent act that caused Decedents harm. *Id.* at 292-93. (*See* DeRosa Br. 14). Instead, the Amended Complaint merely pleads action that "increased the likelihood" that Decedents would be unsafe — action that categorically falls outside the state-created danger exception. *Golian*, 282 F. Supp. 3d at 730.

While Plaintiffs raise credible doubts about the efficacy of the March 25th Directive, a policy that may have raised the likelihood of individuals contracting COVID-19 is entirely "dissimilar from the state created dangers recognized in [Second Circuit] precedents." *Lombardi*, 485 F.3d at 80. "[I]n each of those

cases, a third party's criminal behavior harmed the plaintiff after a government actor — always a law enforcement officer — enhanced or created the opportunity for the criminal act through some interactions or relationship with the wrongdoer." *Id.* Such is not the case here. And the Second Circuit, "[m]indful of the Supreme Court's admonition not to permit the Due Process Clause to 'transform every tort committed by a state actor into a constitutional violation,'" has instructed courts that the state-created danger doctrine should impose liability "with considerable stringency." *Benzman*, 523 F.3d at 127 (quoting *DeShaney*, 489 U.S. at 202). Accordingly, this Court heeds the Second Circuit's instructions and finds that Plaintiffs cannot rely on the state-created danger exception as the basis for their substantive due process claim.

### iii.        Shocking the Conscience

Even were Plaintiffs to have pleaded conduct falling within one of these two exceptions, they would still need to allege that Defendants' "behavior was 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'" *Matican*, 524 F.3d at 155 (quoting *Lewis*, 523 U.S. at 848 n.8). The conscience-shocking standard "screens out all but the most significant constitutional violations, 'lest the Constitution be demoted to … a font of tort law.'" *Id.* (quoting *Lewis*, 523 U.S. at 848 n.8) (citing *Paul* v. *Davis*, 424 U.S. 693, 701 (1976)); *see also Daniels* v. *Williams*, 474 U.S. 327, 333 (1986) ("[I]njuries inflicted by governmental negligence are not addressed by the [U.S.] Constitution[.]"). "[C]onduct exhibiting 'deliberate indifference' to harm can support a substantive due process claim," though "'[d]eliberate indifference

24

that shocks in one environment may not be so patently egregious in another.'"
*Lombardi*, 485 F.3d at 82 (quoting *Lewis*, 523 U.S. at 850).  "Negligent conduct
does not qualify as conscious-shocking behavior," *Golian*, 282 F. Supp. 3d at
732 (citing *Matican*, 524 F.3d at 158), while "reckless conduct is evaluated on a
case-by-case basis," *id.*

      As is particularly important to the case at hand, reckless conduct "does
not qualify as conscious-shocking when the state actors 'were subjected to the
pull of competing obligations.'"  *Golian*, 282 F. Supp. 3d at 732 (quoting
*Matican*, 524 F.3d at 159 (quoting *Lombardi*, 485 F.3d at 83)).  In an analogous
factual context, the Second Circuit in *Lombardi* found that officials'
misstatements about the dangers of environmental contaminants near Ground
Zero following the September 11, 2001 terrorist attacks did not shock the
conscience.  The Court reasoned that public officials in the aftermath of the
attacks were "required to make decisions using rapidly changing information
about the ramifications of unprecedented events in coordination with multiple
federal agencies and local agencies and governments."  485 F.3d at 82.  The
*Lombardi* Court was wary of deterring decisive action in a public emergency,
believing instead that the threat of liability might lead officials to "default to
silence in the face of the public's urgent need for information."  *Id.* at 84.
Accordingly, it concluded that "a poor choice made by an executive official
between or among the harms risked by the available options is not conscience-
shocking merely because for some persons it resulted in grave consequences
that a correct decision could have avoided."  *Id.* at 85.  Put somewhat

differently, the *Lombardi* Court found that an executive may choose "the least of evils" without shocking the conscience. *Id.* at 82. Such a decision is within the province of the executive, unhindered by the Due Process Clause.

For similar reasons to those outlined in *Lombardi*, this Court finds that Defendants' actions here fail to shock the conscience. This is not to minimize the grief and hardship that Plaintiffs have experienced. As in *DeShaney* itself, "[t]he facts of this case are undeniably tragic." 489 U.S. at 191. But the law is clear that "when agency officials decide how to reconcile competing governmental obligations in the face of disaster, only an intent to cause harm arbitrarily can shock the conscience in a way that justifies constitutional liability." *Lombardi*, 485 F.3d at 74-75; *see also Corr. Officers' Benevolent Ass'n, Inc.* v. *City of New York*, No. 17 Civ. 2899 (LTS), 2018 WL 2435178, at *4 (S.D.N.Y. May 30, 2018) ("The Second Circuit, recognizing a government's need to make [ ] difficult decisions, has held that deliberately indifferent policy actions of government actors cannot shock the conscience in a constitutional sense where they seek to accommodate competing governmental interests even if the decision-making official, aware of the risks to a particular group, makes a poor choice resulting in grave consequences.").

Plaintiffs' attempts to distinguish this action from *Lombardi* are unavailing. Plaintiffs argue, for example, that this action is distinct because they are not arguing that Defendants had an affirmative duty to prevent Decedents from being infected with COVID-19, but rather, that Defendants "increased the danger and harm to these residents." (Pl. Opp. 37). However,

as in *Lombardi*, Defendants in this action "were required to make decisions using rapidly changing information about the ramifications of unprecedented events in coordination" with various other government agencies.  485 F.3d at 82.  (*See* DeRosa Br. 16; Cuomo Reply 4-5).  In the wake of a developing public health crisis, Defendants were "subject to the pull of competing obligations," such as the safety of nursing home residents and the countervailing safety concerns related to overcrowding hospitals.  *Lombardi*, 485 F.3d at 83.  Such a situation is the exact kind envisioned by the Second Circuit in *Lombardi*.  The law is intentionally designed to ensure that due process liability to does not "inhibit or control policy decisions of government agencies [in circumstances such as these], even if some decisions could be made to seem gravely erroneous in retrospect."  *Id.* at 84.

Moreover, while Plaintiffs focus in their opposition brief on arguing that the March 25th Directive violated substantive due process, and do not address at length how the DOH Report may also have done so (*see* Pl. Opp. 24-32), the Court briefly notes that Plaintiffs have failed to plead a constitutional violation relating to the DOH Report.  Plaintiffs assert that the DOH Report failed to provide "accurate and reliable information during a public health emergency." (*Id.* at 31).  However, for many of the same reasons already discussed, Plaintiffs have failed to show how this conduct, even when read in the light most favorable to them, constitutes action that "shock[s] the contemporary conscience" — especially in the context of an unfolding public health

emergency.  *Lombardi*, 485 F.3d at 84.  For this reason as well, Plaintiffs have

failed to plead a substantive due process violation.[6]

> **b.    Plaintiffs Have Failed to Allege a Violation of the FNHRA**

In the Amended Complaint, Plaintiffs summarily state that Defendants

"through their shocking actions and omissions, interfered with the rights

guaranteed by federal statutes and regulations, like the Federal Nursing Home

Reform Act, 42 U.S.C[. § ]1396r, 42 U.S.C. [§] 1395i-3, and 42 [C.F.R. §] 483."

(AC ¶ 174).  Defendants argue that this threadbare reference to the statute is

insufficient to plead a violation of the FNHRA.  (*See* Zucker Br. 8 n.5 ("Plaintiffs

fail to allege any specific rights under" FNHRA); DeRosa Br. 17 (arguing that

Plaintiffs "do not even identify any FNHRA-protected rights that were allegedly

violated"); Cuomo Br. 18 n.25 (arguing that a general reference to FNHRA "is

---

[6]    In their opposition brief, Plaintiffs argue for the first time that the March 25th Directive should be analyzed under a strict scrutiny standard.  In doing so, Plaintiffs aver that strict scrutiny applies because the March 25th Directive was "not of general applicability, [and] it imposed greater strain on a specific group, i.e., vulnerable, elderly, and frail nursing home residents."  (Pl. Opp. 14).  However, Plaintiffs misapprehend the law.  To begin, age is not a suspect classification and thus rational basis review would govern the Court's analysis.  *See We The Patriots USA, Inc.* v. *Conn. Off. of Early Childhood Dev.*, 76 F.4th 130, 158 (2d Cir. 2023) ("Under the Equal Protection Clause, claims that the government has discriminated based on age are typically subject to rational basis review because age is not a suspect classification."), *cert. denied*, 144 S. Ct. 2682 (2024).  What is more, even if the Court were to apply the scrutiny-based standard to Plaintiffs' claims, it would apply rational basis scrutiny and evaluate Plaintiffs' claims under the deferential standard articulated in *Jacobson* v. *Massachusetts*, 197 U.S. 11 (1905), pursuant to which "state and local authorities are granted substantial deference in enacting measures 'to prevent the spread of contagious disease' during public health crisis.'"  *Jones* v. *Cuomo*, 542 F. Supp. 3d 207, 217 (S.D.N.Y. 2021) (quoting *Jacobson*, 197 U.S. at 35); *see also We The Patriots USA, Inc.* v. *Hochul*, 17 F.4th 266, 290 (2d Cir. 2021) (applying *Jacobson* to uphold decision to require healthcare facility employees to be vaccinated against COVID-19).  Under such a standard, Plaintiffs' claims also fail because Plaintiffs have not shown that the March 25th Directive had no "real or substantial relation" to the public health crisis.  *See, e.g.*, *Clementine Co., LLC* v. *Adams*, 74 F.4th 77, 84 (2d Cir. 2023) (upholding vaccination requirements that "plainly had a real and substantial relation to the City's public health goal of combatting the COVID-19 pandemic").

insufficient to state a claim")).  The Court agrees that this conclusory statement does not withstand a motion to dismiss, and Plaintiffs cannot correct this pleading deficiency in their opposition briefing.  *See, e.g.*, *Goode* v. *Westchester County*, No. 18 Civ. 2963 (NSR), 2019 WL 2250278, at *2 (S.D.N.Y. May 24, 2019) ("[T]he court can only consider facts raised in the pleading and not those introduced in the opposition papers."); *Maxim Grp. LLC* v. *Life Partners Holdings, Inc.*, 690 F. Supp. 2d 293, 308 (S.D.N.Y. 2010) (confirming that "a party cannot amend its pleading through its opposition brief" (collecting cases)).

However, even if Plaintiffs had provided sufficient facts to support this allegation, the Court would still find that Plaintiffs failed to state a Section 1983 claim based on a violation of the FNHRA.  While the Supreme Court ruled in *Health and Hospital Corporation of Marion County* v. *Talevski*, 599 U.S. 166, 184-86 (2023), that Congress unambiguously created a private right of action for certain FHNRA provisions, enforceable through Section 1983, against nursing homes that receive Medicaid funds, the decision does *not* mean that the FNHRA provides a basis for plaintiffs to pursue claims against Defendants. Plaintiff fails to show that the FNHRA can be enforced against Defendants, who, unlike federally-funded nursing homes, are not the recipients of federal funds, as defendants must be when plaintiffs seek to enforce Spending Clause legislation against them.  *See Davis Next Friend LaShonda D.* v. *Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 641 (1999) ("The Government's enforcement power may only be exercised against the funding recipient[.]"); *Washington* v. *Gonyea*,

731 F.3d 143, 145-46 (2d Cir. 2013) ("Congress'[s] spending power ... allows the imposition of conditions, such as individual liability, only on those parties actually receiving the state funds." (internal citation omitted)).

In decisions issued after *Talevski*, courts have limited the FNHRA's reach, finding, for instance, that the FNHRA does not provide "a private right of action against private parties," including private nursing homes. *Zietek* v. *Pinnacle Nursing & Rehab Ctr.*, No. 21 Civ. 5488 (AT) (JLC), 2024 WL 243436, at *5 (S.D.N.Y. Jan. 23, 2024) ("[T]he Nursing Home Reform Act's provisions do not confer a right of action on [the plaintiff] that can be enforced against a private nursing home[.]" (citing *Prince* v. *Dicker*, 29 F. App'x 52, 54 (2d Cir. 2002) (summary order))); *see also Arbeeny* v. *Cuomo*, No. 22 Civ. 2336 (LDH) (LB), 2025 WL 71729, at *8 (E.D.N.Y. Jan. 10, 2025) ("Plaintiffs bring claims against state officials for the issuance of public health regulations governing the admission of residents to nursing homes and adult care facilities in the midst of an unprecedented global pandemic. *Talevski* does not contemplate the circumstances presented by the instant case."). Accordingly, because Plaintiffs have failed to specify their FNHRA claim, or to demonstrate the basis by which the statute allows for claims against Defendants, Plaintiffs' allegations related to FNHRA are insufficient to support a claim under Section 1983.

### c. Plaintiffs Have Failed to Allege Personal Involvement by Defendant DeRosa

While the above pleading deficiencies are sufficient bases to dismiss Plaintiffs' Section 1983 claim, the claim arguably also fails as to one or more

Defendants for lack of personal involvement.  To review, "[i]t is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [Section 1983]." *Shomo* v. *City of New York*, 579 F.3d 176, 184 (2d Cir. 2009) (quoting *Colon* v. *Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (internal quotation marks omitted)). "[A] plaintiff must directly plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'" *Tangreti* v. *Bachmann*, 983 F.3d 609, 612 (2d Cir. 2020) (quoting *Iqbal*, 556 U.S. at 676).  Plaintiffs "cannot rely on a separate test of liability specific to supervisors."  *Id.* at 619.  As such, it is insufficient to allege "merely" that the defendant "held a high position of authority," *Black* v. *Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996), or was "in the chain of command," *Thomas* v. *Jacobs*, No. 19 Civ. 6554 (CS), 2025 WL 662899, at *20 (S.D.N.Y. Feb. 28, 2025).

Among the three Defendants, DeRosa's arguments regarding her lack of personal involvement in Plaintiffs' claims are particularly strong.  (*See* DeRosa Br. 11-12).  Indeed, Plaintiffs conceded during the Court's pre-motion conference that DeRosa's name does not appear "at the top" of the March 25th Directive.  (*Id.* at 11).  The Court believed this to be the last word on the issue. However, in the Amended Complaint filed after the conference, Plaintiffs continue to allege that "Defendants Cuomo, Zucker, and DeRosa were at the top of the deadly March 25th Directive."  (AC ¶ 64).  In their opposition brief, Plaintiffs attempt to argue that this was inartful pleading, and that Plaintiffs

intended to convey that "Defendants were active and principal participants in the creation of" the March 25th Directive.  (Pl. Opp. 33 n.8).  The Court finds this explanation unconvincing, and urges Plaintiffs to exercise greater care when alleging facts before this Court.  Moreover, in light of the concession that DeRosa's name does not appear at the top of the March 25th Directive, the Amended Complaint lacks specific factual allegations tying DeRosa to the March 25th Directive or the development of its underlying policy.  Plaintiffs must do more than rely upon DeRosa's former position of authority in New York State government to plausibly allege personal involvement sufficient to sustain a Section 1983 claim.  *See Tangreti*, 983 F.3d at 618 ("[T]here is no special rule for supervisory liability[.]"); *Back* v. *Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 127 (2d Cir. 2004) ("An individual cannot be held liable for damages under § 1983 'merely because he held a high position of authority,' but can be held liable if he was personally involved in the alleged deprivation." (internal quotation marks omitted)).  Accordingly, lack of personal involvement provides an alternative basis for the dismissal of Count I against DeRosa.

Defendants Cuomo and Zucker similarly allege that Plaintiffs' claims should be dismissed against them because Plaintiffs merely rely on (i) their titles and (ii) the placement of their names at the top of the March 25th Directive to demonstrate personal involvement in the March 25th Directive and the DOH Report.  (Cuomo Br. 14-15; Zucker Br. 14-16).  In doing so, Cuomo places particular weight on Judge Hector Gonzalez's analysis in *Mauro* v.

*Cuomo*, wherein the court found no personal involvement of then-Governor Cuomo in the issuance of a health advisory that recommended nursing homes prohibit visitations during COVID, except when medically necessary.  No. 21 Civ. 1165 (HG) (ARL), 2023 WL 2403482 (E.D.N.Y. Mar. 8, 2023).  In that case, Judge Gonzalez reasoned that "[w]hile it is true that Defendant Cuomo participated in issuing executive orders and guidance regarding the COVID-19 pandemic, [the nursing home] was responsible for enforcing those mandates and had discretion in determining whether Plaintiffs qualified for an exception under said guidance."  *Id.* at *5.  However, here, the Amended Complaint does more than allege that Cuomo's and Zucker's names were on top of the advisory and, instead, alleges that the two Defendants were involved with the policy's actual administration.  *See Stone #1* v. *Annucci*, No. 20 Civ. 1326 (RA), 2021 WL 4463033, at *9 (S.D.N.Y. Sept. 28, 2021) (discussing how policymakers can still be held liable post-*Tangreti* for their role in the "promulgation of an unconstitutional policy").  For example, Zucker is alleged to have spoken about the policy and to have been involved in defending the DOH Report.  (AC ¶¶ 125, 133).  As such, the Court cannot say that Cuomo and Zucker lacked personal involvement in the March 25th Directive or the DOH Report.  Even so, however, this does not change the Court's ultimate decision regarding dismissal of Count I, because Plaintiffs are still unable to plead a violation of Section 1983 under any purported theory of liability.

###### d.    Plaintiffs Have Failed to Allege a Conspiracy to Violate Section 1983

In addition to bringing a substantive claim for violation of Section 1983, Plaintiffs allege in Count I that Defendants "took part [i]n a conspiracy that resulted in the deprivation of nursing home residents' civil rights." (AC ¶ 175). A plaintiff bringing a Section 1983 conspiracy claim "must allege [i] an agreement between a state actor and a private party; [ii] to act in concert to inflict an unconstitutional injury; and [iii] an overt act done in furtherance of that goal causing damages." *Ciambriello* v. *County of Nassau*, 292 F.3d 307, 324-25 (2d Cir. 2002) (citing *Pangburn* v. *Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999). "In addition, 'complaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed; diffuse and expansive allegations are insufficient, unless amplified by specific instances of misconduct.'" *Id.* at 325 (quoting *Dwares* v. *City of New York*, 985 F.2d 94, 100 (2d Cir. 1993) (internal quotation marks omitted and alteration adopted)). Rather, "[t]he facts alleged must constitute 'a meeting of the minds' between defendants to show a conspiracy." *Marquez* v. *Hoffman*, No. 18 Civ. 7315 (ALC), 2021 WL 1226981, at *23 (S.D.N.Y. Mar. 31, 2021) (quoting *Webb* v. *Goord*, 340 F.3d 105, 10-11 (2d Cir. 2003)). And of course, "[w]here [the] [p]laintiff has failed to plead a claim for a violation of her constitutional rights, her conspiracy claim fails as well." *Id.* (citing *Dowd* v. *DeMarco*, 314 F. Supp. 3d 576, 587 (S.D.N.Y. 2018)); *see also Singer* v. *Fulton Cnty. Sheriff*, 63 F.3d 110, 119 (2d Cir. 1995) ("[A]lthough the pleading of a [Section 1983] conspiracy

will enable a plaintiff to bring suit against purely private individuals, the lawsuit will stand only insofar as the plaintiff can prove the *sine qua non* of a [Section] 1983 action: the violation of a federal right.").  Here, Plaintiffs' conspiracy claim necessarily fails because Plaintiffs have not adequately pleaded a violation of their constitutional or statutory rights.  *See, e.g.*, *Curley* v. *Village of Suffern*, 268 F.3d 65, 72 (2d Cir. 2001).  Moreover, Plaintiffs fail to allege in a non-conclusory manner the overt acts and the agreement that allegedly comprised this conspiracy.  *See Lee* v. *Law Office of Kim & Bae, PC*, 530 F. App'x 9, 10 (2d Cir. 2013) (summary order) ("Absent from [the plaintiff's] second amended complaint are allegations, made in a non-conclusory way, setting out the overt acts, and the agreement, that allegedly comprised the conspiracy.").  Accordingly, insofar as it is construed as a claim for conspiracy to violate Section 1983, Count I must also be dismissed.

### e. Plaintiffs' Claims Are Barred by Qualified Immunity

Even if Plaintiffs had asserted a viable claim under Section 1983 (which they have not), the claim would be barred by qualified immunity.  "Qualified immunity shields government officials performing discretionary functions from suits for money damages unless their conduct violates clearly established law of which a reasonable official would have known."  *Nat'l Rifle Ass'n of Am.* v. *Vullo*, 49 F.4th 700, 714 (2d Cir. 2022), *vacated and remanded on other grounds*, 602 U.S. 175 (2024).  The doctrine is intended to "give[] government officials the breathing room to make reasonable even if mistaken, judgments

and protects all but the plainly incompetent or those who knowingly violate the law." *Id.* (quoting *Malley* v. *Briggs*, 475 U.S. 335, 341 (1986)).

"The Supreme Court has instructed that '[q]ualified immunity balances two important interests — the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Vega* v. *Semple*, 963 F.3d 259, 272 (2d Cir. 2020) (quoting *Pearson* v. *Callahan*, 555 U.S. 223, 231 (2009)).  The defense will shield federal and state officials from money damages unless a plaintiff sufficiently pleads "[i] that the official violated a statutory or constitutional right, and [ii] that the right was 'clearly established' at the time of the challenged conduct." *Id.* at 273 (quoting *Ashcroft* v. *al-Kidd*, 563 U.S. 731, 735 (2011)).  A defendant has the burden of proving the affirmative defense of qualified immunity.  *See Gomez* v. *Toledo*, 446 U.S. 635, 640-41 (1980).

As discussed previously, *see supra* in section B.1.a, the Court finds that Plaintiffs have not sufficiently pleaded a qualifying violation of their rights. Therefore, Plaintiffs clearly fail to meet their burden under the first prong of the two-part test to defeat a qualified immunity defense.  In the interests of completeness, however, the Court concludes that neither Plaintiffs' claimed constitutional rights nor their statutory rights under the FNHRA were clearly established when the March 25th Directive was issued.  Thus, Plaintiffs' Section 1983 claim is also barred by qualified immunity.

### i.    Constitutional Rights

Under the second prong of the qualified immunity analysis, "a case directly on point" is not required "for a right to be clearly established." *White* v. *Pauly*, 580 U.S. 73, 78-79 (2017) (*per curiam*) (internal quotation marks omitted).  That being said, "existing precedent must have placed the statutory or constitutional question *beyond debate.*"  *Id.* (emphasis added) (quoting *Mullenix* v. *Luna*, 577 U.S. 7, 12 (2015)); *see also Douglas* v. *City of New York*, No. 18 Civ. 9327 (KPF), 2022 WL 294075, at *8 (S.D.N.Y. Feb. 1, 2022) ("The Supreme Court has 'repeatedly stressed that courts must not define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced.'" (quoting *D.C.* v. *Wesby*, 583 U.S. 48, 63-64 (2018))).  "A right is 'clearly established' when '[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"  *Vincent* v. *Yelich*, 718 F.3d 157, 166 (2d Cir. 2013) (alterations in original) (quoting *Jackler* v. *Byrne*, 658 F.3d 225, 242 (2d Cir. 2011)).  Put differently, "an official is immune from liability unless, under the particular circumstances the official faced, any 'reasonable offic[ial]' would 'have known for certain that the conduct was unlawful' under then-existing precedent." *Liberian Cmty. Ass'n of Conn.* v. *Lamont*, 970 F.3d 174, 187 (2d Cir. 2020) (alterations in original) (quoting *Ziglar* v. *Abbasi*, 582 U.S. 120, 152 (2017)).  Here, Plaintiffs' alleged constitutional violations fail to meet this standard because "other infectious disease cases had [not] clearly articulated the

substantive due process standard" that Plaintiffs argue should govern Defendants' actions. *Id.* at 191.

This precise conclusion was reached by Judge LaShann DeArcy Hall in an analogous case in the Eastern District of New York, which case also involved constitutional claims against Defendants for their issuance of the March 25th Directive. *See Arbeeny* v. *Cuomo*, 2025 WL 71729, at *1. In that case, Judge DeArcy Hall determined that qualified immunity barred the plaintiffs' claims because the plaintiffs "fail[ed] to cite to any case similar in fact to the one at hand that would demonstrate, beyond debate, that these due process rights were clearly established in the context of public health policy decisions at the time of the issuance of the [March 25th Directive]." *Id.* at *10. Moreover, Judge DeArcy Hall emphasized that qualified immunity is intended to "protect officials when their jobs require them to make difficult on-the-job decisions," which is especially prevalent in the "context of a public health emergency." *Id.* (quoting *DiBlasio* v. *Novello*, 413 F. App'x 352, 356 (2d Cir. 2011) (summary order)).

The Court agrees with this analysis. As various courts have held, "it is implausible that 'every reasonable official' would have understood issuing or enforcing public health policies [during the COVID-19 pandemic] violated the plaintiffs' rights." *Bastian* v. *Lamont*, No. 21 Civ. 1249 (JCH), 2022 WL 2477863, at *7 (D. Conn. July 6, 2022) (quoting *Jacobson* v. *Massachusetts*, 197 U.S. 11, 31 (1905)); *see also Estate of DeRosa* v. *Murphy*, No. 22 Civ. 2301 (ESK) (AMD), 2025 WL 249169, at *3 (D.N.J. Jan. 21, 2025) (dismissing similar

claims premised on a nearly identical directive issued by the State of New Jersey because, in part, plaintiff failed to plead a clearly established right at the time of the challenged conduct); *cf. Liner* v. *Hochul*, No. 21 Civ. 11116 (ER), 2023 WL 358826, at *5 (S.D.N.Y. Jan. 23, 2023) (dismissing COVID-19-related claims based on qualified immunity). And even if Defendants had violated federal law, qualified immunity "shields government officials from liability when they make reasonable mistakes about the legality of their actions." *Sudler* v. *City of New York*, 689 F.3d 159, 174 (2d Cir. 2012) (internal quotation marks omitted). Accordingly, qualified immunity independently bars Plaintiffs' constitutional claims.

### ii.    The FNHRA

The Court likewise finds that Plaintiffs have failed to demonstrate that the law around the FNHRA was clearly established at the time the March 25th Directive was issued. As Plaintiffs acknowledge, it was only the "[o]n the heels of" the Supreme Court's decision in *Talevski* that there was "no longer any doubt that FNHRA 'can create 1983-enforceable rights.'" (Pl. Opp. 18 (quoting *Talevski*, 599 U.S. at 180)). Because that decision was issued three years after the March 25th Directive went into effect, the law could not have been "clearly established" during the relevant time period.

This conclusion was also reached by Judge DeArcy Hall in *Arbeeny*. When considering a Rule 12(b)(6) argument that the plaintiffs' claims under the FHNRA were barred by qualified immunity, Judge DeArcy Hall noted that "[p]rior to the Supreme Court's ruling in *Talevski*, courts around the country,

and within the Second Circuit, were split as to whether the FNHRA conferred a private right of action enforceable under Section 1983." *Arbeeny*, 2025 WL 71729, at *8. "This disagreement at the time of the issuance of the [March 25th Directive] forecloses a finding that a reasonable officer would have known that the issuance of the advisories would violate residents' rights under the FNHRA." *Id.* This Court agrees with Judge DeArcy Hall's thoughtful analysis, which observes that "[i]t is axiomatic that for a case to provide the basis to claim that the law articulated therein was clearly established to defeat a claim of qualified immunity, the case must predate the conduct at issue." *Id.*; *see also Reichle* v. *Howard*, 566 U.S. 658, 669-70 (2012) (noting that "[i]f judges [ ] disagree on a constitutional question, it is unfair to subject [officials] to money damages for picking the losing side of the controversy" (internal quotation marks omitted)).

Moreover, as discussed *supra* in section B.1.b, while the *Talevski* decision confirmed that the FNHRA confers a private right of action that can be enforced against state-run nursing home facilities under Section 1983, "[t]his broad proposition is insufficient to support a finding that the Decedents' rights under the FNHRA were clearly established with respect to public health regulations imposed by the state." *Arbeeny*, 2025 WL 71729, at *8; *see also Estate of DeRosa*, 2025 WL 249169, at *3 ("Here, plaintiffs bring claims against state officials for the issuance of promulgations governing the admission of residents to nursing homes during the unprecedented COVID-19 pandemic. *Talevski* neither 'contemplate[s] the circumstances presented by the instant

case' nor 'place[s] the statutory or constitutional questions raised in this case beyond debate." (alterations in original) (quoting *Arbeeny*, 2025 WL 71729, at *8)).  Accordingly, because the law was not settled at the time of the March 25th Directive, and even now *Talevski* does not put the statutory questions beyond debate, Plaintiffs' FNHRA claims are precluded by qualified immunity.

Recognizing the insurmountable hurdle of qualified immunity, Plaintiffs urge the Court to defer its judgment on this question because "[t]here are issues of fact and credibility that will need to be determined by the jury, including the extent of each Defendants' personal involvement in the design and implementation of the [March 25th Directive]."  (Pl. Opp. 41).  However, "federal courts around the country have granted state officials qualified immunity at the motion to dismiss stage for restrictions implemented during the COVID-19 pandemic."  *Mauro*, 2023 WL 2403482, at *6 (collecting cases); *see also Whitfield* v. *City of New York*, No. 20 Civ. 674 (JMF), 2025 WL 327312, at *2 (S.D.N.Y. Jan. 29, 2025) ("[T]he Second Circuit explained ... that it saw 'no reason why even a traditional qualified immunity defense may not be asserted on a Rule 12(b)(6) motion as long as the defense is based on facts appearing on the face of the complaint[.]" (quoting *McKenna* v. *Wright*, 386 F.3d 432, 436 (2d Cir. 2004))).  The Court takes the same approach here and concludes that it is clear at the pleading stage that Defendants are entitled to qualified immunity.  For all of these reasons, the Court dismisses Count I with prejudice.

> **2.    The Court Declines to Exercise Supplemental Jurisdiction over Plaintiffs' State-Law Claims**

A district court may decline to exercise supplemental jurisdiction over state and city law claims if "the district court has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c).  Indeed, "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine — judicial economy, convenience, fairness, and comity — will point toward declining to exercise jurisdiction over the remaining state-law claims." *Pension Benefit Guar. Corp. ex rel. Saint Vincent Cath. Med. Ctrs. Ret. Plan* v. *Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 727 (2d Cir. 2013) (quoting *Valencia ex rel. Franco* v. *Lee*, 316 F.3d 299, 305 (2d Cir. 2003)); *see also Klein & Co. Futures, Inc.* v. *Bd. of Trade of City of New York*, 464 F.3d 255, 262 (2d Cir. 2006) ("It is well settled that where, as here, the federal claims are eliminated in the early stages of litigation, courts should generally decline to exercise pendent jurisdiction over remaining state law claims.").

Having dismissed Plaintiffs' federal claim over which the Court has original jurisdiction, the Court declines to exercise supplemental jurisdiction over the remaining state-law claims.  At this stage in the litigation, judicial economy will not be served by the Court retaining the state-law claims, particularly because discovery has not begun and Plaintiffs' federal claim has been eliminated "prior to the investment of significant judicial resources." *Kolari* v. *N.Y.-Presbyterian Hospital*, 455 F.3d 118, 123 (2d Cir. 2006).  Accordingly, Plaintiffs' state-law claims for New York civil-rights violations

(Count II), conscious pain and suffering (Count III), wrongful death (Count IV),
gross negligence (Count V), and intentional infliction of emotional distress
(Count VI) are dismissed without prejudice to their refiling in state court.

### 3.    The Court Will Not Grant Leave to Amend

The remaining issue concerns further amendment of Plaintiffs' pleadings.
On December 10, 2024, Plaintiffs requested leave to file a second amended
complaint. (Dkt. #57). Defendants opposed this request, arguing that the
flaws in Plaintiffs pleadings were incurable. (Dkt. #60 at 2). The Court
ultimately denied Plaintiffs' request, without prejudice to its renewal after
resolution of the instant motions. (Dkt. #61).

"Rule 15(a)(2) of the Federal Rules of Civil Procedure provides that a
court 'should freely give leave [to amend] when justice so requires.'" *Gorman* v.
*Covidien Sales, LLC*, No. 13 Civ. 6486 (KPF), 2014 WL 7404071, at *2 (S.D.N.Y.
Dec. 31, 2014) (alterations in original) (quoting Fed. R. Civ. P. 15(a)(2)).
Consistent with this liberal amendment policy, "[t]he rule in this Circuit has
been to allow a party to amend its pleadings in the absence of a showing by the
nonmovant of prejudice or bad faith." *Id.* (alterations in original) (quoting *Block*
v. *First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993)). That being said, "it
remains 'proper to deny leave to replead where ... amendment would be futile.'"
*Gorman*, 2014 WL 7404071, at *2 (quoting *Hunt* v. *All. N. Am. Gov't Income Tr.,
Inc.*, 159 F.3d 723, 728 (2d Cir. 1998)). Given the analysis above, the Court
does not believe that further amendment would remedy the pleading
deficiencies outlined in this Opinion. *See Baines* v. *Nature's Bounty (NY), Inc.*,

No. 23-710-cv, 2023 WL 8538172, at *3 (2d Cir. Dec. 11, 2023) (summary order) (finding no abuse of discretion in denying leave to amend where plaintiffs had "already amended their complaint once in the face of a pre-motion letter from Defendants," and then "requested leave to amend again in a single, boilerplate sentence without specifying what allegations they could add or how amendment would cure any deficiencies"); *Binn* v. *Bernstein*, No. 19 Civ. 6122 (GHW) (SLC), 2020 WL 4550312, at *34 (S.D.N.Y. July 13, 2020) ("To grant Plaintiffs leave to amend would be allowing them a 'third bite at the apple,' which courts in this district routinely deny." (collecting cases)), *report and recommendation adopted*, No. 19 Civ. 6122 (GHW), 2020 WL 4547167 (S.D.N.Y. Aug. 6, 2020).  Accordingly, the Court declines to grant Plaintiffs leave to amend.

## CONCLUSION

Based upon the foregoing analysis, the Court hereby GRANTS Defendants' motions to dismiss the Amended Complaint.  The Court's sympathy for Plaintiffs and their loved ones simply cannot supplant governing law.  The Court dismisses Count I with prejudice, and Counts II through VI without prejudice.  The Clerk of Court is directed to terminate all pending motions, terminate all remaining dates, and close this case.

SO ORDERED.

Dated:    March 31, 2025
          New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge